**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No.: 23-cv-1211**

THE ESTATE OF CRISTO JESUS CANETT,
by and through its personal representative Elizabeth Naranjo;

      Plaintiff,

v.

WELLPATH, LLC;
THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF EL PASO,
COLORADO;
SHERIFF JOSEPH ROYBAL, in his official capacity;
ANTHONY LUPO, individually;
MICHELLE SILVA, individually;
MAKAYLA PATTERSON, individually;
JENNENE SCOTT, individually;

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, by and through their attorneys of HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC, complains against Defendants and requests a trial by jury as follows:

## I.  INTRODUCTION

1.      Cristo Canett died a gruesome, painful and entirely preventable death while incarcerated in the El Paso County Jail.

2.      Mr. Canett took himself to the emergency room because of his severe back and flank pain.

3.      He was recklessly arrested at the hospital after he was triaged and waiting to be taken back to see the nurses and doctor.

4.      When Mr. Canett arrived at the El Paso County Jail, without having been medically evaluated at the ER, his pain had grown worse, spreading to his abdomen and right shoulder. Mr. Canett told jail nurses about his new emergency symptoms of abdominal and shoulder pain, asking to see a nurse and doctor.

5.      Mr. Canett's pain became so bad he needed a wheelchair. He was pale, clammy, had labored breathing, shortness of breath, and was in obvious severe pain and medical distress.

6.      Deputies called the jail medical unit for help several times, but Wellpath staff did nothing in response. They did not send him to the hospital where they knew he had tried to go the day before when he was arrested. They did not even call a doctor to report these abnormal symptoms. No nurse or doctor ever assessed or treated Mr. Canett at the jail.

7.      Mr. Canett was suffering from a duodenal ulcer, which finally perforated early in the morning on April 26, 2022, causing him to internally bleed to death on the floor of his cell.

## II.  JURISDICTION AND VENUE

8.      This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution, and 42 U.S.C. § 1983 and 42 U.S.C. § 1988.  The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

9.      This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

10.     Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

11.     The state law claim in this matter is brought pursuant to Colo. Rev. Stat. § 13-21-131.  The Colorado Governmental Immunity Act does not apply to such claims and no notice of claims was required. C.R.S.A. §13-21-131(2)(a).

### III.  PARTIES

12.     At all times pertinent hereto, the decedent, Cristo Canett, was a resident of the State of Colorado and a citizen of the United States of America.

13.     At all times relevant hereto, Plaintiff Elizabeth Naranjo was a resident of the State of Colorado and a citizen of the United States of America.  Plaintiff Elizabeth Naranjo is the sister of Cristo Canett and the Personal Representative of his Estate, which was opened in El Paso County.

14.     Defendant The Board of County Commissioners of the County of El Paso Colorado, a/k/a "BOCC" is a governmental entity chartered under the laws of the State of Colorado. Among other things, El Paso County, through the El Paso County Sheriff's Office ("Sheriff"), operates the El Paso County Criminal Justice Center ("CJC" or "the jail"), located at 2739 E. Las Vegas St., Colorado Springs, Colorado 80906.

15.     Defendant BOCC represents, oversees, and sets policy for El Paso County Colorado. The BOCC also contracted with Defendant Wellpath, LLC ("Wellpath") to provide health care to detainees and inmates at the jail.

16.     Defendant Joseph Roybal, in his official capacity, is the El Paso County Sheriff and is a final policy maker for El Paso County with respect to all matters concerning the Sheriff's Office and all of its divisions, including the El Paso County Criminal Justice Center ("CJC" or "the jail").

17. The El Paso County Sheriff and the BOCC are collectively referred to herein as "El Paso County," or "the County."

18. County Defendants are properly sued under 42 U.S.C. § 1983 for their own deliberately indifferent policies and practices with respect to the provision of medical care and treatment for inmates. They are also properly sued for the deliberately indifferent policies and practices of Wellpath, LLC. Although the County has sought to privatize the provision of healthcare services to its population of pre-trial detainees and post-conviction inmates, it has a non-delegable duty to provide constitutionally adequate care, cannot contract away its constitutional obligation, and is legally liable for the challenged deliberately indifferent polices, practices as moving forces in the deliberately indifferent medical care and treatment of persons detained in the jail, including Mr. Canett, by its contractors, their agents and employees including the named individual caregivers.

19. Defendant Wellpath, LLC ("Wellpath"), formally known as Correct Care Solutions, LLC ("CCS") is a private Delaware corporation doing business in the state of Colorado with its principal address located at 3340 Perimeter Hill Dr., Nashville, TN 37211, and its registered agent in Colorado, Corporate Creations Network, Inc., is located at 155 E. Boardwalk #490, Fort Collins, CO 80525.

20. Defendant Wellpath is a proper entity to be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff with respect to the provision of medical care and treatment for inmates. Since 2020, Defendant Wellpath has contracted with El Paso County to provide medical services to the jail's detainees and inmates, and supervises and implements such care. Upon entering into contracts or

subcontracts to provide medical and/or other services to El Paso County detainees and inmates, Wellpath assumed public functions, acted under color of state law, and is legally responsible to comply with all requirements of the United States Constitution.

21.     El Paso County Defendants and Defendant Wellpath are hereafter at times collectively referred to herein as the "Entity Defendants."

22.     At all times relevant hereto, Defendant Jennene Scott was a citizen of the United States and a resident of Colorado. Defendant Scott was a Sergeant working for the Colorado Springs Police Department and acting under color of state law.

23.     At all times relevant hereto, Defendant LPN Anthony Lupo was a citizen of the United States and a resident of Colorado. Defendant Lupo was an agent, employee, and/or subcontractor of Defendant Wellpath and was responsible for providing medical care to Cristo Canett during his detention. At all material times, this Defendant acted under color of state law.

24.     At all times relevant hereto, Defendant LPN Michelle Silva was a citizen of the United States and a resident of Colorado. Defendant Silva was an agent, employee, and/or subcontractor of Defendant Wellpath and was responsible for providing medical care to Cristo Canett during his detention. At all material times, this Defendant acted under color of state law.

25.     At all times relevant hereto, Defendant EMT Makayla Patterson was a citizen of the United States and a resident of Colorado. Defendant Patterson was an agent, employee, and/or subcontractor of Defendant Wellpath and was responsible for providing medical care to Cristo Canett during his detention. At all material times, this Defendant acted under color of state law.

26.     Defendants Lupo, Silva, and Patterson are referred to as the Individual Wellpath Defendants.

## IV. <u>STATEMENT OF FACTS</u>

27.     In April 2022, Christo Canett resided in a community corrections halfway house (ComCor) in Colorado Springs, Colorado.

28.     He had a job at the N. Academy Blvd. Whole Foods store and was moving towards being released in the next few months.

29.     Tragically, Mr. Canett died from a perforated duodenal ulcer on the floor of his cell in excruciating pain on April 26, 2022.

30.     A duodenal ulcer is a particular kind of peptic ulcer, located in the upper part of the small intestine or duodenum.

31.     If left untreated, ulcers can cause severe internal bleeding, an obstruction of the digestive tract, or a perforation. A perforation is an ulcer which effectively eats a hole through the wall of a person's stomach or duodenum.

32.     Symptoms of an ulcer include burning stomach, abdominal or back pain, which can spread to the shoulder, fainting or feelings of faintness, and nausea or vomiting, among other symptoms.

33.     Sudden and severe abdominal pain, which can also spread to the back or shoulder, is a very clear warning sign that an ulcer is perforating.

34.     A perforated duodenal ulcer is unquestionably an emergency medical condition; the rush of gastric juice and gas into the abdominal cavity causes infection of the abdominal lining, sepsis, and death.

35.     All reasonably trained health care workers understand that the signs and symptoms of an ulcer must be worked up and evaluated by a doctor because of the serious risk of sepsis and

death associated with a perforated ulcer.

36.    All reasonably trained health care workers understand that a perforated ulcer is a medical emergency requiring immediate medical attention, workup by a physician, an abdominal exam, and frequently further testing or treatment by endoscopy, X-ray, or emergency surgery.

### Mr. Canett Was Recklessly Removed from the St. Francis ER Waiting Room by CSPD Sgt. Scott Before He Could Be Evaluated by a Doctor

37.    On April 24, 2022, Mr. Canett went to St. Francis Medical Center Emergency Department because he was in severe unexplained pain. He drove himself in the car he shared with his sister.

38.    Mr. Canett had recently gone to this same emergency department ten days prior, on April 14, 2022, with complaints of ongoing right flank pain that had persisted for two weeks. He was evaluated and treated at the ER with discharge instructions, including a referral to physical therapy, and told to return to the emergency room if his symptoms worsened. As his symptoms of pain persisted and worsened, and he had been vomiting all day, Mr. Canett returned ten days later on April 24, 2022.

39.    While Mr. Canett was waiting to be seen, he and his sister, Elizabeth Naranjo, got into a verbal argument about who had the right to be using their shared car at the time, and Ms. Naranjo's husband called the police.

40.    When Officers from the Colorado Springs Police Department ("CSPD") arrived at St. Francis around 11:45 p.m., they found Ms. Naranjo and her husband waiting by the disputed car in the parking lot just outside the St. Francis Emergency Room (ER).

41.    Mr. Canett was then sitting inside the St. Francis ER waiting room. He had been triaged by the emergency department nurses, who charted his blood pressure as 138/78, his

respirations 18, his pulse a borderline tachycardic 99, and his "severe pain," (7 on a scale of 10).

42.     Mr. Canett was in the ER waiting room wearing a white hospital bracelet and waiting to be medically evaluated when CSPD officers arrived, responding to the report about the disputed car.

43.     The first CSPD Officers to arrive were Sgt. Jennene Scott and Ofc. Alison Steinhardt.

44.     Sgt. Scott arrived at the St. Francis ER and came upon Ofc. Steinhardt talking in the parking lot with Mr. Canett's sister Elizabeth and her husband.

45.     While Ofc. Steinhardt continued talking with Ms. Naranjo and her husband about the disputed car, Sgt. Scott went inside the ER and spoke to a security staff member about contacting Mr. Canett, then sitting in the waiting room to see a doctor.

46.     Sgt. Scott, now joined by Ofc. Steinhardt, went over to Mr. Canett and asked him to explain what was going on. Mr. Canett told officers he went to the ER for medical treatment.

47.     Although Ms. Naranjo told officers she did not want to press any charges against her brother related to the car, Sgt. Scott told Mr. Canett that he had an outstanding warrant for alleged "escape" from ComCor.

48.     Mr. Canett was surprised to learn about this warrant, because he had been in contact with ComCor about his need for medical care and going to the emergency room, so he didn't understand why there would be a warrant out for his alleged failure to return.

49.     Thus, when Mr. Canett called ComCor, staff told Sgt. Scott that they did not mean to submit an 'escape' warrant because they knew he was at the hospital.

50.     Nevertheless, Sgt. Scott decided to handcuff and arrest Mr. Canett at the hospital,

8

forcing him to leave the ER while knowing he had yet to be actually seen by a doctor or receive any treatment.

51.     After escorting Mr. Canett outside, Sgt. Scott went back into the ER waiting room and asked the ER receptionist about Mr. Canett's status.

52.     The ER receptionist told Sgt. Scott that Mr. Canett was waiting to be seen for his pain. Sgt. Scott baselessly responded that she didn't think Canett needed to be seen for his back pain, but she would come back to discuss next steps, knowing that the hospital itself had already determined that Mr. Canett did need to be seen.

53.     Despite being told by hospital staff that Mr. Canett was waiting to be seen for his medical complaints, Sgt. Scott did not allow Mr. Canett to receive any medical evaluation and treatment. She arrested him and forced him to go to jail *before he was seen by a doctor, evaluated, and cleared to leave the emergency department.*

54.     Sgt. Scott chose not to talk to any medical professional about whether it was safe for Mr. Canett not to be seen by a doctor, instead arrogating this critical medical decision to herself.

55.     As charted by St. Francis ER nurses, he was then in serious pain, 7 on a 10 scale, with ongoing unexplained back pain for the last two weeks, clear signs of a medical problem that needed a full workup at the hospital.

56.     Sgt. Scott, a medically untrained lay person, decided to refuse Mr. Canett medical care on the basis of nothing more than her own ill-informed personal opinion that Mr. Canett was seeking drugs. Thus, Sgt. Scott falsely and recklessly concluded that Mr. Canett had gone to the hospital because he was 'med seeking,' *i.e.* faking his medical condition to get drugs.

57.     When Mr. Canett took himself to the St. Francis ER twice in less than two weeks,

he was not, in fact, "med-seeking." He was suffering from a severe and worsening ulcer that was going to perforate and kill him the next day.

58.     Knowing that the hospital would object to their patient being arrested without being evaluated for a medical emergency (such as the one Mr. Canett had), Sgt. Scott did not return to the desk to discuss next steps as she told ER medical staff she would do. Instead, Sgt. Scott instructed the hospital security guard (who sits outside the emergency room) to tell the Nurse that Mr. Canett would not be coming back because she was taking him to jail.

59.     As a result, Mr. Canett never got to see the St. Francis doctor he desperately needed to see and he was never medically cleared to go to jail. Mr. Canett's hospital records unequivocally explain that he "[l]eft without being seen."

60.     It is deliberately indifferent for a police officer to supplant their own decision making for that of a patient and his medical team regarding what medical care is needed.

61.     Sgt. Scott's actions described above would have fatal consequences, made all the more egregious by the fact that ComCor personally informed her that any escape warrant was mistakenly submitted.

62.     Mr. Canett died approximately 26 hours later of a treatable ulcer (which later perforated) that could easily have been identified and treated at the hospital had Sgt. Scott not unconstitutionally decided to play Russian roulette with his life.

### Charge Nurse Anthony Lupo Recklessly Disregarded Mr. Canett's Serious Medical Complaints and Visibly Ill Appearance

63.     Mr. Canett arrived at the jail, where Officer Steinhardt told booking medical and deputy staff that Mr. Canett had been arrested at the hospital, but that he had not been seen because there was 'no reason' to get him medically cleared.

64.     Defendant Charge Nurse Michelle Silva, LPN, met Mr. Canett in the sally port to administer a COVID test before he was admitted to the jail.

65.     LPN Silva was told that Mr. Canett had been arrested at the hospital but that they didn't have any clearance paperwork for him, and she thus also actually knew that he had not been seen before being arrested at the ER.

66.     Mr. Canett was obviously feeling terrible as he was booked into the jail. He was leaning over the trash can, spitting up, looking like he was going to vomit, rubbing his abdomen, and leaning against the wall.

67.     He told the arresting officer he felt like he was going to throw up and was deliberately controlling his breathing, as if he was in a lot of pain.

68.     Ofc. Steinhardt then gave Mr. Canett's paperwork to the jail booking deputy, reiterating that there was no medical clearance conducted.

69.     Asked by the intake Deputy why Mr. Canett was at the hospital, Ofc. Steinhardt responded: "back pain."

70.     Mr. Canett told this booking deputy that he went to the hospital for back pain, felt sick, nauseous, and that he had been throwing up all day today. Throughout the initial booking process, Mr. Canett observably rubbed his abdomen, groaned, swore, and was obviously very sick.

71.     He asked the Deputy for a lower bunk restriction and asked to see a nurse.

72.     LPN Anthony Lupo conducted a receiving screening on Mr. Canett at or around 1:57 a.m. on April 25th.

73.     During the receiving screening, Mr. Canett was visibly in extreme pain. He was grimacing, crouching on the floor, leaning against the wall and asking for help.

11

74.     Mr. Canett was rubbing his abdomen, shoulder, and generally evincing extreme pain and obviously worsening condition.

75.     Any lay person (never mind medical professional) seeing his presentation would know that Mr. Canett was experiencing an emergency level of pain and deterioration.

76.     Nurse Lupo, despite seeing a person in front of him in dire circumstances, did nothing to even evaluate Mr. Canett.

77.     Mr. Canett reported to LPN Lupo during this receiving screening that he had recently been to the hospital, as illustrated in the screenshot below:

| 2200004973 | Receiving Screening | Were you treated at ED, hospital, or refused medical care in last 3 days? | Yes (Explain When, Where, Reason): | Lupo, Anthony | 04-25-2022 1:57 am |
|---|---|---|---|---|---|

78.     Mr. Canett reported to LPN Lupo during his screening, as illustrated below, that he was experiencing "right shoulder pain onset just now and stomach pains onset right now":

| 2200004973 | Receiving Screening | Other: | C/O RIGHT SHOULDER PAIN ONSET JUST NOW AND STOMACH PAINS ONSET RIGHT NOW | Lupo, Anthony | 04-25-2022 1:57 am |
|---|---|---|---|---|---|

79.     Sudden onset shoulder and stomach pain, especially in the context of weeks of back pain and persistent vomiting, are serious signs of a potential medical emergency. All reasonably trained medical staff know this, and that at the very least, these symptoms require a nursing assessment and to relay symptoms and findings to a provider, who would certainly know these to be potentially life-threatening symptoms.

80.     Nevertheless, LPN Lupo chose not to conduct any physical assessment, take a full set of vitals, or even refer Mr. Canett for any kind of follow-up medical attention, urgent or otherwise. He made no effort to request or review Mr. Canett's recent hospital records or conduct any assessment for his new and worsening symptoms. Even though the computerized record

system asks for an explanation of when, where, and the reason for medical care, Nurse Lupo left this blank.

81.     After ignoring obvious signs of a medical emergency, Mr. Lupo did not even house Mr. Canett in the Medical Unit where he could be monitored and seen by a jail doctor.

**Nurses Refused Mr. Canett Necessary Medical Care Despite Deputies Calling for Help**

82.     Mr. Canett continued to deteriorate over the course of Monday, April 25. The staffing plan for El Paso County jail calls for at least two provider level health care workers -- meaning a doctor or a nurse practitioner or a physician assistant (people who can diagnose and treat) -- to be on site, but Mr. Canett was not scheduled to see them.

83.     During the early evening on April 25, 2022, Mr. Canett interacted with deputies Divine, Przymu and Deluca all of whom saw that Mr. Canett was clearly suffering, in a great deal of pain, grimacing, and in bad health.

84.     Around 7:30 p.m. on April 25th, Deputy David Divine transferred Mr. Canett from one part of the jail to another in a wheelchair.

85.     Deputy Divine knew Mr. Canett from his previous time at this jail and could see that this was not his normal condition at all. Mr. Canett told Deputy Divine that he was at the hospital before he came to jail, and that he needed to be seen by a doctor.

86.     Deputy Divine assisted Mr. Canett out of his wheelchair and into his new cell.

87.     Deputy Cody Deluca, who also recognized Mr. Canett from a previous incarceration, witnessed this transfer and was told that Mr. Canett was not in great health. Deputy Deluca observed him to be slumped down in the wheelchair, pale and clammy, and not looking well. Mr. Canett was grunting and having labored breathing.

88.     Having finished his transport duties, deputies determined that Mr. Canett needed to keep the wheelchair in his cell and Deputy Divine spoke to LPN Silva about Mr. Canett's medical condition between 7:30 and 8:00 p.m.

89.     Charge Nurse Silva knew Mr. Canett had been arrested while at the hospital without any medical clearance while waiting to be seen by doctors, that he looked sick the day before when she saw him, complained of new shoulder and stomach pain at his intake screening, that over the last 18 hours he was no longer able to walk due to severe pain causing deputies who knew him to be very concerned for his health, and that he was now slumped down in a wheelchair, pale, clammy, grunting, and having labored breathing.

90.     Obviously, these serious symptoms and deterioration over the last day required an immediate escalation to a higher level of medical care but Nurse Silva was deliberately indifferent to Mr. Canett.

91.     Nurse Silva refused to go see Mr. Canett.

92.     Nurse Silva refused to call a provider to get the evaluation he obviously needed.

93.     Nurse Silva did not have Mr. Canett sent to the hospital.

94.     Nurse Silva did not even house him in the medical unit.

95.     Instead, at around 8:00 p.m., she responded to Mr. Canett's obvious signs and symptoms of a life-threatening medical emergency by authorizing and directing a lower level/lower bunk restriction and a wheelchair for his cell in general population. As Nurse Silva knew at the time, these accommodations were not in any way a responsive medical treatment to Mr. Canett's symptoms of an ongoing and serious medical emergency.

96.     Given his worsening health and his awareness of medical's refusal to help, Deputy

Deluca conducted 15-minute welfare checks on Mr. Canett over the next several hours, witnessing his ongoing and immense suffering. Mr. Canett was continuously making a deep moaning sound that was so loud it was audible outside his cell. He was moving positions and unable to get relief.

97. At around midnight, Deputy Deluca found Mr. Canett laying on the floor on a blanket totally naked.

98. Deputy Deluca immediately opened the cell door. Mr. Canett was having a hard time breathing, taking only short gasps of air, letting out a sharp cry with movement.

99. Deputy Deluca told Mr. Canett he needed to be seen by medical. Mr. Canett told Deputy Deluca that he had already put a kite in asking to be seen.

100. By then, Mr. Canett had taken himself to the hospital, told booking he needed to be seen by a nurse, told the nurses about his shoulder, back, and stomach pain, and put in a medical kite to see a doctor.

101. It was obvious to Mr. Canett and to the involved deputies that he was in an acute medical crisis and needed to be seen by a doctor, but medical staff shockingly continued to ignore him while he was dying.

102. Deputy Deluca, understanding that this was much too urgent to wait for a kite, called the medical department himself and talked to Charge Nurse Silva (as Deputy Divine had done earlier).

103. Outrageously abandoning Mr. Canett, Nurse Silva told Deputy Deluca that "medical was aware of his condition and his pain."

104. Nurse Silva callously told Deputy Deluca that she would have some light over the counter pain meds brought up on the 0300 medication cart – *three hours later*.

105.    Deputy Deluca was still understandably not satisfied, however, with Nurse Silva's recklessly casual response to an obvious medical emergency and intense human suffering. He told her again that he was concerned about Mr. Canett's "shortness of breath" and "*immediate* health," pushing her to actually come see him right then.

106.    Charge Nurse Silva again abdicated all responsibility as the Charge Nurse. Nurse Silva did not come to Mr. Canett to do a nursing assessment or call the doctor about the serious repeated medical reports of a life-threatening emergency.

107.    Rather than go see Mr. Canett herself, she sent an EMT up with Tylenol and Ibuprofen. EMT Patterson did not perform any assessment, she just administered Tylenol and Ibuprofen.

108.    Desperate for relief, Mr. Canett told the EMT that he had been given muscle relaxers before for his pain. EMT Patterson told Mr. Canett that no doctor was present to issue orders and took no other steps to address Mr. Canett's obviously severe suffering, breathing problems and crisis. During this conversation, Mr. Canett was moaning and showing obvious signs of shortness of breath, but EMT Patterson still did not call an ambulance. She did not even take vitals, do an assessment or call a doctor.

109.    All reasonably trained nurses understand that Ibuprofen, Tylenol, other "light pain medications," are not in any way a responsive medical treatment for a man with Mr. Canett's symptoms: two weeks of lower back and flank pain, sudden onset shoulder and abdominal pain, nausea and vomiting, stomach and abdominal discomfort, pale and clammy appearance, difficulty breathing, and the kind of extreme pain and suffering that causes a person to need a wheelchair and take off his clothes and lie down on a jail cell floor, grunting and moaning loud enough to be

heard through the cell door.

110.     EMT Patterson went back to the medical unit and told Nurse Silva about this interaction. After telling EMT Patterson to give Ibuprofen in response to deputies calling for immediate medical help, and after administering over the counter pain meds to a dying man, Charge Nurse Silva took no further action until Mr. Canett died.

111.     Nurse Silva described these interactions only after Mr. Canett had died in what she charted was a "late entry." Her post death 'late note' falsely states he was clearly at the hospital for "chronic back pain." Notably, her note does not describe his labored breathing, laying on the floor moaning, other symptoms, or the multiple attempts by deputies to get her to help.

112.     Mr. Canett was not medically cleared because he was arrested while in the ER waiting room. Mr. Canett also did not have chronic back pain, nor did he go to the hospital for chronic back pain, nor did he report any chronic conditions on intake. Rather, Mr. Canett had been experiencing back pain from this ulcer just in the two weeks before it perforated, and he died.

113.     Even if he had been medically cleared, over the course of the next 24 hours. Mr. Canett developed severely worsening symptoms to the point of needing a wheelchair, slumping over, taking his clothes off and laying naked on the floor, being pale and clammy, taking short breaths of air, having labored breathing, making sharp cries with movement, and moaning so loud they could hear it outside his cell.

114.     Nurses and EMTs cannot by the terms of their licensure make diagnoses or rule out causes for symptoms.

115.     All reasonably trained nurses and EMTs know that it is reckless to diagnose or rule out serious conditions without a doctor evaluation.

116.    Nurse Silva knew, at the latest by 8:00 p.m., that Mr. Canett had a serious worsening of his condition, and that no one in the jail was capable of assessing him, even had they tried to do so (which they didn't).

117.    All reasonably trained health care workers know it would be reckless not to call for emergency help for a man exhibiting the signs and symptoms of Mr. Canett. Indeed, the lay deputies knew and reported to medical repeatedly that he needed emergency help.

118.    A little after 1:00 a.m., Deputy Deluca, who heard Mr. Canett's moaning in pain and labored breathing from *outside* the cell during his 15-minute checks, realized he could no longer hear him moaning in pain or his labored breathing.

119.    Deputy Deluca called out a "Code Blue" medical emergency over the staff radio at 1:16 a.m. on April 26.

120.    Deputy Deluca laid Mr. Canett down on the floor, grabbed his shoulders and began shaking him and yelling his name. The skin on Mr. Canett's shoulders was already cold to the Deputy's touch.

121.    Deputy Deluca then did a sternal rub on the unresponsive Mr. Canett and found his chest was still warm, so the Deputy immediately began chest compressions until relieved by medical staff.

122.    Medical staff's bumbling CPR process unsurprisingly did very little for Mr. Canett. His signs and symptoms of an obvious life-threatening emergency had been flatly ignored for 24 hours, and, by then, no amount of CPR could save him.

123.    Cristo Canett, lying on the floor just outside his cell, was officially pronounced dead at 1:41 a.m.

124.     Then, almost five hours after Mr. Canett was already pronounced dead, medical staff post hoc started trying to find his medical records from his pre-jail hospital visit.

125.     Medical staff member Alicia Reavis reached out to the wrong hospital system (UCHealth) with a "STAT/URGENT" request for Mr. Canett's records at 6:30 a.m. After being told by UCHealth that Mr. Canett had not been to that hospital system since 2020, Ms. Reavis then called Centura-Penrose and St. Francis, leaving voicemail messages with "asap" records requests shortly after noon.

126.     Of course, there was nothing urgent at this point as Mr. Canett had already died from a perforated duodenal ulcer.  The time for urgency had been ignored and passed.

127.     Medical staff had no sense of urgency or any interest in trying to get Mr. Canett's medical records from his pre-jail hospital visit until after he died, most likely born out of a desire to cover up and divert their liability for their egregious mishandling of his medical crisis.

128.     Mr. Canett's autopsy report states that his death was caused by "peritonitis due to a perforated duodenal ulcer," noting a 2.5 x 1.2 cm perforation, serosal exudate of abdominal organs, and 2000 mL of dark brown peritoneal effusion.  The autopsy also specifically notes Mr. Canett's recent history of abdominal pain, which he had reported to the deliberately indifferent Defendant LPN Lupo during his receiving screening some 24 hours prior.

129.     Mr. Canett's deterioration and death was utterly predictable given the Individual Wellpath Defendants' decisions to ignore Mr. Canett's obvious symptoms of a life-threatening medical condition, their refusal to take a full medical history or timely gather his hospital records, their refusal to seek higher-level evaluation and treatment, and their refusal to send Mr. Canett to the hospital.

130.    Cristo Canett, pictured below, was only 48 years old when he died, causing his Estate and his heirs damages and losses.



131.    Mr. Canett had a close relationship with his now eleven-year-old son, G.C. G.C. lives with his mother, but Mr. Canett saw him frequently and had taken him out to lunch just two days before his death.

132.    Mr. Canett had many close relationships with friends and family. He was a very loved man who loved many people.  He has lost many years of his expected life, many years of his pleasure of living, and many important relationships. He lost past and future earnings in amounts still being ascertained and, pre-death he suffered excruciating pain at the hands of Defendants.

**Wellpath's Practice, Policies, Customs and Habits Were Moving Forces in the Unconstitutional Death of Cristo Canett**

133.    At all times relevant hereto, El Paso County contracted with Defendant Wellpath to provide medical and mental health care to people incarcerated at El Paso County jail.

134.    Wellpath maintains unconstitutional policies and customs that are deliberately

indifferent to inmates' serious medical needs, which have left a trail of deaths and serious injuries at the El Paso County jail and throughout the country. Specifically, these policies and customs include a pattern of:

- recklessly understaffing its jails, and improperly using nurses to practice outside their scope of licensure;
- recklessly failing to properly screen and care plan for medical and mental health needs on intake, and recklessly failing to timely respond to serious changes in condition;
- recklessly failing to hospitalize inmates with obviously serious medical needs whose needs they know cannot be met within the jail; and,
- recklessly presuming an inmate is malingering or faking their serious symptoms and withholding treatment on that basis.

135.    These local and nationwide unconstitutional policies and practices, often implemented to maximize profits at the expense of care, have caused a host of abject neglect and abuse by the company.

136.    Wellpath has financial incentives both to understaff and to avoid hospitalization.

137.    Former Sheriff Bill Elder testified in 2021 that he absolutely had concerns about Wellpath's care due to "for-profit business model" having "systemic' problems." He further testified that providing adequate medical staffing was a consistent problem under Wellpath.

138.    In August, 2020, then Sheriff Bill Elder was quoted in Denver's 5280 magazine, about for-profit jail medical contractors like Wellpath as follows:

They're in it for the money, … They will do necessary operations, but if they can increase their net, they'll do it…. What happens if a nursing job comes open and they don't fill it immediately, or ever? Those dollars go directly to the bottom line.

139.    Mr. Canett's death was caused by these unconstitutional patterns.

140.    Despite the fact that the jail staffing plan required every shift to have a Registered Nurse (RN) assigned as Charge Nurse, while Mr. Canett was being deprived care, no RN ever saw

him – and the "charge nurse" was only a Licensed Practical Nurse, apparently the highest licensure in the jail at the time to care for inmates.

141.    Despite known serious complaints of worsening back pain and new stomach and shoulder pain on intake, medical staff never even performed an assessment.

142.    As Mr. Canett's very painful condition worsened over the next 26 hours, his need for emergency treatment continued to be recklessly ignored. Despite numerous requests for medical help by deputies, nurses continued to refuse assessment, refused to call a doctor, and refused to send him to the hospital.

**Mr. Canett's Death Was Preceded and Followed by Many Other Deaths and Serious Injuries at the Jail**

143.    Mr. Canett's mistreatment and preventable death was by no means an isolated incident. Rather, pre-litigation investigation shows that Mr. Canett was the 14th death in this jail since Wellpath took back over the contract in 2020, many from known serious medical conditions and mental health needs that were recklessly ignored. In the year since Mr. Canett's death in April 2022, another six people have died as part of this litany of intolerable deliberate indifference.

144.    On July 3, 2020, Shawn Meehan was found hanging in his cell. He had a reported history of mental health issues, but the intake process was recklessly insufficient. On June 13, 2020, Mr. Meehan submitted a kite to Wellpath mental health workers asking for help and saying he wanted to hurt himself, but as part of a continuing pattern of deliberate indifference, no alerts or precautions were started, and he was not placed on suicide watch before he died.

145.    Adison Reed was booked into the El Paso County jail on September 3, 2021. Wellpath staff were aware that Mr. Reed was diabetic based on a previous incarceration but deprived him of necessary diabetic care and treatment. By September 8, Mr. Reed was in extreme

diabetic ketoacidosis , a life-threatening condition that results from a lack of insulin. He was finally transported to the hospital, and died 19 days later, on September 27, 2021. Wellpath was deliberately indifferent in Mr. Reed's intake screening and care planning. Staff then allowed his medical condition to devolve to the point of extreme diabetic ketoacidosis as part of their pattern of refusing to respond to obviously critical changes in medical condition until the person is dead.

146.     On September 27, 2021, William Johnson suffered a fatal seizure in the El Paso County jail after spending a month pleading to receive the prescription medications that he brought to the jail with his PCP's current orders and letters warning of the dangers of withdrawal if his medications were not provided. Wellpath staff conducted a cursory intake assessment, and then abruptly discontinued four of Mr. Johnson's necessary mental health and anti-seizure prescriptions with no medical basis, and without consulting with his prescribing PCP. Without his medications, Mr. Johnson decompensated, became severely anxious, could not sleep, lost touch with reality, and suffered a complete mental breakdown. Instead of helping him, he was punitively placed in solitary confinement where he continued not to receive his medications, including those for seizure prevention. Although Mr. Johnson had a known, major unexplained change in mental status and was severely incapacitated, he was not sent to the hospital. He spent the last week of his life disoriented, alone, and begging for medications, before dying of a seizure in solitary confinement.

147.     On February 14, 2022, 32-year-old Sean Williams was in El Paso County Jail when deputies saw him to be "physically unwell." He was naked and emaciated, not responding to verbal commands, and there were feces scattered on the floor. He struggled to sit up and had to be helped into a wheelchair.  Deputies decided that he needed to go to medical immediately. Deputies told the Wellpath Charge Nurse that Williams hadn't eaten or drank much (if anything) for days. The

Charge Nurse said that he was "experiencing an episode of psychosis," but did not evaluate him. Deputies decided that to keep him in medical until he was actually evaluated. Over the next hours, deputies repeatedly found Mr. William still sitting in medical, waiting to be evaluated. On one such occasion, a deputy noted that "[m]ultiple medical staff walked over Inmate Williams. He made sounds of distress while he laid on the floor." Deputies returned him to his wheelchair. When deputies asked medical about him, they said "just so you know, he's psychotic." Later that same day, deputies saw on the video feed of the medical unit that Mr. Williams was back on the floor with "medical staff standing at the charge desk approximately 6 feet from Inmate Williams" with "no one evaluating" him. Mr. Williams became progressively worse while medical staff ignored him. Medical told deputies on multiple occasions that his medical crisis was not real and "behavioral," meaning "a choice that someone engages in" rather than an actual "medical condition." On one of the times, he slipped out of his wheelchair, too weak to hold himself up, the Charge Nurse said "[h]e's fine. It's behavioral. Just leave him there. If anything, it's better than him sliding in and out of the wheelchair." Deputies returned to medical to help him and found him with mucus and spit all over his face – they demanded that nurses take his vitals. EMT Patterson was not able to get vitals and left to get different equipment. His vital signs were unobtainable. Mr. Williams died on February 15, 2022 of lymphocytic encephalitis, only 22 days after being booked into the jail on charges of trespass and shoplifting.

148.   On March 16, 2022, Laura Gibbs told El Paso County deputies that she was not feeling well and having panic attacks. Deputies told medical and the Chemical Dependency nurse said she would see her. Later that day, deputies again told medical that Ms. Gibbs wasn't feeling well, but medical refused to come. Later again on the 16th, deputies called medical a third time and

she was finally seen. Her problems continued into the morning of March 17. At approximately 9:00 a.m., when the nurses came to her unit to pass out medications, deputies asked them to see Ms. Gibbs. She told medical that she was withdrawing from heroine and was experiencing nausea, diarrhea, the shakes, and was hot and cold. Medical staff merely responded that they would make note of her problems and would come back to see her. Medical did not come back or provide any medication to address Ms. Gibbs' worsening condition even though all jail staff know these withdrawal symptoms can be fatal in drug users if not treated. Predictably, later that day at 2:17 p.m. on March 17, Ms. Gibbs was found unresponsive and declared dead shortly thereafter.

149.    A little over two months before Mr. Canett died at the jail, Wellpath failed to screen, care plan, and provide necessary medications and treatment to 32-year-old Princeton Jackson, who was paralyzed from a prior spinal cord injury with extremely limited use of his now-very-atrophied lower extremities. To urinate, Mr. Jackson requires a catheter and lubricant; to have a bowel movement, he requires an enema, all of which was well understood by Wellpath staff. Nevertheless, staff forced Mr. Jackson to ration catheters, leaving him without any means to relieve his bladder for extremely long periods of time. Adding injury to injury, the limited supply of catheters Mr. Jackson was given were the wrong size, causing extreme pain every time he inserted or removed a wrong-sized catheter, as well as discharge of chunks of tissue and blood. Wellpath staff also refused to allow Mr. Jackson access to cheap and readily available enema supplies. Instead, they forced Mr. Jackson to digitally remove his own feces. Despite numerous requests for medical care and to be seen by a provider, he was effectively ignored. During his 72-day detention, Mr. Jackson fell victim to severe staffing issues at the El Paso County jail, often going hours without being able to urinate, developing infections, constipation, diarrhea, and fecal impaction.

He also was denied his prescription Gabapentin, which he needed to alleviate severe nerve pain and Duloxetine, for his depression and PTSD caused by his prior accident. Even one of the Wellpath medical staff was frustrated enough with the company's understaffing that he charted, in connection with one of Mr. Jackson's missed dosages on March 6, that the "medication was **not given due to critical staffing, only having one person to pass meds for the entire jail**." (Emphasis supplied).

150.    In June 2022, 18-year-old Dezeree Archuleta died from suicide after repeated worsening of her mental health condition was recklessly not responded to and staff repeatedly refused to send her for obviously needed higher level care. Ms. Archuleta had a well-documented history of mental health issues, including major depressive disorder and post-traumatic stress disorder.  Despite ongoing, obvious and well-known signs of suicidality, Ms. Archuleta was taken off suicide watch. Over the course of her incarceration, Ms. Archuleta's situation deteriorated, and she relayed suicidal ideation, visual hallucinations, self-harm, and requested medications to help with her depression. Wellpath staff merely responded that she should try to take her mind off things. Even after she was found naked and punching herself in the face, she was placed in a restraint chair but, recklessly, this known worsening of her condition did not prompt transfer to a hospital or advanced level psychiatric care. Ms. Archuleta asked Wellpath mental health staff to keep her on suicide watch as she was continuing to have self-harming thoughts, but on June 8th, staff removed Ms. Archuleta from watch. The only reason given for taking Ms. Archuleta off suicide watch was that she had been "bopping back and forth" between being on suicide watch and being off suicide watch. The next day, Ms. Archuleta was noted to have a blunted affect and change in her presentation -- she told staff she was suicidal, but again was not transferred or

provided any higher-level mental health care. She was callously told to simply "use her coping skills." Ms. Archuleta was found dead hanging from a vent grate by a torn strip of clothing in her single-cell later that day.

151.   On July 3, 2022, Cassandra Ramirez died from drug related issues in the El Paso County Jail. That day, she had been "chem depping pretty aggressively throughout the day and she was needing a new jumpsuit and blankets," which means that Ms. Ramirez's symptoms had caused her to urinate and defecate on herself.  Later that day, she was humming at deputies and fluttering her eyes. Medical staff refused to address these serious obvious symptoms, leaving Ms. Ramirez to die near midnight on July 3, 2022.

152.   Daniel Murray died of alcohol related conditions and withdrawal seizures while incarcerated at El Paso County Jail in July of 2022. While he was in "chem dep," which is how the jail staff often refer to the medical's Chemical Dependency plans for withdrawal, he had a sharp mental decline and was ranting incoherently and hallucinating. Mr. Murray supposedly "refused" medication, although he was not competent then to do so given his mental state. Despite his obvious inability to refuse medication, and his declining condition, medical staff treated Mr. Murray as "refusing" and just being "in a mood," choosing themselves to not provide any treatment. Deputies noticed shallow breathing and Mr. Murray told staff that he was having a seizure.  Mr. Murray's alcohol withdrawal needs were recklessly under-assessed, and then staff ignored his obvious change in condition and active decompensation until he died.

153.   Felicia Hudson died at the El Paso County jail on October 15, 2022. She had a clinical history of chronic obstructive pulmonary disease and chronic respiratory failure, requiring supplemental oxygen. During her intake screening on October 13th, she reported to Wellpath staff

that she was supposed to use an oxygen concentrator at nighttime. She also reported that for the last three days, she had a productive cough and shortness of breath. Despite telling a nurse about her chronic conditions and serious symptoms, she was not provided any oxygen or escalated to a higher-level provider. She was found unresponsive in her cell just two days later.

154.    On December 11, 2022, 24-year-old Savannah Poppell was found barely responsive in her cell surrounded by copious amounts of vomit that looked like coffee-grounds – a telltale sign of internal bleeding. The dark vomit was on the floor, the walls, her bed, and all over her face. Ms. Poppell was withdrawing from opiates, which all medical staff know frequently involves significant vomiting and needs to be properly managed as it is potentially fatal. She was also a Type 1 diabetic and her insulin was totally unmanaged even in the very dangerous context of repeated vomiting of blood. Near the time of her death she was extremely hyperglycemic. The coroner concluded Ms. Poppell experienced such violent and prolonged vomiting from substance abuse withdrawal that she tore her esophagus, suffered a fatal upper gastrointestinal hemorrhage and bled to death at the jail.

### The El Paso County Deaths and Serious Injuries are Part of Wellpath's National Pattern of Unconstitutional Care

155.    These tragic and preventable outcomes at El Paso County Jail are part of Wellpath's well-known pattern, practice and custom of constitutionally inadequate care in jails across the country for many years.

156.    These patterns and practices preceded the name Wellpath and were persistent problems in each of their predecessor and subsidiary entities. These entities include Correct Care Solutions ("CCS") Correctional Healthcare Companies ("CHC"), Correctional Healthcare

Management ("CHM"), and Conmed Healthcare Management ("Conmed") (hereinafter "predecessor companies").

157.    Wellpath was most recently operating under the name CCS, and as Wellpath, has maintained the same leadership, and consistent unconstitutional policies and practices. In submitting Wellpath's bid to take back over the medical care at El Paso County jail, Wellpath submitted a Qualification Statement for Inmate Medical Services, signed by Wellpath President Kip Hallman.  Wellpath was asked: "what other names has your company operated under" and answered: "Correct Care Solutions, LLC."

158.    Wellpath and its predecessor companies have been the subject of many government investigations, the target of many watchdog organizations and press reports, and/or defendants in over a thousand lawsuits throughout the country. These investigations and reports all similarly reveal the company's deliberately indifferent practices of ignoring obvious medical emergencies, refusing to treat serious medical conditions and instead merely offering inappropriate over-the-counter medications, and failing to call a doctor or send someone to the hospital until far too late.

159.    In November 2022, Private Equity Stake Holder Report issued a report about Wellpath and another private health care correctional company called "Private Equity Firms Rebrand Prison Healthcare Companies But Care Issues Continue." The Private Equity State Holder Project is a financial watchdog organization that researches and reports on private equity investments.

160.    The report found that "Recent investigations indicate that Wellpath facilities are characterized by **poor intake and screening**; **difficulty accessing care**; and inconsistent medication management practices;" "**Inadequate staffing** at Wellpath facilities has contributed to

concerns about access to care." The report concluded that "Federal and state correctional authorities should not renew or seek new contracts with Wellpath." (Emphases supplied).

161.    After several in-custody deaths at the San Luis Obispo County Jail, the Department of Justice investigated Wellpath's medical and mental health care. One of these deaths involved a man who did not get a comprehensive medical screening when he entered custody, did not get any tests or laboratory examinations, and who was not otherwise monitored by staff while having symptoms of a heart attack. Instead, they improperly gave him high doses of Ibuprofen (as with Mr. Canett), a drug the FDA has warned can lead to heart attacks in people with high blood pressure. On the morning of his death, the man complained of left shoulder and arm pain, numbness and tingling, clamminess, and left sided chest pain. Consistent with Wellpath's unconstitutional practices, staff refused his requests to be sent to the hospital and he died of a heart attack in the jail.

162.    The DOJ found that Wellpath's systemic issues caused constitutional violations at the San Luis Obispo County Jail. Specifically, the DOJ found that "[t]he Jail has failed to provide a medical screening system that ensures adequate diagnosis and treatment of serious medical conditions and continuity of care; has failed to ensure access to care for prisoners who report medical problems; and has failed to deliver an acceptable quality of care in several areas…." The DOJ further found that the jail "**fails to provide constitutionally adequate medical care to prisoners**" and that it "**does not timely evaluate or treat prisoners who request medical attention**." (Emphases supplied).

163.    Just as then Sheriff Elder testified regarding Wellpath's staffing problems at El Paso County Jail, the DOJ found "**Wellpath fails to provide adequate staffing to prevent delays**

**in medical care that place prisoners at substantial risk of serious harm**," and further found:

> The nursing staff who conduct the [initial] screenings sometimes fail to obtain prisoners' medical histories or take appropriate follow-up action—such as making a referral for a medical provider to order laboratory tests or medications—for prisoners flagged as having significant medical conditions….

Emphases supplied.

164.    Much like in El Paso jail, these same patterns of unconstitutional medical care has caused numerous preventable deaths around the country. The following is simply a selection among literally hundreds of examples of horrifying deaths and refusals of care further evincing Wellpath's unconstitutional policies and practices, under its previous names and continuing.

165.    In *LaBar v. County of Placer,* No. 2:20-cv-902-MCE-CKD (E.D. Cal.), Phillip LaBar died at the South Placer County Jail in 2019 after suffering from a perforated duodenal ulcer. Mr. LaBar complained to Wellpath nurses of constipation and stomach pain so severe it felt like his stomach was bursting. No diagnostic tests were administered to identify the source of the pain. He was not seen by a doctor. He was not sent to the hospital. Rather, he was simply sent back to his cell to fend for himself overnight. Mr. LaBar's symptoms predictably worsened: he was sweating, he had difficulty breathing, and he was verbally unresponsive. Again, no diagnostic testing was done, he did not get to see a doctor, and he was not sent to the hospital. Mr. LaBar, in a course of deliberately indifferent non-care much like that experienced by Mr. Canett here, died after intense and prolonged suffering of a ruptured duodenal ulcer and associated sepsis.

166.    In 2016, Henry Clay Stewart died of a perforated gastric ulcer at the Hampton Roads Regional Jail. Mr. Stewart, who was incarcerated related to alleged probation violations from a shoplifting conviction over 10 dollars of stolen beer, complained to CCS staff for weeks of chest, heart, and stomach pain. He reported passing out and other inmates reported that he coughed

up blood. He asked repeatedly to go to the emergency room but was ignored even as he began foaming at the mouth. Other inmates, not blind to Stewart's obvious decline, described Mr. Stewart's health as "deteriorating right before my eyes." Mr. Stewart himself submitted multiple requests for medical care, only to be told that his needs were "deemed not to be an emergency" or that he need to wait on a purported future medical appointment that never happened. An autopsy of Mr. Stewart's body revealed a pint of blood in his stomach at the time of his death.

167.    After the death of Mr. Stewart, and others, at the Hampton Roads Regional Jail, the United States Department of Justice ("DOJ") conducted an investigation, concluding that CCS was running a deficient intake process and a deficient continuity-of-care (medical-record-gathering) process. The DOJ also found that people were being effectively denied access to medical care because of nursing staff's refusal to triage or respond to medical requests. According to the DOJ report, "**one of the primary deficiencies in the Jail's medical care system is that it does not take prisoner requests for treatment seriously, and often ignores them**." (Emphases supplied). DOJ investigators further found that sick call slips were "not routinely collected and triaged in a timely manner," and during one visit they saw the "nursing director [] admonishing the nursing staff for leaving sick call slips uncollected in a box for one month without any answer."

168.    In 2018, James Jarvis, a 60-year-old man, was incarcerated at the Mesa County Jail with current prescription medications for hypertension. Mr. Jarvis was denied his prescribed medication by CCS medical staff, and he became seriously ill in about a week. After days of vomiting, dizziness, and stumbling when he tried to walk, Mr. Jarvis complained to a nurse and was just told to put in a kite. His condition continued to deteriorate in front of the nurses' eyes, so much so that he could no longer move without assistance. This was caught on video and reported

to staff repeatedly. But for many days, multiple nurses on multiple shifts, refused to send him to a hospital or even call a doctor. An LPN saw Mr. Jarvis five days after he submitted a kite, by which time he could not walk and the left side of his face felt rubbery. Yet this LPN sent him back to his cell without performing any assessment and without contacting a higher-level nurse or doctor. Mr. Jarvis had suffered a stroke, and despite his obvious presentation of the classic symptomology of such a serious medical emergency, he was forced to wait for a scheduled appointment with an NP before an ambulance was finally called. This delay caused permanent injuries.

169.    In April 2017, Denny Lovern died of a heart attack at the Arapahoe County Detention Facility after CCS nursing staff ignored his obvious emergency symptoms in the days leading up to his death. Despite Mr. Lovern's known history of cardiac issues and his prescription heart medication Plavix, CCS nurses failed to give Mr. Lovern his Plavix because the jail didn't have any and they failed to promptly secure a supply. CCS nurses then ignored Mr. Lovern's reports of chest pains, presuming he was malingering, and "treated" this chest pain with an over the counter antacid. CCS nurses passively managed Mr. Lovern in a medical "observation" cell, where no observation or medical treatment was provided. Despite repeated requests for help, Mr. Lovern's obvious and treatable cardiac emergency went untreated. He was never sent to the hospital, and he died on the floor of his cell. He was 59 years old.

170.    CNN aired an investigation into the many CCS cases, including Denny Lovern, reporting in June 2019:  that "[e]xperts who reviewed medical records for CNN pointed to serious lapses in care in the deaths of … Lovern, among other inmates. Several cited a pattern of lower-level nurses making critical decisions that, by most state laws, they should not be making on their own — including the nurse who treated Lovern's chest pains with an antacid."

171.    Just like Canett, this pattern of allowing LPNs and RNs to rule out serious causes or decide not to escalate emergency symptoms has cost others their lives.

172.    One of these experts, Dr. Kathryn Locatell, told CNN she thought these cases pointed to "systemic issues" at CCS facilities, the same systemic issues Wellpath carries on:

> Dr. Kathryn Locatell, a physician board-certified in internal medicine who regularly investigates abuses in the medical system alongside the California Department of Justice, said the cases pointed to "systemic issues" at CCS facilities, and that the withholding of treatment she saw documented could suggest financial motivation taking precedence — saying she believed CCS could have prevented the deaths of inmates including … Lovern.

173.    One former CCS worker, a dental assistant named Jeanien Maese who worked at the Arapahoe County jail, told CNN she "repeatedly made it clear to her supervisors…that she believed [ACDF] inmates were at risk." She went on to allege that in her experience at CCS, "medical decisions and staffing were being driven by an 'obsession with profit.'"

174.    Marc Moreno died of died of dehydration in the Benton County Jail in Washington State at just 18 years old.  Marc Moreno entered the jail in a mental health crisis and was put in a "safety cell," a very small padded isolation cell with no natural light and 24-hour-a-day illumination by overhead lamp. There was no access to water in this isolation cell except through staff. A jail social worker witnessed Mr. Moreno's obvious deterioration – including his playing with his own feces inside the cell – and his failure to eat or drink, so she referred him to CCS staff. Despite knowing that Mr. Moreno had not consumed any fluids or nutrition for at least two days, medical staff waited two days before even responding to the referral. When a CCS nurse finally did observe Mr. Moreno through his cell window, she saw him lying naked on the floor face down. She took no vital signs. She did not take a urine sample, weigh the young man, or take any other steps to assess the severity of his dehydration. This nurse also looked at a food/fluid log for Mr.

Moreno, which did not report any food or fluid intake for an additional two days. Despite observing Mr. Moreno in an obviously deteriorated state, and despite knowing that he had not consumed any fluids for at least four days, this nurse left Mr. Moreno to fend for himself. She did not return. Mr. Moreno died of dehydration caused by prolonged fluid deprivation, lying naked and face down on the floor of his isolation cell, with feces and trash strewn about him.

175.    Prison Legal News reported that "private correctional healthcare contractor Wellpath paid $4.5 million to settle" the suit brought by the "family of a mentally ill teen who died from dehydration while incarcerated in 2016 at Benton County Jail." This settlement happened after the *Moreno* court found that Wellpath/CCS had instituted a purge of a large amount of obviously relevant ESI *after* Plaintiffs' preservation letter put the company on notice to not destroy or spoliate evidence. Notably, this purge of emails and other electronic evidence was part of a "new preservation process" announced by Wellpath, in which it again referred to itself as "Wellpath, f/k/a [formerly known as] CCS." The Court granted Plaintiffs' Rule 37 motion, finding that "Defendants' obstruction of the truth through the permanent deletion of countless emails," and its "continued deceptive misconduct throughout this litigation," warranted default judgment against Defendants.

176.    In 2017, after five inmates died under CCS's care during a 75-day period at the Fulton County Jail in Georgia, the County terminated its contract with CCS. In a scathing termination letter, Fulton County criticized CCS for its failure to meet minimum staffing levels, its incomplete implementation of an electronic medical records system, and its continued inadequate training and supervision of staff.  Writing about CCS staffing and training failures in particular, the County termination letter stated: "CCS[] has not been able to adequately staff the

Fulton County Jail since the inception of the Agreement. As a result, CCS[] has been pulling staff from other facilities that have not been adequately trained to follow protocols put in place by CCS[] at the Fulton County Jail."

177.    Rashad McNulty died in 2013 while incarcerated in the Westchester County jail in New York, a jail whose medical care was provided by CCS and another of its subsidiaries, NYCCS. Mr. McNulty had complained of chest pain, and after a cursory assessment, nurses called the on-call doctor who concluded, without any medical assessment, that Mr. McNulty had indigestion. Under closer medical observation for a time, Mr. McNulty kept complaining of chest pain and telling jail staff he did not want to die. Then CCS/NYCCS nurses decided that Mr. McNulty did not need any more observation, so they took him back to his cell by wheelchair. The transporting nurse told McNulty on the way back to his cell that complaints about chest pain was one of the "oldest trick[s] in the book" and that she had "been doing this too long to be tricked." The New York State Commission of Correction found that "the emergency medical care provided to McNulty by the nursing staff" was "grossly uncoordinated and mismanaged … McNulty's signs and symptoms, all highly indicative of acute coronary syndrome, were dismissed by nursing staff." The report recommended an investigation for professional misconduct of the involved nurses "for practicing with gross incompetence by failing to recognize obvious cardiac symptoms in the course of nursing care of Rashad McNulty, failing to maintain proper medical records, and for abandoning a patient in obvious distress." The state Commission of Correction urged state licensing authorities to investigate the nurses after finding they missed "obvious cardiac symptoms" and failed to maintain proper medical records. These deliberately indifferent patterns and practices continued and are continuing after the transition of name to Wellpath and are part of the same practices that

killed Mr. Canett.

178.    In 2015, Scott Millward died in a Wyoming jail where the medical care was provided by CCS. Mr. Millward was in the throes of an obvious medical crisis from alcohol intoxication and withdrawal and also had critically high blood pressures. Despite this crisis and abnormal vital signs, CCS staff ignored abnormal vitals, did not take other required vitals, and did not administer Mr. Millward his required medications or gave him insufficient doses. Mr. Millward appeared in Court where the judge noted that he did not look well. Staff continued to fail to take his vitals and Mr. Millward finally died in his cell. Mr. Millward's autopsy concluded that he died of cardiovascular disease, including hypertension, and that "lack of antecedent medical care" was a contributing factor in his death. Just like Mr. Canett, Mr. Millward was basically warehoused by CCS staff; he was not administered needed medication, he was not worked up despite serious symptoms and complaints, and instead he was left to die in his cell.

179.    In 2018 "a national healthcare company" paid $4.25 million to settle the claims related to the 2014 death of John Patrick Walter at the Fremont County Detention Center in Colorado from deliberate indifference to his serious medical needs.  After the "national health care company" paid that money, the complaint against CHC, CCS, and two other subsidiary companies Correctional Healthcare Physicians, P.C. and CHC Companies, Inc. were all dismissed from the case. Involved medical staff employed by Wellpath predecessor companies disregarded Mr. Walter's known malnourishment and dehydration, withdrawal related conditions, and refused to transport him to the hospital for emergency medical evaluation. Like Mr. Canett here, Mr. Walter also ultimately died on the floor of his cell after medical staff decided not to ignore his medical crisis and not send him to the hospital.

180.    On December 14, 2014, a jury awarded an approximately $11 million dollar verdict against predecessor company CHC and other defendants for failing to provide timely medical care to an inmate in Jefferson County who was having a stroke. Nurses disregarded Ken McGill's obvious and serious symptoms as not real, didn't call a doctor, and instead abandoned Mr. McGill while in the throes of a stroke for hours. The jury found that this company had a pattern and practice of not providing timely medical care and allowing nurses to practice outside their scope in treating inmates, awarding millions of dollars in punitive damages for these deliberately indifferent customs and policies. *See McGill v. Correctional Healthcare Companies, Inc. et al.*, Case No. 13-cv-1080-RBJ-BNB (D. Colo.).

181.    In 2013, Donnie Ray Brown died from a perforated ulcer in Coos County Jail in Oregon as result of the deliberately indifferent medical care he received from Conmed Healthcare Management ("Conmed), a CCS subsidiary. *See Paris v. Conmed Healthcare Mgmt., et al.*, No. 6:14-cv-1260-TC (D. Or.). Despite pleas for help by Mr. Brown and other people nearby who could see how obviously dire Brown's medical emergency was, CCS/Conmed staff refused to treat his medical needs as emergent or even real, stating that he was just trying to get out of jail early. CCS/Conmed staff refused to send Mr. Brown to the hospital until it was too late. His ulcers had perforated through the wall of his duodenum, causing him peritonitis and an unnecessary death at the age of 43. Like Mr. Canett, health care workers practiced outside their scope and Mr. Brown died of a preventable condition, which could have been treated if given medical care in a timely fashion. The Court denied summary judgment, finding that Mr. Brown was treated by an EMT who was not qualified to diagnose or treat his serious medical needs, and who made critical assessments of Brown that were beyond the scope of an EMT's training, skill levels, and licensing.

The Court also denied summary judgment on the entity claims, finding that CCS/Conmed failed to adequately staff the jail with qualified medical professionals, and that it ratified and endorsed the constitutionally inadequate medical care and understaffing at the jail.

### County Defendants Are Liable for their Policy Decision to Re-Hire and Maintain Wellpath as the Medical Company in the Jail Despite Known Misconduct and Continuing Unconstitutional Care Prior to Mr. Canett's Death

182. CCS, the immediate predecessor company to Wellpath, was the contracted medical provider in the El Paso County jail until 2017.

183. It was well known by Entity Defendants prior to Mr. Canett's death that there was a widespread pattern and practice of deliberately indifferent medical care by Wellpath/CCS, including in El Paso County.

184. El Paso County Defendants had previously *fired* CCS from the jail because of their recklessly substandard care, which played a significant role in the jail being put on probation from their health care accrediting agency, the National Commission on Correctional Health Care ("NCCHC").

185. Leading up to the 2017 termination of CCS/Wellpath, it was well-known to the County Defendants that CCS/Wellpath had understaffed the jail, that the for profit model was a major problem in the jail and increased the staffing problems, that over a thousand health care tasks and requests were not completed by the staff that Wellpath/CCS had in place, and that the combination of these factors nearly lost the County its accreditation.

186. The County hired Armor Correctional Health Services ("Armor") to replace CCS.

187. Roughly two years later, the County then terminated Armor and switched back to Wellpath because of dissatisfaction with Armor. Armor's defense to the County's dissatisfaction

was that Armor had inherited a system from CCS/Wellpath that was out of compliance with national standards and straining under a serious backlog of critical tasks -- including more than 1,500 medical requests. CCS's system-wide unconstitutional deficiencies were unlike anything Armor "had ever seen."

188.    In an article about the decision to go back to Wellpath after having previously terminated CCS and the incredible back log of needed medical care tasks that CCS left behind, then El Paso County Sheriff Elder "said he's 'absolutely' concerned about similar problems if the County again hires Wellpath."

189.    Despite Sheriff Elder's concerns, and despite the many, many lawsuits alleging deliberate indifference against Wellpath/CCS, El Paso County re-contracted with Wellpath/CCS to provide for-profit jail medical services at the jail. Initially conceived as a stopgap measure while then-Sheriff Elder tried to persuade County stakeholders to create a community-based model, the County's contract with Wellpath has been renewed every year since 2019.

190.    In 2019 the County signed a one-year contract with Wellpath, valued at $8.7 million, despite having moved away from this very same correctional health in the pursuit of better care.  Sheriff Elder admitted to 5280 Magazine that they were hiring Wellpath again "even though they're now the same people we had to get rid of two years ago."

191.    When the County Defendants put the jail medical care out for bids for the contract, the next nearest bid to Wellpath's was $15,000,000, "almost twice as much" as Wellpath bid, which is likely reflective of other companies' assessments of how much it costs to profitably run the medical unit. Knowing that other companies looking at El Paso County's jail medical and mental health needs thought it would cost twice as much as Wellpath bid, was an obvious neon

sign that Wellpath would do again what it did last time, which was underfund, understaff, and under-respond to serious medical needs – causing deaths.

192.     Knowing of all these problems, the County willingly and with deliberate indifference, went back into a relationship with Wellpath.

193.     Sheriff Elder was right to be concerned. The constitutionally inadequate medical care provided to detainees and inmates around the country under the label "CCS," continued at the El Paso County jail, now under the new label "Wellpath."

194.     At first, they only gave them one year.

195.     At the end of that first year, at least four people had died.

196.     Wellpath's contract was renewed for another year but was amended to put in place harsher financial penalties for understaffing and failing to fill "critical" positions – because the staffing issues persisted.

197.     At the end of that year, at least six more people died – several, if not all, preventable deaths caused by deliberate indifference.

198.     Again the County decided to renew with Wellpath for 2022.

199.     In February, 2022, Sean Williams died a preventable death.

200.     In March, 2022, Laura Gibbs and Leroy Eckhoff died preventable deaths.

201.     Despite knowing of the national problems of Wellpath, despite knowing of the history problems with CCS/Wellpath in this jail, despite knowing those problems were continuing, despite knowing those problems were causing many deaths – the County did not intercede, and Cristo Canett was brought into the unconstitutional system to suffer and die.

202.     After Mr. Canett, six more people have died under all to similar suspicious

circumstances involving profound issues of deliberate indifference, but Wellpath remains the provider. These deliberate policy choices to look the other way while maintaining a system of unconstitutional care are deliberately indifferent and creates direct liability for the County, in addition to their liability for Wellpath's policies based on their non delegable duty.

**Defendants Have Spoliated Video Evidence Central to these Claims**

203.    Mr. Canett died on April 26, 2022.

204.    El Paso County has video in many parts of the jail, including showing Mr. Canett's cell door and the area outside it, the booking area, the hallways and transport area, and the nurses' stations.

205.    Unless specifically preserved, the camera system at the jail overwrites the video around 60 days later.

206.    When a person dies while incarcerated at El Paso County jail, some video is preserved as part of the County's own practices related to death investigations. Despite many health care related deaths in this jail, and despite much litigation surrounding many of those deaths naturally involving what happened in the days leading up to the death, the County has a purposefully designed system of only preserving the *emergency response* to a death, where the person is essentially already dead, not the often obviously more central video of the days before showing what actually happened.

207.    After Mr. Canett died on April 26, 2022, undersigned counsel sent a preservation letter on May 13, 2022, 17 days after Mr. Canett's death, and clearly well before the automatic 60-day override.

208.    Undersigned counsel sent preservation letters to the Sheriff's office by email and by fax, to an assistant County Attorney by email, and to Wellpath by email and by fax.

209.    Because of the County's practice of only retaining emergency response video during a death investigation, and having crucial video footage destroyed by El Paso County previously in another death case despite a timely preservation letter being sent, the letter to the County specifically asked the County to preserve:

> All jail video footage of Mr. Canett for the last two days of his life (understood to be April 24-26, 2022), including of intake, booking, medical, cell footage, emergency response, transport, and the like.  Preservation of only the time of his death and emergency response **would not be sufficient** to satisfy the request.  We are specifically asking that **all** footage of Mr. Canett, in booking, transport, medical and in his cell be preserved and **all** footage of the outside of his cell showing who entered and when also be preserved.

210.    Likewise, another law firm, Maxted Law LLC, also sent a preservation letter on May 13, 2022 to the County Attorney, former Sheriff Bill Elder, and other County Officials. They likewise alerted the County that video of Mr. Canett should be preserved, specifically stating (emphasis in the original):

> This request specifically includes that **you immediately take action to preserve all video and/or audio and other recordings, including dash cam and body worn camera recordings, pertinent to these matters, including without limitation all audio/video recordings of Cristo Canett from the entirety of his time in custody from approximately April 24-26 2022 (or a broader timeframe to cover the entirety of his contact with law enforcement and time in custody), including Cristo Canett's time in custody or in contact with law enforcement prior to his detention, his transportation to the jail or any other locations, his arrival and intake into the jail, his movement and incarceration within the jail, and all audio and video recordings of Cristo Canett inside the jail from the entirety of his incarceration**.

211.    In June of 2022, undersigned counsel sent a CORA request for all video and other documents relating to Mr. Canett during his 24-hour incarceration at El Paso County.

212.     In response to the CORA request, only the video of the emergency response was provided, which only included video of their resuscitation efforts *after he had died*.

213.     Almost a year later, in May of 2023, the County provided additional video footage of Mr. Canett's medical screening upon booking.

214.     All video footage after intake and before death was deleted. The County destroyed all other video footage of Mr. Canett's 24 hours in the jail before he died, including: video footage of Mr. Canett walking to his cell; being transferred by wheelchair to a different ward; putting in a Kite (which also the County claims does not exist); any communications he had with deputies; medical staff, or other inmates; his position and movement in his cell through the window and when the door was open; which deputies and medical staff went into his cell, what time, how long they stayed; and what was done in response to his deteriorating condition.

215.     In violation of their clear legal duties to preserve this evidence, and while ignoring two separate letters from different law firms putting them on express notice that counsel was requesting all video footage of Mr. Canett, the County destroyed case-critical video evidence.

216.     This destruction of this evidence hampers access to the Courts and to justice for the Estate of Cristo Canett.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983 – 14th Amendment
### Unconstitutional Medical Care
(Plaintiff Estate against Defendants Anthony Lupo, Michelle Silva, and Makayla Patterson)

217.     Plaintiff Estate hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

218.     42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

219.    Cristo Canett was a citizen of the United States and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

220.    Mr. Canett was a pre-trial detainee.

221.    As a pre-trial detainee, he was protected from deliberate indifference to his known serious medical needs by the Fourteenth Amendment.

222.    There is no qualified immunity for private actors working in a jail.

223.    Each individual Defendant to this claim, at all times relevant hereto, was acting under color of state law.

224.    As a result of the allegations contained in this Complaint, Individual Wellpath Defendants are liable under 42 U.S.C. § 1983 for the violation of Mr. Canett's rights under the Fourteenth Amendment by acting with deliberate indifference to his serious medical needs and disregarding the excessive risks associated with his serious and life-threatening medical condition, despite being expressly aware of his known serious medical needs.

225.    All of the Individual Wellpath Defendants named in this Complaint personally participated in the constitutional deprivations described herein.

226.    The acts or omissions of these Defendants were the legal and proximate cause of Mr. Canett's injuries and his Estate's losses.

227.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses entitling it to recover its compensatory and special damages,

including for death, loss of earnings, loss of enjoyment of life, loss of relationships, suffering, pain,

and and other special damages, all in amounts to be proven at trial.

228.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-

judgment interest and costs as allowable by federal law.

229.    Plaintiff is also entitled to punitive damages against these Defendants, in that their

actions were taken maliciously, willfully or with a reckless or wanton disregard of the

constitutional rights of Plaintiff.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – 14th Amendment**
**Unconstitutional Policies**
(Plaintiff Estate against Entity Defendants)

230.    Plaintiff Estate hereby incorporates all other paragraphs of this Complaint as if fully

set forth herein.

231.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or
usage of any state or territory or the District of Columbia subjects or causes to be
subjected any citizen of the United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges or immunities secured by the
constitution and law shall be liable to the party injured in an action at law, suit in
equity, or other appropriate proceeding for redress . . .

232.    Cristo Canett was a citizen of the United States and Defendants to this claim are

persons for the purposes of 42 U.S.C. § 1983.

233.    Mr. Canett was a pre-trial detainee.

234.    As a pre-trial detainee, he was protected from deliberate indifference to his known

serious medical needs by the Fourteenth Amendment.

235.    As a result of the allegations contained in this Complaint, Defendants are liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, which resulted in the violation of Mr. Canett's Fourteenth Amendment right to adequate medical care and to humane conditions of confinement. This was part of an aggravated pattern and practrice of deliberate indifference as alleged in the statement of facts.

236.    Defendant Wellpath knew that the aforementioned policies, practices, and customs posed a substantial risk of serious harm to detainees like Mr. Canett, and it was obvious that such harm would occur and had regulary occurred to other inmates. Nevertheless, Defendants failed to take reasonable steps to alleviate those risks of harm. There is an affirmative causal link between the deliberate indifference of the individual health care workers towards Mr. Canett's medical needs and the policies, practices, and customs, described herein. All acts or omissions committed by Defendants were the direct and proximate result of the Estate's damages.[1]

237.    The El Paso County Defendants are directly liable for their own policy choices to hire and retain Wellpath, and non delegably liable for the constitutional policy violations of Wellpath as its hired and repeatedly retained contractor.

238.    The unconstitutional acts and omissions of Entity Defendants were moving forces in the unconstitutional acts of the Individual Wellpath Defendants.

---

[1] Plaintiffs intend to argue that the 10th Circuit case *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005) was wrongly decided and that respondeat superior should apply to private entities in § 1983 actions. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014) ("For all of these reasons, a new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983. Since prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to prevent their employees from violating inmates' constitutional rights raises serious concerns. Nothing in the Supreme Court's jurisprudence or the relevant circuit court decisions provides a sufficiently compelling reason to disregard the important policy considerations underpinning the doctrine of respondeat superior. And in a world of increasingly privatized state services, the doctrine could help to protect people from tortious deprivations of their constitutional right.")

239.     As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses entitling it to recover its compensatory and special damages, including for death, loss of earnings, loss of enjoyment of life, loss of relationships, suffering, pain, and and other special damages, all in amounts to be proven at trial.

240.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

241.     Plaintiff is also entitled to punitive damages against Defendant Wellpath, in that its actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

### THIRD CLAIM FOR RELIEF
### Colo. Rev. Stat. § 13-21-131
### Cruel and Unusual Punishment and Deprivation of Due Process
### Violation of Colorado Constitution, Article 2, Sections 20 & 25
(Plaintiff Estate against Defendant CSPD Sgt. Scott in her individual capacity)

242.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

243.     Plaintiff Estate brings this claim against Defendant CSPD Sgt. Jennene Scott in her individual capacity.

244.     At all times relevant hereto, Defendant Scott was acting under the color of state law in her capacity as a Colorado Springs Police Department Sergeant, a peace officer as defined by Colo. Rev. Stat. § 24-31-901(3).

245.     Mr. Canett had a constitutional right under Article 2, Section 20, of the Colorado Constitution to be free from cruel and unusual punishment, including the right to receive adequate medical care while under arrest.

246.     As a relatively new statute, the Colorado Supreme Court has not determined the precise standard for claims under Article 2, Section 20, of the Colorado Constitution to be free from cruel and unusual punishment. Specifically, it has not determined whether as an arrestee, this right includes the right to receive objectively reasonable medical care, or non-deliberately indifferent medical care, and this is therefore a matter of first impression. *See* Colo. Rev. Stat. § 13-17-201(2).

247.     The Colorado Supreme Court has also not determined whether the constitutional right under Article 2, Section 25, of the Colorado Constitution to due process includes the right to receive objectively reasonable or non-deliberately indifferent medical care as a pretrial detainee. *See* Colo. Rev. Stat. § 13-17-201(2).

248.     Mr. Canett had a constitutional right under Article 2, Section 20 and 25 of the Colorado Constitution, to receive objectively reasonable and non-deliberately indifferent medical care, including an actual pre-jail medical screening, which in this case was unlawfully discontinued by Defendant Scott, who decided on her own that Mr. Canett was drug seeking before he was able to see a doctor who could evaluate his days-long and increasingly severe pain.

249.     Defendant Scott was aware of the substantial risk of harm to Mr. Canett by pulling him out of the hospital ER waiting room before he could be seen by a doctor. Despite knowing that she was obligated as a police officer to wait for Mr. Canett to be seen and medically cleared for jail, she ignored and violated those obligations, causing his death.

250.     As a direct and proximate result of Defendant Scott's unlawful acts and omissions, Plaintiff Estate has suffered damages, losses and injuries in an amount to be determined by the jury at trial. These damages include, *inter alia*, pain and suffering, loss of life, loss of past and

future earnings, loss of relationships, society and companionship, and all other purely non-economic damages as allowed under all applicable statutes.

251.    Plaintiff Estate is therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages in amounts to be ascertained in trial, and to punitive damages against this Defendant.

## VI.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Plaintiff prays that the Court award against Defendants:

(a)    All available compensatory damages, including, but not limited to, all available damages for pain and suffering, physical, mental and emotional distress, and all other non-economic and economic damages available under the law;

(b)    Punitive damages on all claims as allowed by law and in an amount to be determined at trial against individual and corporate defendants;

(c)    Attorneys' fees and costs;

(d)    Pre- and post-judgment interest as appropriate; and

(e)    Any further relief at law or equity that this Court deems just and proper.

**PLAINTIFF RESPECTFULLY REQUESTS TRIAL BY JURY.**

Respectfully submitted this 15th day of May, 2023

<u>/s/ Anna Holland Edwards</u>
Anna Holland Edwards
Erica T. Grossman
John Holland
Dan Weiss
Rachel Kennedy
Holland, Holland Edwards & Grossman, LLC
1437 High Street
Denver, CO 80218
anna@hheglaw.com

Phone:  (303) 860-1331
Fax:  (303) 832-6506
*Attorneys for Plaintiff*