IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-1211-DDD-MDB

THE ESTATE OF CRISTO JESUS CANETT,
by and through its personal representative Elizabeth Naranjo;

    Plaintiff,

v.

WELLPATH, LLC;
THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF EL PASO, COLORADO;
SHERIFF JOSEPH ROYBAL, in his official capacity;
ANTHONY LUPO, individually;
MICHELLE SILVA, individually;
MAKAYLA PATTERSON, individually;
JENNENE SCOTT, individually;

    Defendants.

---

**RESPONSE TO EL PASO COUNTY DEFENDANTS'
MOTION TO DISMISS [DOC. #32]**

---

Plaintiff submits his Response to El Paso County Defendants' Motion to Dismiss:

## I. INTRODUCTION

Cristo Canett died a painful and preventable death from a perforated ulcer in the El Paso County Jail (CJC) on April 26, 2022. Canett took himself to the Emergency Room on April 24, 2022, for severe back and flank pain, but was recklessly arrested by Sergeant Scott as he was waiting to be seen. Complaint ¶¶37-62.

When Canett arrived at CJC, without having been medically evaluated at the ER, his pain worsened, spreading to his abdomen and right shoulder – known emergency symptoms. During

the nurse intake screening, Canett reported these emergency symptoms. He was grimacing, crouching down, leaning against the wall, rubbing his abdomen, and generally evincing obvious extreme pain. Jail medical staff recklessly ignored his serious symptoms while he deteriorated for 24 hours. ¶¶63-81. He became pale, clammy, had labored breathing, required a wheelchair, and was in obvious crisis. Deputies repeatedly called medical, who refused to help, callously saying they were "aware" of his condition. Canett had a duodenal ulcer, which finally perforated, causing him to bleed to death internally in his cell. ¶¶82-123.

Plaintiff sued Wellpath and individual medical defendants for deliberate indifference under §1983[1]. Plaintiff sued County Defendants non-delegably for Wellpath's unconstitutional policies, and for their own unconstitutional policy decision to rehire and retain Wellpath despite knowing of its' proclivity for unconstitutional conduct.

Defendants' Motion argues: 1) BOCC is not a proper party[2] 2) they are not liable for Wellpath's unconstitutional practices under the non-delegable duty doctrine, and; 3) they are not directly liable for the hiring and retaining Wellpath. Contrary to Defendant's Motion, the Estate has more than met its burden, buttressing its allegations of Wellpath's policies and practices by identifying a trail of deaths at CJC and throughout the country. More is not required. As this Court has explained, it "would be asking too much to require plaintiffs to have located an organization's internal policy 'without the benefit of discovery.'" *Cross v. Turn Key,* No. 1:22-cv-03143-DDD-NRN, Order Denying Defendant's Motion to Dismiss, Doc. #60, p. 6 (July 18, 2023) *citing Petty*

---

[1] The County does not argue that Plaintiff failed to allege a Constitutional violation, nor did Wellpath move to dismiss any claims.

[2] With respect to the BOCC being a proper party, the parties anticipate filing a joint stipulation shortly dismissing the BOCC and agreeing that the Sheriff will be the proper official party regarding the County claims.

2

*v. Cnty. of Franklin,* 478 F.3d 341, 348 (6th Cir. 2007).[3]

## II. STANDARD OF REVIEW

To survive under Rule 12(b)(6), the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court must accept the well-pled facts alleged as true and view them in the light most favorable to the plaintiff. *Alvarado v. KOB-TV, L.L.C.,* 493 F.3d 1210, 1215 (10th Cir. 2007). A complaint need not contain detailed factual allegations to state a claim for relief, but the facts alleged must be enough to raise a right to relief beyond mere speculation. *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action" are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where Plaintiffs plead sufficient factual allegations such that the right to relief crosses "the line from conceivable to plausible," they meet this standard. *Twombly*, 550 U.S. at 570. The balance demanded in pleading municipal liability requires "more than boilerplate allegations but not demanding specific facts that prove the existence of a policy." *Id.* As Judge Ebel explained:

> The reasons for not requiring heightened fact pleading in a § 1983 municipal liability complaint remain even in the wake of *Twombly* and *Iqbal*: a plaintiff, as an outsider to municipal government, is not expected to have information about a city's official policies, practices, or training programs at the pleading stage. . . . To require more could foreclose legitimate §1983 claims that, after appropriate discovery, turn out to have evidentiary support.

*Walker v. Zepeda*, No. 1:11-cv-01242-DMECBS, 2012 U.S. Dist. LEXIS 74386, at *14-16 (D. Colo. May 29, 2012).

## III. ARGUMENT

---

[3] This Court noted that while the Sixth Circuit's standard was no longer good law, the analysis is persuasive. *Id.*

3

For an entity to be liable under §1983, Plaintiff must identify an unconstitutional policy. *Monell v. Department of Social Services.* 436 U.S. 658 (1978). This unconstitutional policy may be shown by:

(1) A formal regulation or policy statement;
(2) Informal custom that is "permanent and well settled as to constitute custom usage with the force of law";
(3) "[D]ecisions of employees with final policy making authority";
(4) A final decision maker's ratification of a decision made by an employee with delegated authority to make such a decision; and
(5) A failure to train.

*Waller v. City & Cnty. of Denver,* 932 F.3d 1277, 1283-84 (10th Cir. 2019). Next, Plaintiff must allege that such policies caused the deprivation of Canett's rights. *Id.* Finally, the Estate must allege Defendant was deliberately indifferent, meaning it "has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). *Shermanv. Klenke*, 593 Fed. App'x 580, 690 (10th Cir. 2016), *but Waller*, 932 F.3d at 1284.

A. **<u>The County is Liable for Wellpath's Unconstitutional Policies and Customs.</u>**

The County hired Wellpath to provide medical care at CJC. As Defendant's Motion concedes, courts in Colorado and across jurisdictions consistently hold that while counties may outsource their jail medical care, "[u]nder the nondelegable duty doctrine, a municipal entity cannot avoid §1983 liability by contracting out its constitutional duties to a third party." Doc. #32, p. 11 *citing Walter v. Corr. Healthcare Cos., Inc.*, 323 F.Supp.3d 1199, 1215-16 (D. Colo. May 29, 2018); *Lovern*, No. 18-cv-02573-KLM, 2019 WL 2903589, at *7 (D. Colo. July 3, 2019).

While purporting to accept the applicability of the non-delegable duty doctrine, Defendants

conflate the non-delegable duty doctrine with *respondeat superior*/vicarious liability, citing to inapposite cases that stand for the unremarkable proposition that governments cannot be held liable under traditional employer *respondeat superior* theories of liability and which do not discuss the non-delegable duty at all. See Doc. #32, pp. 11-12 citing *Connick v. Thompson*, which reiterated that "under § 1983, local governments are responsible only for their own illegal acts. They are not vicariously liable under § 1983 for their employees' actions." 563 U.S. 51, 60 (2011).

Plaintiff has not alleged vicarious liability, instead suing under the well-established non-delegable duty doctrine, whereby the County is liable for Wellpath's unconstitutional policies, regardless of its direct role. *West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the [government] of its constitutional duty to provide adequate medical treatment to those in its custody….").

Defendant's motion props up a legal straw man—arguing a legally unsupported distinction between Wellpath's patterns at CJC versus nationally. No such distinction exists. Plaintiff could not hold Wellpath liable for an unconstitutional national custom that was *not a moving force in Canett's death at CJC*. The County's insistence that cases outside of CJC are irrelevant because they "have no control" over the polices evinces a fundamental misunderstanding of the doctrine. Unlike Plaintiff's 'direct' theory of liability against the County, the non-delegable duty doctrine does not turn on whether the County has policy control. If Plaintiff has alleged *Monell* liability against Wellpath, it has alleged it against the County. As Judge Martinez explained:

> Thus, CHC's policies became the County's policies . . . For these reasons, the question is not whether the County itself promulgated an unconstitutional policy or had notice of problems caused by CHC's policy, but whether CHC had an unconstitutional policy and otherwise satisfies the *Monell* requirements. If it does, the County can be liable because CHC stepped into the County's shoes with the County's permission.

5

*Walter,* 323 F. Supp. 3d at 1215–16. *See also Rogacki v. Jefferson Cty*., No. 1:21-cv-02281-CNS-KLM, 2022 U.S. Dist. LEXIS 197757, at *41 (D. Colo. Oct. 31, 2022) ("Mr. Rogacki has stated a plausible entity liability claim against Wellpath. . . Accordingly, Mr. Rogacki has alleged that Jefferson County is liable under the non-delegable duty doctrine.").

Plaintiff alleges that Wellpath fostered a company-wide custom of unconstitutional policies that are deliberately indifferent to inmates' serious medical needs, including recklessly failing to properly screen on intake, delaying assessment and evaluation for serious conditions and changes in condition, presuming an inmate is malingering, understaffing and refusing to hospitalize when obviously needed. ¶134. Plaintiff has plausibly alleged that these customs are motivated, in part, by a desire to save money. Former Sheriff Bill Elder testified in 2021 that Wellpath's business model was a problem and it resulted in consistent staffing problems at CJC. In August, 2020, he was quoted in 5280 magazine about such business models: "They're in it for the money, … They will do necessary operations, but if they can increase their net, they'll do it…. What happens if a nursing job comes open and they don't fill it immediately, or ever? Those dollars go directly to the bottom line." ¶¶135-138. As the Seventh Circuit noted, private providers "have financial incentives to save money at the expense of inmates' well-being and constitutional rights." *Shields v. Illinois Dep't of Corr*., 746 F.3d 782, 794 (7th Cir. 2014). And where such financial motives drive unconstitutionally under-resourcing -- such as understaffing or delaying hospitalization -- municipal liability may attach.

Even though these customs resulted in a surfeit of deaths, Wellpath chose not to rectify the problems, putting the lives of its patients at risk. In support of these claims, Plaintiff identified numerous instances where Wellpath delayed care resulting in death or substantial harm. Canett

was the 14th death at CJC since Wellpath took back over the contract in 2020, many from known serious medical conditions that were ignored. ¶143. In the year since Canett's death in April 2022, another six people died as part of this litany of intolerable deliberate indifference.[4]

Many of these deaths involve similar reckless intake screenings and delays of care for serious changes of condition, as with Cannett. Specifically, at CJC: 1) In 2021, Adison Reed died because intake screen staff ignored his medical conditions, and then allowed him to deteriorate to the point of extreme diabetic ketoacidosis, as part of their pattern of refusing to hospitalize; 2) In 2022, Sean Williams died of lymphocytic encephalitis. Just like Canett, Williams became progressively worse while staff dismissed his crisis as malingering, despite deputies repeated pleas to medical; 3) In March 2022, Laura Gibbs died from drug withdrawal. Just like Canett, Gibbs displayed serious symptoms for hours, deputies requested medical come see her to no avail, and when medical finally responded, they refused to hospitalize her; 4) In July 2022, Cassandra Ramirez died from drug related issues. Much like Canett, despite serious symptoms that worsened over many hours, eventually causing her to urinate and defecate on herself, medical refused to respond or hospitalize Ramirez, leaving her to die; 5) In July 2022, Daniel Murray died of alcohol related conditions and withdrawal seizures. Just like Canett, Murray had a sharp decline, yet medical treated his condition as fake, ignoring him over many hours, and delaying care until he died; 6) In October 2022 Felicia Hudson died. Just like Canett, staff conducted an utterly insufficient intake, and despite serious symptoms reported over days, staff did not call a doctor, or

---

[4] "Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989). *See also McRorie v. Shimoda,* 795 F.2d 780, 784 (9th Cir. 1986); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) ("[S]ubsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy.").

send her to the hospital. She was found dead in her cell; 7) In December 2022, 24-year-old Savannah Poppell died after prolonged serious withdrawal symptoms that were recklessly ignored by Wellpath. The coroner concluded Poppell's violent and prolonged vomiting tore her esophagus, causing her to bleed to death.[5] ¶¶144-154.

Defendants dismiss this long list of similar deaths at CJC as irrelevant because they involved different medical conditions. But what matters is the *pattern* of Wellpath's *conduct*, not whether the symptoms or medical conditions were the exact same as Canett's. *See, e.g. Paugh v. Uintah Cty.*, 47 F.4th 1139, 1147 (10th Cir. 2022); *Awalt v. Marketti*, No. 11 C 6142, 2015 U.S. Dist. LEXIS 91546, at *49 (N.D. Ill. July 15, 2015) (denying Motion *in Limine* to keep the care of different medical conditions from the jury, reasoning "Plaintiff's *Monell* claim is that CHC and HPL failed to have a practice of providing adequate medical care in general. The other detainees' medical complaints do not have to precisely match those of Mr. Awalt to be relevant in this case. In fact, it would be surprising if they did. Each individual presents with different medical issues.").

Defendants ask the Court to disregard these numerous cases because none of these lawsuits resulted in a "finding of liability." Doc. #32, p. 3. Yet as this Court commented, "just as complaints are filed for many, even frivolous, reasons, so too are cases dismissed or settled for many reasons other than lack of liability." *Cross*, Order Denying Defendant's Motion to Dismiss, Doc. #60, p. 7 *citing Andersen v. City of Colo. Springs*, No. 1:20-cv-02032-RBJ, 2021 U.S. Dist. LEXIS 258224,

---

[5] Furthermore, about two months before Canett died, Princeton Jackson, who was paralyzed from a prior spinal cord injury, fell victim to severe staffing issues, often going hours without being able to urinate, developing infections, constipation, diarrhea, and fecal impaction. One Wellpath staff member was frustrated enough with Wellpath's understaffing that he charted that Jackson's "medication was **not given due to critical staffing, only having one person to pass meds for the entire jail**." ¶149.

8

at *15-16 (D. Colo. Aug. 12, 2021).

Additionally, Plaintiff has plausibly alleged that the many tragic and preventable deaths at CJC were caused by Wellpath's widespread pattern, practice and custom of constitutionally inadequate care in jails across the country – patterns documented by many government investigations, watchdog organizations, press reports, and hundreds of lawsuits. These reports all similarly reveal the company's unconstitutional practices of cursory intake screenings, ignoring obvious medical emergencies, refusing to treat serious conditions, and refusing to call a doctor or hospitalize until far too late. *See e.g.*, Private Equity Stake Holder report finding: "Wellpath facilities are characterized by poor intake and screening; difficulty accessing care; and inconsistent medication management practices;" "Inadequate staffing at Wellpath facilities has contributed to concerns about access to care … Federal and state correctional authorities should not renew or seek new contracts with Wellpath." ¶¶155-160; DOJ findings that Wellpath at San Luis Obispo Jail "fails to provide constitutionally adequate medical care to prisoners," "does not timely evaluate or treat prisoners who request medical attention," and that "Wellpath fails to provide adequate staffing to prevent delays in medical care that place prisoners at substantial risk of serious harm." ¶¶161-163.

Much like in CJC, these same patterns have caused preventable deaths nationwide. Consider the strikingly similar case of *LaBar v. County of Placer,* No. 2:20-cv-902-MCE-CKD (E.D. Cal.), where Phillip LaBar died at the South Placer County Jail in 2019 after suffering from a perforated duodenal ulcer. LaBar complained to nurses of constipation and stomach pain so severe it felt like his stomach was bursting. No diagnostic tests were administered. He was not seen by a doctor or sent to the hospital. LaBar's symptoms predictably worsened: he was sweating,

9

had difficulty breathing, and was verbally unresponsive. LaBar, in a course of deliberately indifferent non-care exactly like Canett's, died after intense and prolonged suffering of a ruptured duodenal ulcer. ¶¶165.

*LaBar* represents just one of hundreds of cases that could be highlighted for the Court. ¶¶164-181. Because these incidents occurred across Wellpath facilities, over the course of several years preceding these events, it is even more plausible the complained of practices are widespread, longstanding corporate customs. *See Bailey v. Turn Key*, No. 20-CV-0561-CVE-SH, 2021 U.S. Dist. LEXIS 177310, at *18-19 (N.D. Okla. Sep. 17, 2021) (denying dismissal of *Monell* claim where "Plaintiff cites numerous instances at other prison medical facilities operated by [Defendant] in which medical care was inadequate or denied altogether, and she alleges that the poor medical care is the result of a custom or policy of Turn Key to cut costs and prioritize financial gain over the delivery of constitutionally adequate medical care.").

By adhering to an approach "they know or should know has failed to prevent tortious conduct by employees," Wellpath acted with deliberate indifference to the rights of persons with whom the employees come into contact. *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997). Finally, Plaintiff has sufficiently asserted a direct causal link between these customs and the harm suffered -- the obvious consequence of its policies to delay medical treatment is that some inmates will face substantial harm from lack of timely treatment, as with Canett. *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

**B. The County Is Directly Liable for the Policy Decision to Re-Hire and Maintain Wellpath.**

The County moves to dismiss the "direct" *Monell* claim, arguing essentially that it cannot be liable for its contracting decisions to hire and retain Wellpath. To the contrary, when a "County

10

is 'faced with actual or constructive knowledge that its agents will probably violate constitutional rights, [it] may not adopt a policy of inaction.'" *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012), citing *Warren v District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004).[6]

CCS, Wellpath's predecessor company, was the provider at CJC until 2017. Prior to Canett's death, the County knew of the widespread practice of deliberately indifferent medical care by this company at CJC and nationwide. The County knew that CCS/Wellpath's business model was a major problem in CJC, causing understaffing and over a thousand health care tasks and requests to go uncompleted. The County *fired* CCS because of their recklessly substandard care, which played a significant role in the jail being put on probation from their accrediting agency. ¶¶182-185.

The County hired Armor to replace CCS. Roughly two years later, the County terminated Armor and re-hired CCS, now called Wellpath (¶¶156-7). Armor defended against the County's dissatisfaction, arguing that CCS/Wellpath's system was out of compliance with national standards and straining under a serious backlog of critical tasks -- including more than 1,500 unanswered medical requests. These deficiencies were unlike anything Armor "had ever seen." In press, Sheriff Elder "said he's 'absolutely' concerned about similar problems if the County again hires Wellpath," yet decided to hire "the same people we had to get rid of two years ago." ¶¶186-190. Despite Sheriff Elder's concerns, and the intimate knowledge of the refusals to respond to medical requests, the County signed a one-year contract with Wellpath, valued at $8.7 million.

---

[6] *Tafoya v. Salazar*, 516 F.3d 912, 916-21 (10th Cir. 2008) (holding that when a policymaker is on notice of a pattern of unconstitutional conduct and takes no action, the policymaker is deliberately indifferent and the entity subject to potential liability for unconstitutional policies); *see also Cash v. County of Erie*, 654 F.3d 324, 334-39 (2d Cir. 2011) (same).

When the County solicited bids after firing Armor, the nearest bid to Wellpath's was $15,000,000, "almost twice as much." That other companies looking at CJC's medical needs thought it would cost twice as much as Wellpath was an obvious neon sign that Wellpath would do again what it did last time -- underfund, understaff, and under-respond to serious medical needs – causing deaths. ¶¶190-191.

Yet, the County re-hired Wellpath.[7] By year one, four people died. Wellpath's contract was renewed. By year two, at least six more people died. Again in 2022, the County renewed with Wellpath. Nine more people died, including Canett. ¶¶193-202.

These facts are analogous to *King*. There, a county hired HCL to provide medical care in a jail. HCL employed a prescription formulary allowing only specific medications – inmates on non-formulary medications were weaned off with little to no on-site physician care. Mr. King died after he was 'weaned' too quickly off benzodiazepines without meaningful doctor supervision, causing withdrawal symptoms and death. The Sheriff testified that he was aware of problems with the medication system, and the media "express[ed] alarm" over HPL's medication policy in multiple press pieces. The Court denied Summary Judgment for the County (a notably higher burden than Plaintiff faces here) because the County was "on notice that HPL's physician- and medication-related policies were causing problems at the jail" and there was a "question of material fact whether the County was aware at the relevant time that HPL had policies that violated inmates' constitutional rights." *King,* 680 F.3d at 1021.

---

[7] While Defendants suggest otherwise, there were "various alternatives" available to the County, including: fire Wellpath, take a higher bid from a company rationally evaluating the actual costs of care, implement the community-based model the Sheriff has long said he wanted.

El Paso County rehired a company that they knew would understaff, underfund,[8] and with a known custom of deliberate indifference. Like *King*, these deliberate policy choices to look the other way while maintaining a system of unconstitutional care create direct liability for the County.

Defendants overly rely on the *Rogacki* case, which is distinguishable. The Court held there that the contract between Jefferson County and CCS, which created financial incentives related to hospitalization, was not a "policy." It further found that the prior deaths alleged were not enough to make the County's decision to hire CCS deliberately indifferent. *Rogacki,* 2022 WL 16551336 at *34-6*.

This is fundamentally different than *Rogacki*, which sought to hold the County 'directly' liable with nowhere near the showing of actual knowledge of unconstitutional conduct. Here, there is a surfeit of specific knowledge by County decision makers about how this company operates in this jail. This is much more akin to a Sheriff firing a private jail security company because it implemented a policy of tasing inmates who are insubordinate, then rehiring that same company, learning they re-implemented that same policy of tasing anyone who is rude, retaining the company anyway, and then claiming the Sheriff can't be held directly responsible.

It should not be that a County can insulate itself from liability for deliberately indifferent decisions it makes to hire a company known to consistently provide unconstitutional care. It cannot

---

[8] The County misconstrues the meaning of Plaintiff's allegations about Sheriff Elder's comments related to financial incentives. *See* Doc. #32, p. 10. Plaintiff does not allege that it is unconstitutional to hire a for-profit company, or that it matters *exactly why* Wellpath allows rampant misconduct. The point is not that Sheriff Elder was right about the dangers of financial incentives, or that these individuals were motivated themselves by profit. The point is that the County *knew* that Wellpath has a proclivity for unconstitutional care and yet they retained them, precisely the "policy of inaction" the *King* Court found deliberately indifferent. *King,* 680 F.3d at 1021.

be that *no decision* made by the delegated final decisions makers to hire a company could rise to the level of a deliberately indifferent policy. Unless it is impossible as a matter of law to hold a County liable for its own choice to employ someone it knew was continually committing constitutional violations, Plaintiff has far exceeded "threadbare recitals of the elements of a cause of action." *Ashcroft*, 556 U.S. at 678.

WHERFORE, Plaintiff requests the Motion be denied.

Respectfully submitted this 30th day of August, 2023.

*/s/ Erica Grossman*
Erica Grossman
Anna Holland Edwards
Dan Weiss
HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC
1437 High Street
Denver, CO 80218
erica@hheglaw.com
*Attorneys for Plaintiff*

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1).

*/s/ Erica Grossman*
Erica Grossman

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of August 2023, the foregoing was filed using the CM/ECF system. I hereby certify I will send electronic notification of said filing to the following recipients.

Nathan J. Whitney
Bryan E. Schmid
Steven Martyn
EL PASO COUNTY ATTORNEY'S OFFICE
nathanwhitney@elpasoco.com
bryanSchmid@elpasoco.com
stevenmarytn@elpasoco.com
*Attorneys for El Paso County Defendants*

Ryan D. Doherty
COLORADO SPRINGS CITY ATTORNEY'S OFFICE
Ryan.doherty@coloradosprings.gov
*Attorney for Defendant Scott*

Brenda S. McClearn
HALL BOOTH SMITH, P.C.
BMcClearn@hallboothsmith.com
*Attorney for Defendants Wellpath, Silva & Patterson*

Paul A. Faraci
FARACI LEASURE, LLC
pfaraci@faracileasure.com
*Attorney for Defendant Lupo*

*/s/ Brooke Thiele-LaForest*
Brooke Thiele-LaForest, Paralegal