# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

AMBER HIRSCH, as administrator of ）
the estate of decedent, MARCUS MAYS, ）
                                   ）
             Plaintiff, ）
      vs. ）         19 CV 7398
                                   ）
WILL COUNTY, Illinois, et al., ）     Judge DURKIN
                                   ）
          Defendants. ）     Magistrate Judge CUMMINGS

## PLAINTIFF'S 19th MOTION TO COMPEL DISCOVERY FROM WELLPATH

    This civil rights lawsuit arises out of the death of thirty-year old Marcus Mays at the Will County jail on November 8, 2018. Mays is survived by his now 12-year-old daughter and her mother, Plaintiff, Amber Hirsch. Will County contracts with Wellpath (formerly known as Correct Care Solutions or CCS) to provide medical care to its detainees. Mays had epilepsy, and when first admitted to the jail, intake records show he told both a CCS and a County employee of his history of grand mal seizures. But for eleven days, Mays was not given any anti-seizure medication, he did not see a doctor, and he was not sufficiently monitored. As a result, Mays had a massive seizure and died.

## ARGUMENT

    The Federal Rules of Civil Procedure allow for the discovery of "any non-privileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b). Federal Rule of Civil Procedure 37(a) allows a party to "move for an order compelling disclosure of discovery." Fed. R. Civ. P. 37(a). A party objecting to producing documents bears the burden of showing that its objections are proper. *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 331, 337 (N.D. Ill., 2005).

    In this 2019 case, Plaintiff has been repeatedly unable to obtain relevant discovery from Wellpath without court intervention, despite the granting of many prior motions to compel and the prior imposition of sanctions for discovery misconduct. Plaintiff's 37.2 efforts to obtain the below discovery have failed, and thus court intervention is necessary.

## I.  Verifications for Wellpath's Amended Interrogatory Responses 3, 6, 7 and 11.

*Compliance with Rule 37.2.* Plaintiff issued her First Set of Interrogatories to Defendant Wellpath in 2020. Beginning in October of last year, Plaintiff's counsel began the meet and confer process with Wellpath's counsel regarding the supplementing a handful of these responses. Wellpath amended its responses to Interrogatory Nos. 3, 6, 7 and 11 but it has not provided any verifications for them. The following is a timeline of Hirsch's counsel's efforts:

**10/19/23**:  Hirsch's counsel requests in writing that Wellpath amend and supplement a handful of its original interrogatory responses, providing her reasoning for each request.

**10/24/23:**  Attorney Neroda and Hirsch's counsel held a 37.2 teleconference during which the parties discussed Wellpath's interrogatory responses and Wellpath's counsel indicated he would be providing some amended interrogatory responses within 14 days. He did not.

**11/16/23**:  Wellpath provides supplemental responses to Interrogatories 3, 6, 7 and 11, but no verification for them.

**12/14/23**:  The parties conducted a second 37.2 teleconference and discussed the sufficiency of Wellpath's  supplemental interrogatory responses and the  missing verification. Wellpath's counsel agreed to "look into it."

**1/4/24:**  The parties conducted a *third* 37.2 teleconference during which Wellpath's interrogatory responses were again discussed, and during which Wellpath's  counsel indicated he would let Plaintiff's counsel know if he intended to further supplement by January 12th. That did not happen.

**1/31/24**:  The parties conducted a *fourth* 37.2 teleconference during which Wellpath's counsel promised he would provide amended responses and verifications "by the end of the week." He did not.

**2/5/24:**  Wellpath provides Second supplemental responses to Interrogatories 3 and 7, but no verification for them or the first supplemental responses.

**2/7/24:**  The parties conducted a *fifth* 37.2 teleconference during which Wellpath's counsel indicated he still intended to provide verifications for his amended responses. One month later, he still has not.

In addition, between October 19, 2023 and February 7, 2024, Hirsch's counsel and lead counsel for Wellpath exchanged approximately **27 emails** about Wellpath's interrogatory responses. In his emails, Wellpath's counsel said he would provide the requested supplemental responses "today,"

"tomorrow," "by the end of the week," and "on Monday" and in each instance, that did not occur. Plaintiff asks this Court to order Wellpath to verify its amended interrogatory responses to Nos. 3, 6, 7 and 11 and to set a short deadline for the completion of this task.

## II. Compensation Information for Wellpath Defendants

In response to Plaintiff's discovery requests and a prior motion to compel, Wellpath has produced personnel files for the Wellpath Defendants. However, Wellpath has redacted all references to their compensation. This information is relevant to Plaintiff's *Monell* claim. *See Second Amd. Compl.* at ¶¶ 48-51, 78-80, 82, and 109(5) and (8), Dkt. No. 230. Mays alleges that the substandard medical care Mays received was caused, in part, by CCS's practices of underpaying and understaffing. Wellpath seeks to increase profits by employing underqualified medical staff who are willing to be underpaid due to their lack of qualifications. Paying medical staff less than market rates impacts the quality of the staff and the quality of the care provided. Moreover, this evidence is relevant to the issue of punitive damages. If Wellpath had a practice of providing compensation *increases* to its employees after being made aware of those employee's failures to provide adequate medical care to detainees, this compensation information would be relevant to the egregiousness of the Corporation's indifference to the medical care it was providing. The parties have engaged in multiple communications on this issue and agree they are at an impasse on it. Plaintiff requests that this Court order Wellpath to produce unredacted versions of the documents it has already produced.

## III. Documents and Responses to Plaintiff's 7th Requests for Production (RFPs)

Nearly four months ago, on November 16, 2023, Hirsch issued *Monell* Requests for Production (RFP) to both Wellpath and the County. The County has answered them and produced nearly 2000 pages of documents. Wellpath, on the other hand, after months of discussing these requests with Hirsch's counsel, has provided almost nothing but objections. Wellpath has only provided a substantive response and documents to one request (RFP 17), producing a 16-page medication list.

*See Wellpath's Responses and Amended Responses to Plaintiff's 7th RFP,* Attached as Exhibit A.

*Compliance with LR 37.2.* The following timeline demonstrates compliance with LR 37.2:

**12/14/23:** The parties first discussed Hirsch's 7th RFP during a 37.2 teleconference on this date and set up a separate call on December 18, 2023, to focus exclusively on the 7th RFP.

**12/18/23:** Hirsch's counsel and lead counsel for Wellpath, Ron Neroda, conducted a lengthy teleconference on Hirsch's 7th RTP and during which the parties discussed the various requests at length and specifically. During this conference, Wellpath agreed to respond to four requests: RFP 3, 7, 8 (with a limitation to anti-convulsant medications) and 12. Plaintiff agreed to withdraw requests 4, 21 and 56 and the parties reached impasse on RFP 24. Wellpath wanted to wait to further discuss 9 of the requests after this Court ruled on Plaintiff's 18th MTC (RFP 1, 13, 17, 18, 20, 19, 22, 23 and 26). For the remaining requests, Wellpath's counsel agreed to "look into" them and to provide additional information about responsive documents so the parties could discuss whether narrowing them further was necessary (RFPs 9, 10, 11, 14, 15, 16, 25, 27-54 and 55). The parties closed this lengthy meet and confer by scheduling another conference for December 22, 2023 to discuss the requests Wellpath's counsel had indicated he would "look into."

**12/21/23**: Wellpath's counsel cancelled the parties' scheduled follow up teleconference.

**1/4/24:** The parties next discussed Plaintiff's 7th RFP at a teleconference during which Wellpath's lead counsel indicated that he had no new information since the parties last discussion, but that he would have more information the week of January 8th and would also be producing some responsive documents at that time. That never happened.

**1/31/24:** The parties conducted another 37.2 teleconference during which Wellpath's lead counsel told Hirsch's counsel that he would provide responses to the 7th RTP and produce responsive documents by February 9, 2024. During this meeting, the parties further discussed the scope of the requests and Plaintiff's counsel indicated she would be willing to agree to the same five-year time period that Judge Cummings had ordered for other *Monell* document production (2013-2018). Wellpath's counsel was still unable to provide any information about the number of responsive documents for any of the requests. Plaintiff's counsel suggested that when he responded to these requests on February 9th, that he produce whatever scope he did *not* object to and make it clear what scope was being produced. That did not happen.

**2/7/24**: The parties conducted another discovery teleconference. At this conference, Wellpath's counsel reiterated his intention to provide new documents and responses to Plaintiff's 7th RFP two days later on February 9th. This also did not occur.

**2/9/24**: Wellpath filed a motion for an extension of time to answer Plaintiff's 7th RFP. This motion was granted and Wellpath was given until February 23, 2024 to respond to Plaintiff's 7th RTP.

**2/12/24**: This Court issued a memorandum opinion on Plaintiff's 18th motion to compel. On the same day, Plaintiff offered to meet and confer with Wellpath counsel on three dates

prior to the due date for its responses to the 7th RFP. Of the three dates Plaintiff's counsel offered, Wellpath's counsel chose February 19th.

**2/19/24**:    On the morning of this scheduled meeting, Wellpath's counsel canceled it. Plaintiff tried to reschedule this meet and confer but was unable to confirm Wellpath's counsel's availability despite several attempts.

**2/23/24**:    Wellpath provided its responses to Plaintiff's 7th RFP objecting to every response and providing no substantive answers or documents except to RFP 17 for which it produced 16 pages. In its responses, Wellpath reneged on its December 18th agreement to answer certain requests and relied on this Court's February 12th order for its non-answers and non-production.

**2/26/24:**    Hirsch's counsel sent an email to defense counsel complaining about these responses and asking for better ones.

**2/28/24:**    The parties met virtually and discussed the 7th RTP a *sixth* time. Wellpath's lead counsel who had participated in the prior five meet and confers about the requests was not present. Wellpath's new counsel did not seem to be cognizant of the parties' prior meetings or discussions about the 7th RFP and he instead insisted on starting the meet and confer process over from square one. Plaintiff's counsel suggested that Wellpath respond in some fashion to the requests other than just to object and that it produce documents within the scope of this Court's *Monell* rulings on Plaintiff's 18th motion to compel. That has not occurred as of the filing of this motion.

LR 37.2 has more than been complied with respect to the 7th RTP requests. Plaintiff's counsel should not be required to spend additional time getting Wellpath's new associate up to speed and repeating the months of efforts already expended. Rule 37.2 does not serve justice when one party's purpose is to obstruct and delay. Plaintiff asks this Court for help obtaining responses to her discovery requests without any further wasting of time attempting to "meet and confer" with Wellpath's counsel. Plaintiff's counsel is happy to meet with the County's counsel and has done so productively throughout discovery in this matter. But ordering her to meet and confer with Wellpath's counsel is a waste of everyone's time and is serving only to needlessly drive up fees and costs in this case.

*The RFP responses Plaintiff Seeks to Compel.* The exact RFP at issue in this motion total 35 requests: 2, 3, 5, 7, 9-13, 15, 16, 18-20, 22-28, 30, 32, 35, 38-42, 44, 45, 47, 49, 52 and 55.

**RFP 2 and 5 (Copies of licenses and employment contracts for CCS employees working at Will County jail in October and November 2018).**

On December 18, 2023, the parties discussed limiting these requests to the CCS/Wellpath Defendants plus Jennifer Briscoe and Paula Walker. In its 2/23 RFP Responses, Wellpath has objected to RFP 2 as irrelevant and to RFP 5 based on this Court's 2/12 ruling. These objections are baseless. If Wellpath was employing un- or under licensed medical staff, this evidence supports Plaintiff's *Monell* allegations that the substandard medical care Mays received was part of a larger practice to save money by employing underqualified medical staff willing to be underpaid due to their lack of qualifications.

**RFP 3 (Attendance records for CCS employees at the jail while Mays was there).**

On December 18, 2023,  Wellpath's lead counsel indicated he had no objection to this request and would produce responsive documents. Three months later, Wellpath's 2/23/24 RFP response indicates it "is in the process of identifying responsive records in its timekeeping system and will produce those documents on a rolling basis as they become available."

**RFP 7 (Sick Call or Health Service Request Forms filled out by Mays).**

On December 18, 2023, Wellpath's lead counsel indicated he did not object to this request. In its 2/23 RFP Responses, Wellpath objects to this request as "duplicative" without referencing any prior RFP or production. Wellpath has previously claimed there is only one health service request for Mays and it was produced as part of his medical file. Plaintiff has not previously issued a request specifically for Mays' health service requests. She issued this one to ensure there are no others and is entitled to a signed discovery response certifying that fact.

**RFP 9 (internal audits of the medical care being provided by CCS at the Will County jail).**

On December 18, 2023, Wellpath's lead counsel indicated he would investigate whether any of these even existed and if they did, how voluminous these might be so that the parties could further discuss the scope of this request. Despite several follow up emails and calls, he never did that. Instead, in their 2/23 RFP Responses, Wellpath objects to this request as irrelevant. However, CCS's awareness of problems relating to the healthcare it was providing at the Will County jail (knowledge of the policy-

maker) is an element of Plaintiff's *Monell* claim.

**RFP 10 (all meeting minutes and attendance sheets).**

At their 12/18/23 meet and confer, Wellpath's lead counsel agreed to look into whether there were any other meeting minutes besides the monthly staff meeting minutes Judge Cummings had ordered Wellpath to produce. Two days later, at during Dr. Kim's deposition, Plaintiff learned that Wellpath was withholding quarterly Continuous Quality Improvement (CQI) meeting minutes relating to patient care at the Will County jail. After this deposition, Plaintiff's counsel began pushing for these previously requested but not produced meeting minutes. Since then, some of these have been produced. But if there are other similar meeting minutes still being withheld they should also be produced. Because of Wellpath's spoliation of ESI in this case, these meeting minutes provide the only evidence of the day-to-day operations of CCS at the Will County jail during the time period leading up to Mays' death. This evidence is vital to proving Plaintiff's *Monell* claim and should not be redacted or limited in any way except by the 2013-2018 time period previously ordered for the production of the monthly staff meeting minutes by Judge Cummings.

**RFP 11 (signed acknowledgement forms for CCS's policies).**

At their December 18, 2023 meet and confer, Plaintiff agreed to limit this request to the 2013-2018, and Wellpath's counsel agreed to look into whether these even existed and if so, the number of responsive documents that might exist so the parties could work together to further limit this request, if necessary. That never happened. In its 2/23 RFP Responses, Wellpath objects to this request as irrelevant and outside the "court determined scope" of this matter. Wellpath will rely upon its written policies in defense of this lawsuit, claiming that it maintains certain policies and by doing so, it was not indifferent to the substandard care being provided to the pretrial detainees at the Will County jail. But if its employees are not required to be familiar with its written policies, this is relevant evidence that they are not really in effect. Plaintiff must be allowed to do discovery on what steps CCS took to

7

ensure that its employees were educated about its written policies.

**RFP 12 (the employee handbook provided to Kim and Simpri-Mensah).**

At their meet and confer on December 18, 2023, Wellpath's counsel indicated he had no objection to this request. Three months later, according to Wellpath's 2/23 RFP Responses it is now "searching for responsive documents."

**RFP 13 (documents relating to medical care quality improvement plans put into place).**

During the parties' discussions about the 7th RTP, Plaintiff indicated she would limit these to the time period of 2013-2018. Wellpath's 2/23 RFP Responses object that this request is not relevant and has no time limit. The efforts CCS took – or did not take- to improve upon patient care at the Will County jail is directly relevant to Hirsch's *Monell* claim.

**RFP 15 and 55 (Clinical Performance Enhancement Reviews, logs showing how often these performance reviews were conducted and Nurse Peer Reviews for the Wellpath Defendants).**

In previous discussions with Wellpath's counsel, Plaintiff has limited this request to the five years preceding Mays' death: 2013- 2018. Wellpath's 2/23 RFP response to RFP 15 object to this request claiming it is irrelevant and outside the court determined scope. If Wellpath did – or did not—address performance issues related to the medical care being provided to the detainees at the Will County jail, this evidence is relevant to Plaintiff's *Monell* claim that CCS was providing substandard medical care. For RFP 55, four months after the request was issued, Wellpath is "still investigating."

**RFP 16 (Documents relating to health-related training CCS provided to Will County Correctional Officers for the 5 years preceding Mays' death).**

This request is appropriately limited to training that relates to topics relevant to this case like the manifestations of chronic illnesses, such as seizures, the administration of medication, and the housing classifications for chronically ill detainees like Mays. Plaintiff suspects the response to this request is "none" based on her discussions with Wellpath's lead counsel, but she is entitled to a signed discovery response indicating Wellpath has no such training records. Instead, Wellpath has provided only

objections.

**RFP 18, 19, 20 (sick call lists, sick call request forms and chronic care clinic lists for one year).**

These documents are relevant to establishing whether CCS had a practice of ignoring the serious medical needs of detainees. Plaintiff seeks to discover if there was a pattern of delaying doctor visits and denying medication to detainees, such as what happened to Mays. The documents sought in these requests will provide evidence of CCS's scheduling practices and the sick call forms are likely to identify other detainees with chronic illnesses who were complaining that CCS was denying them their medication. Plaintiff has limited these requests to a one-year time period. Wellpath should not be allowed to only produce the ones it deems relevant. It should be ordered to produce them all for a one-year period. The trial court can then later limit the evidence for trial.

**RFP 22 and 23 (documents relating to disciplinary actions taken by outside agencies against CCS or reports made to outside agencies about the medical care provided by CCS at the Will County jail)**

If outside agency reports or documents exist relating to the medical care provided by CCS at the Will County jail during the five years leading up to Mays's death, they are relevant to whether or not there was a widespread practice of providing substandard care to the detainees there and whether CCS the corporation was on notice about it.

**RFP 24 and 25: (Complete Medical Files and medication administration records for all Detainees at the Will County Jail for the year preceding Mays's death).**

The parties discussed this request during their 12/23 teleconference and Plaintiff explained this request was fashioned after one approved by Judge Durkin in *Awalt v. Marketti, 11 CV 6142*. Plaintiff also referred Wellpath's counsel to the *Awalt* Docket, No. 147, pp. 6-10. These documents are vital to proving Hirsch's *Monell* claim and her expert requires them in order to opine about CCS's practices in at the Will County jail. There is a HIPAA order already in place in this case. Wellpath objects to this request as irrelevant, overly broad and unduly burdensome. This request is clearly relevant and Plaintiff is willing to limit it to one year of records. Wellpath's overly burdensome objection is baseless. These

records are stored electronically and can be produced in the same manner. They can all be marked confidential subject to the HIPAA order entered in this case and then produced. Wellpath should not be culling these records or redacting them or removing anything from them. The entire record is necessary for Plaintiff's expert to evaluate the medical care at CCS.

**RFP 26 (documents relating to the investigation of, and discipline for, failures in the medication verification process in particular).**

Wellpath objects that this request is irrelevant and outside the court ordered scope of *Monell* discovery. It is not. The medication verification process CCS employees are supposed to conduct upon intake failed for Mays. No one verified his epilepsy diagnosis or his active prescription for anti-seizure medication. As a result, he never saw a doctor and he was not given the medication he needed to survive. This request is limited to discipline imposed during the five years preceding Mays's death, the time period Judge Cummings previously set for other *Monell* discovery. If Wellpath has not adequately addressed prior instances of the same failures that occurred with Mays, this evidence supports Mays' *Monell* claim.

**Documents Relating to Wellpath's Response to Employee Performance Deficiencies (RFP 27, 28, 30, 32, 35, 38-42, 44, 45, 47, 49, 52).**

RFP 27-54 all related to the same subject matter and likely could have been labeled as one request. These requests all sought documents related to Wellpath's responses to specific employee performance deficiencies noted in CCS's monthly staff meeting minutes during the two years preceding Mays's death. Each of these requests has nearly identical language calling for

> "Any and all documents evidencing or relating to any investigation, discipline, corrective action, performance improvement plan, written warning, verbal warning, additional training, or any other document addressing performance issues or deficiencies for" [a specific problem noted in Wellpath's monthly staff meeting minutes].

The documents responsive to the 15 RFP at issue in this motion relate to the following CCS employee performance issues identified in CCS monthly staff meeting minutes as follows:

- "lots of missing items on intakes, either not completed or not done at all" May 4, 2016 (RFP 27);

- "medication errors" - May 4, 2016, September 6, 2017 (RFP 28, 41);

- "Booking issues - missing a lot of intake documentation ie., Receiving Screenings, Intake Provider Orders…Med. Verifications (no follow through esp. with essential meds)"June 4, 2016 (RFP 30);

- "Med. Ver[ifications]… are not being initiated/completed upon intake" July 25, 2017 (RFP 32);

- "med[ication] ver[ifications] have also been lacking in accuracy - recently had 3 med.ver. stating 'no profile' by the nurse but had not been called on as when we recalled all 3 had med on file. This is unacceptable and is falsifying a record" August 8, 2017 (RFP 35)

- "Per Dr. Kim missing chart items/documentation at intake are lacking - be sure to do Intake Provider Orders" September 6, 2017 (RFP 38)

- "We recently had an emergency response for chest pain that ended up being anxiety because the pt. had not been receiving his psychotropic meds  for a few days" September 6, 2017 (RFP 39-40)

- "Missing Med Verifications - call Dr.'s for orders, do not endorse or leave on a desk or T.O. pile" September 6, 2017 (RFP 42)

- "I see many days of missing signatures on the Sick Call logs in the boxes indicating the number of and signatures that the sick calls have been pick up, I have been finding them lying around the Pharmacy incomplete or not addressed at all, in Jen's, Doc's or my mailbox. This is unacceptable. Sick Call is to be done every 24 hours. They can never be thrown away" September 6, 2017 (RFP 44)

- "Documentation greatly needs to improve for Continuity of Care to happen, esp. from Booking, Dr. needs a detailed progress note detailing any medical history, injuries, return from hospital, medications, etc" December 7, 2017 (RFP 45)

- "Med. Verifications- still missing quite a few or no follow through with completing them and calling for orders" March 7, 2018 (RFP 47)

- "need better documentation by nurse progress notes on intakes - any returns from hospital, injuries, significant medical history requiring medical treatments/meds to be ordered" August 9, 2018 (RFP 49)

- "Med Verifications not being completed in a timely manner or not at all. These must be reported in Booking at shift change as well as pulling the document out of ERMA so you know what needs to be completed and call Dr. for orders" October 3, 2018 (RFP 52).

The requests at issue in this motion all focus on performance deficiencies relevant to Plaintiff's *Monell* claim in this case. Wellpath has responded to each and every one of these requests in an identical fashion as follows:

**Defendant objects to this request**. **This request is not relevant, overly broad, unduly burdensome, and not properly limited in scope and disproportionate to the needs of the pending litigation. The Court has already determined that the scope of relevancy in this case is limited to Wellpath's intake admissions, treatment and monitoring of detainees with chronic conditions (Doc. 433, pgs. 4, 14). The instant request goes well beyond the bounds of the Court-determined scope in this matter. Objecting further, the instant request directly contradicts the scope pertaining to discipline as outlined in the Court Order entered on February 12, 2024. (Doc. 433).**

Wellpath either did or did not investigate, train or discipline its employees as a result of these specifically noted performance issues. If it maintains poor record keeping with respect to employee discipline, its poor record keeping does not relieve it from its responsibility to respond to these requests, nor should its poor record keeping shift the financial burden of locating these records to Amber Hirsch and her daughter. These performance issues are directly relevant to this case and Wellpath's attempt to use this Court's February 12th order to justify not answering these 15 requests is absurd. Each and every one of these requests relate to intake (also referred to as "receiving" and "booking"), and the treatment (including medication administration) of patients with chronic conditions, and thus the documents responsive to these 15 requests are well within—not outside-- the scope of this Court's February 12, 2024 order.

### REQUEST (AND RATIONALE) FOR AN EXPEDITED RULING

Wellpath's delay tactics in this case have been unphased by 18 motions to compel, and they are equally unmoved by court orders and admonishments. Even sanctions have little effect. In fact, sanctions are not an anomaly for Wellpath. Another court in this district sanctioned Wellpath for delaying the scheduling of a nurse's deposition for months. *Brusaw v. Hammond*, 2021 WL 3930128, (Judge Cole finding that attorney Neroda should be personally liable for "four months of canceling dates and ignoring emails"). While the *Bursaw* case involved the same attorney representing Wellpath here, the issue is not the lawyer but the company itself. Wellpath has been sanctioned by federal judges all over the country. See *Hernandez v. County of Monterey*, 2023 WL 6299863 (Wellpath found in

contempt of court for violating 43 of 44 provisions of a settlement agreement it entered into in a class

action lawsuit); *Johnson for Estate of Stewart v. Coos County*, 2023 WL 4002680 (default judgment entered

against Wellpath for violating discovery obligations, opinion contains extensive recitation of Wellpath

duplicity in the case): *Nall v. Correct Care Solutions*, 2020 WL 4597288 (W.D. Washington)(company

sanctioned for failure to produce ESI as ordered); *Estate of Moreno v. Correctional Healthcare Companies,*

*Inc.*, 2020 WL 5739747 (Wellpath held in contempt of court for refusing to comply with court order

granting motion to compel, court later entered default judgment against company as an additional

sanction); *Marziale v. Correct Care Solutions,* LLC, 2020 WL 4744859 (E.D. Arkansas) (the first of three

sanctions orders in this particular lawsuit, finding that Wellpath had "thrown sand in the gears" of the

court system due to discovery misconduct). In each case, Wellpath employed litigation tactics that

caused delay. Delay is a *de facto* corporate policy for Wellpath and a part of its business strategy.

Furthermore, in 2022, Wellpath went to trial on a case in federal court in Oklahoma, *Young v.*

*Correctional Healthcare Companies, Inc.* This case involved the death of an inmate in the Tulsa jail. The

jury returned a verdict against Wellpath for $82 million. The litigation is on-going, but Wellpath's post-

trial Rule 50 motion for judgment as a matter of law was denied last month, (2024 WL 81547).

Meanwhile, Wellpath is losing business all over the country. Hirsch's counsel has been

monitoring news accounts of this phenomenon and has identified the following jurisdictions which

have terminated Wellpath since January 1, 2023: Louisville, KY; DeKalb County, GA; Richmond

County, GA; Branstable County, MA. In addition, just recently, Wellpath abandoned the contracts it

had with the jail in Mecklenburg County, NC and the Georgia Department of Corrections. Moreover,

two United States senators from Massachusetts are calling for Senate hearings into the chronic

problems experienced by inmates in that state's prison system, which Wellpath has the contract for.

Plaintiff suspects that the deliberate delay tactics she is experiencing in this case are part of

Wellpath's larger plan to follow in the footsteps of another correctional health care corporation,

Corizon Health, Inc. Wellpath currently claims to be the largest privately-held company providing medical care to jail and prison inmates. But until several years ago, Corizon made that same claim. The companies have identical business models; both are privately-held companies rather than publicly traded corporations and both are owned by hedge funds. Like Wellpath, Corizon faced hundreds of federal lawsuits from inmates and their families. After losing a number of trials in 2022, Corizon filed for Chapter 11 bankruptcy in Texas and its officers organized a different company called Yes-Care to conduct the same business with most of the same staff and at the same jails. This legal maneuver has been called "the Texas Two-Step" by the Wall Street Journal, commenting that Yes-Care, formerly known as Corizon, "expands a legal tactic for cleansing businesses of litigation through bankruptcy." *Wall Street Journal*, September 19, 2023, https://www.wsj.com/articles/prison-health-contractor-expands-texas-two-step-bankruptcy-tactic-acac4928 (last viewed on Feb. 20, 2024). *See also* "Business Insiders Took Over Corizon Health, A Leading Prison Healthcare Company. Then They Deployed The Texas Two-Step," *Business Insider* magazine, August 21, 2023, at https://www.businessinsider.com/corizon-health-bankruptcy-yescare-texas-two-step-law-2023-8, last viewed Feb. 20, 2024; and public statement of the United States Senate Judiciary Committee, issued October 25, 2023 and available at https://www.judiciary.senate.gov/press/releases/durbin-warren-lawmakers-call-on-corizon-health-inc-to-answer-for-use-of-texas-two-step-evasion-of-liability-by-abusing-bankruptcy-system. For a more thorough analysis of how some large companies are using Chapter 11 bankruptcy to avoid liability for pending tort cases, see Ralph Brubaker, *Assessing the Legitimacy of the "Texas Two-Step" Mass-Tort Bankruptcy,* 42 No. 8 Bankr. L. Letter NL 1 (Aug. 2022.)

Time will tell if Hirsch's fears have any basis in reality. But at the very least, this Court should be aware of this information so that some urgency can be imposed on the pace at which this lawsuit proceeds. Marcus Mays died on November 8, 2018, when his daughter was seven years old.  She will be 13 in April and her attorneys are still trying to obtain written discovery from Wellpath. Allowing

Wellpath to further delay discovery and the resolution of this case is unfair to her.

### REQUEST FOR FEES PURSUANT TO FRCP 37(a)(5)

Federal Rule of Civil Procedure 37(a)(5) provides that "[i]f [a] motion [to compel] is granted – or if the disclosure or requested discovery is provided after the motion was filed – the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." FED. R. CIV. P. 37(a)(5). District courts possess wide latitude in fashioning appropriate sanctions under Rule 37. *Johnson v. Kakvand*, 192 F.3d 656, 661 (7th Cir. 1999). Federal Rule 37 empowers district courts to sanction a party for failing to cooperate in discovery and comply with court orders. *See* FED. R. CIV. P. 37. Attorney fees as a sanction under Rule 37 can be awarded by magistrate judges. *Hangzhou Aoshuang Co v. 008 Fashon*, 336 F.R.D. 154, 155 (N.D. Ill. 2020). Mays's daughter should not have to bear the fees associated with her counsel having to repeatedly seek court intervention to get Wellpath's counsel to comply with the Rules of discovery. Wellpath should bear that burden and is required to do so under FRCP 37(a)(5). Thus, Plaintiff requests that this Court order Wellpath to pay Hirsch's fees associated with her repeated efforts to force Wellpath to produce the discovery that is the subject of this motion.

### CONCLUSION

Plaintiff seeks a court order compelling Wellpath to provide the above requested discovery within 14 days or by March 22, 2024 and pursuant to FRCP 37(a)(5), to pay Hirsch's attorneys' fees associated with this motion and the time spent pursuing discovery that should have been produced months ago.

Respectfully submitted,

HAMILTON LAW OFFICE, LLC                    /s Torreya L. Hamilton
53 West Jackson Boulevard, Suite 620
Chicago, Illinois 60604
312.726.3173