1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
         CASE NO. 23-cv-01211-DDD-MDB
 3       _____

 4       ELIZABETH NARANJO, by and through its personal

 5       representative Estate of Cristo Jesus Canett,

 6            Plaintiff,

 7       v.

 8       WELLPATH, LLC, ET AL.,

 9            Defendants.

10       _____

11            Proceedings before MARITZA DOMINGUEZ BRASWELL

12       United States Magistrate Judge, for the District of

13       Colorado, commencing at 1:01 p.m. on March 5, 2024, in the

14       United States Courthouse, Denver, Colorado.

15       _____

16       WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE

17       HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18       _____

19                         APPEARANCES

20            ANNA HOLLAND-EDWARDS, RACHEL KENNEDY, AND DAN

21       WEISS, Attorneys at Law, appearing on behalf of the

22       Plaintiff.

23            ROBERT MCLEOD, Attorney at Law, appearing on

24       behalf of Defendants Wellpath, LLC, MICHELLE SILVA, AND

25       MAKAYLA PATTERSON.
         _____
                MOTION HEARING/DISCOVERY CONFERENCE
```

2

```
 1                    APPEARANCES (Continued)

 2            NATHAN WHITNEY, Attorney at Law, appearing on

 3    behalf of Defendants El Paso County Sheriff's Office and

 4    James Roybal.

 5            CHARLES WOOD, Attorney at Law, appearing on behalf

 6    of Defendant Anthony Lupo.

 7            RYAN DOHERTY, Attorney at Law, appearing on behalf

 8    of Defendant Jennene Scott.

 9    _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

3

```
 1                P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3    proceedings are herein transcribed, pursuant to order of

 4    counsel.)

 5              ("Indiscernibles" in transcript due to quality of

 6    audio recording.)

 7              THE COURT:  All right.  Case No. 23-1211, in the

 8    matter of the Estate of Canett v. Wellpath and other named

 9    defendants.  I will take appearance of counsel.  We'll start

10    with plaintiff's counsel, and then we'll -- I'll just sort

11    of go around the screen here.  But let's start with

12    plaintiff's counsel first.

13              MS. HOLLAND-EDWARDS:  Anna Holland-Edwards and

14    Rachel Kennedy on behalf of plaintiff.

15              THE COURT:  Okay.  All right.  Mr. Doherty, go

16    ahead.

17              MR. DOHERTY:  Ryan Doherty on behalf of Jennene

18    Scott.

19              THE COURT:  Mr. Whitney.

20              MR. WHITNEY:  Nathan Whitney on behalf of the El

21    Paso County Sheriff's Office.

22              THE COURT:  Mr. McClure.  Or is it McLeod?  I'm

23    sorry.

24              MR. MCLEOD:  McLeod.

25              THE COURT:  McLeod.  Okay.
```

4

```
1              MR. MCLEOD:  It's okay, Judge.  Ryan McLeod on

2      behalf of Wellpath.

3              THE COURT:  All right.  And Mr. Wood.

4              MR. WOOD:  Charles Wood on behalf of Anthony Lupo.

5              THE COURT:  Okay.  Do we have anyone else on the

6      line?  All right.  Are you all expecting anyone else?

7              MR. WEISS:  Dan Weiss here also for the plaintiff.

8              THE COURT:  I'm sorry.  Who is this?

9              MR. WEISS:  Dan Weiss also for the plaintiff.

10             THE COURT:  Okay.

11             MR. WEISS:  Thank you, Your Honor.

12             THE COURT:  All right.  We're here in connection

13     with a pending motion regarding confidential designations of

14     certain medical records.  That motion was filed at ECF 63.

15     I'm going to hear the parties briefly on that, but I have

16     some initial thoughts.

17             And we're also here because the parties have

18     raised a discovery dispute with the Court, and that is

19     reflected in their joint discovery dispute report filed at

20     ECF 69.

21             Let me start first with the motion regarding

22     confidential designation.  So my understanding, just to make

23     sure that I'm teeing this up correctly, is that Mr. Canett,

24     who is the deceased individual in this case or that this

25     case is about, has certain medical records that were
```

5

1    accessed by the plaintiff as part of the records inspection

2    that occurred, which is something that I had allowed in

3    connection with a review of a particular database that

4    Wellpath has control over.

5              Those medical records are -- have been produced in

6    this case as confidential or with a confidential designation

7    under the protective order, and there are arguments back and

8    forth about whether that confidentiality designation should

9    remain.

10             My initial -- have I teed that up right?  I just

11   want to make sure I've got the scope of the issue correct.

12   Okay.  I see heads nodding.

13             MR. MCLEOD:  That's right, Judge.

14             THE COURT:  My initial reaction to that, despite

15   the arguments that have gone back and forth about the

16   protective order and whether we're moving under the protect

17   -- protective order correctly or not, my initial thoughts

18   are this:  First, there is a protective order in place.

19   That protective order allows a party to designate certain

20   materials as confidential.

21             I do think there's a little bit of an ambiguity in

22   that protective order in Section 3 on Page 2.  That section,

23   which identifies what information is designated

24   confidential, reads as follows:  "Information designated

25   'confidential' shall be information that is relevant to this

1  case and that implicates common law and/or statutory privacy

2  under confidentiality interests," and then it lists all of

3  the things that it includes, but it is not limited to.

4        I think that provision could be read to mean that

5  the parties will designate medical records confidential.  I

6  think it could also be read to mean that the parties may or

7  are allowed to designate certain information, including

8  medical records, confidential.

9        But regardless of how that provision reads, it

10  sounds to me like there's no dispute that these records have

11  been designated confidential.  It's either that they were

12  designated confidential by the defendant when the inspection

13  occurred and this information was pulled out of the system,

14  or they've been produced -- and when I say, "they," I mean

15  generally medical records for Mr. Canett have been produced

16  under a confidential by the plaintiff.

17        So either way, these records are confidential and

18  should be treated as such unless and until the Court

19  determines that they don't need to be treated that way.

20        So then I move onto the next step of this, which

21  is, well, how are records de-designated confidential, right?

22  So how do you remove that confidentiality designation?  And

23  it seems pretty clear that there's this objection process,

24  and under that process, it is the party who is intending to

25  keep the confidentiality designation that has the burden of

7

1    proving there is good cause for -- for a confidential

2    designation.

3        So here, the defendants are wanting to keep that

4    confident designation.  So you all have the burden of

5    showing good cause.  I certainly believe that the fact that

6    these are medical records and are subject to HIPAA

7    protections is good cause, except that in this case, you've

8    got an estate that is essentially seeking to waive those

9    protections.

10        So then the question for me was, can the estate

11    waive those protections, and although nobody seemed to brief

12    this issue, I do want to hear what your position is on that.

13    Can the estate essentially waive those?

14        And if it can, then the next question for me is

15    going to be to defendants, what other good cause would you

16    have to keep these records confidential?

17        So that's where I'd like to start.  I apologize

18    for the long-winded intro, but that gives you a sense for

19    how I'm thinking about this.  I'm going to start with

20    defendants and ask you, one, is it your position that the

21    estate cannot waive those protections on behalf of Mr.

22    Canett, who is now deceased; and two, if -- if you're wrong

23    on that and they can waive those protections, what other

24    good cause would you have to maintain a confidentiality

25    designation?

8

1          MR. MCLEOD:  Well, first off, I -- I appreciate
2    it, Judge, for getting us almost all the way across the
3    finish line here.  I have not personally briefed or
4    researched that issue as to whether the estate can waive
5    those protections.  If I may skip that initially and maybe
6    circle back to it.
7          I think that even assuming it can, there's a
8    method under which these records were obtained I think lends
9    some creed to the confidentiality.  These are records that
10   were produced only by an on-site inspection.  We had to get
11   into the jail, we had to have the helpers initially log onto
12   the Wellpath system and access the records.
13         So they're -- while they are medical records in a
14   sense they have this HIPAA protected information of Mr.
15   Canett, this is what the providers see when they're
16   inputting information.
17         THE COURT:  So -- I -- I will tell you --
18         MR. MCLEOD:  I know the protective order --
19         THE COURT:  -- Mr. McLeod -- and -- and I'm sorry
20   to interrupt you.  I always think though it's helpful for
21   you to have my reaction to arguments along the way so you
22   can tailor your comments.
23         MR. MCLEOD:  Sure, sure.
24         THE COURT:  So I -- I view that, what you just
25   described, which is the way that they're housed and the way

Case No. 2:23-cv-01211-DDD-DMB   Document 95   Filed 05/16/24   USDC Colorado   pg 9 of 54
pg 9 of 54

9

1    that they're accessed and sort of the nature of the database

2    within which those records are found, to be relevant to the

3    analysis only to the extent you're arguing that something

4    that's already protected maintains its protection, right?

5            So certainly all of that goes to they've been

6    treated as confidential, but they're confidential for that

7    underlying reason, which is that they are medical records,

8    and in this case, they are the deceased's medical records,

9    and the estate purports to represent the deceased and is

10   waiving those protections, which kind of just circles us

11   right back to are --

12           MR. MCLEOD:  Well --

13           THE COURT:  -- they really confidential anymore?

14           MR. MCLEOD:  I'll also a say (indiscernible)

15   Judge, that to a certain extent, they're business records in

16   a sense that they're located on this system.  I know the

17   protective order also allows the parties to assert rights of

18   third parties or -- or nonparties to the case, which I sense

19   will be CorEMR, who has developed this proprietary software.

20           And I know in (indiscernible) the HIPAA protection

21   from the fact that some of these records are Mr. Canett's

22   medical records, some of these documents don't have any of

23   Mr. Canett's information.  They're blank, they're forms.

24   They're nothing other than business records.

25           And so to that extent, we would assert that the

1    confidential -- confidentiality is a separate issue and

2    would apply separate from any analysis of whether the estate

3    could waive HIPAA.

4            THE COURT:  But what is the sort of confidential

5    nature or proprietary nature?  Because I think that's kind

6    of what you're alluding to is -- and when you say they're

7    business records, I mean, is there some proprietary

8    characteristic of these blank forms that I need to be

9    concerned about?

10           MR. MCLEOD:  Well, I -- I think the issue is the

11   goings of the -- the business and how they input and record

12   information that is relevant to -- to how they operate and

13   function as -- as a business entity.  I mean, they're --

14           THE COURT:  Okay.

15           MR. MCLEOD:  -- they're business records just like

16   any other.

17           THE COURT:  Okay.  All right.  Who's going to

18   argue on behalf of the estate?

19           MS. HOLLAND-EDWARDS:  I am, Your Honor.  So just

20   to the Court's first question whether the estate can waive

21   the (audio interference) of the deceased, I think that's --

22   the parties didn't brief it, but I think it's pretty clear

23   that the estate can.

24           The Colorado Health Regulation -- you know, HIPAA

25   adopts Colorado regulations of the formed state regulations

1    for defining terms.  A designated representative is if

2    there's an estate (indiscernible) is the personal

3    representative of the estate for HIPAA.  That person can

4    sign a release to obtain records, that person can file a

5    lawsuit, which obviously waives a bunch of the HIPAA

6    material.

7            With respect to whether there's some difference

8    because we got these through the inspection whether -- or

9    you know, whether we got them from the County or from the --

10   from Wellpath's records, my problem with the record I get is

11   not this sort of secret process of proprietary.  It's that

12   they don't do a good enough job giving me the full records.

13           So if you look at the Restricted Exhibit 3 that we

14   did, you'll see that we, you know, tried to do a comparison

15   of one ones that they are -- or they're asserting

16   confidentiality and ones that they're not, and there are

17   simply different views of the same document that are

18   expanded to include all of the evaluations.

19           I don't think that -- the only difference between

20   those documents is that they are -- you know, somebody

21   clicked.  You know, there's different views.  And just this

22   week we were in Mr. McLeod's office to do a review like this

23   in a different case, and we all sat there and said, "What

24   happens if you click this view?  What happens if you click

25   this view?"

```
1           So they printed -- again, they accessed the
2    database, printed the records, and it's the printed view I
3    want.  I don't think that that was some effort to protect
4    proprietary business interests.  It was just the way their
5    Print All system works, but they are fundamentally the same
6    record, and it's my client's records.
7           And so to hamstring our ability through the
8    protective order, which we all signed to facilitate getting
9    stuff out so then we can seek intervention when necessary,
10   not to agree that forever they are the keeper of my -- my
11   client's HIPAA information is to me just is creating all
12   this process where I -- I (indiscernible) accidentally filed
13   confidential information last week that I did in fact
14   (indiscernible) quickly (indiscernible), and the Court
15   (indiscernible), which I appreciate.
16          But it kind of shows exactly how cumbersome this
17   process is.  You know, like there are -- there's so many
18   different categories of information, and it certainly seems
19   like I should be able to not be worried every time my
20   client's (indiscernible) medical records that I'm going to
21   be violating some purported interest of Wellpath.
22          THE COURT:  Okay.  All, right.  Well, we've got a
23   lot of other thing s to cover, so we're going to move on,
24   but I've heard the parties, I've reviewed the motion, the
25   response and the reply, and I am going to deny the motion as
```

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

1    ECF 63 because I do find that defendant bears the burden of

2    showing good cause to maintain a confidentiality designation

3    over these medical records, and with the estate essentially

4    waiving protections or claims of protection over those

5    records, I just don't see good cause.

6             I'm not persuaded that, you know, the -- the mere

7    fact that this information is housed in a particular

8    database that is essentially a restricted database that only

9    Wellpath and approved users have control over somehow

10   converts what otherwise is not protected and to protect that

11   information.

12            And because there is a favored view of

13   de-designating documents and allowing concern documents to

14   be viewed in the public, I -- I find for all of those

15   reasons that the confidentiality designation should not be

16   maintained on these documents.

17            By the way, Ms. -- Ms. Holland-Edwards, it's --

18   it's neither here nor there anymore because I denied their

19   motion, but I don't -- I don't really view this notion of,

20   you know, it's too cumbersome as a good reason.

21            So just for future reference on other arguments, I

22   mean, litigation can be cumbersome and keeping track of

23   confidential records and nonconfidential records is just

24   part of -- part and parcel of litigation.  So I don't really

25   view that as a persuasive reason to de-designate otherwise

1    protected information.  But again, not relevant here --

2              MS. HOLLAND-EDWARDS:  Okay.

3              THE COURT:  -- in my ruling.

4              MS. HOLLAND-EDWARDS:  Okay.

5              THE COURT:  Okay.

6              MS. HOLLAND-EDWARDS:  (Indiscernible) other is not

7    necessary, so I'll let it go.

8              THE COURT:  Okay.  All right.  The next issue is

9    the joint discovery dispute report that was filed at 69, and

10   it looks like there are various disputes.  The first is just

11   a threshold issue.  It sounds like the parties have already

12   come to agreement with respect to certain RFPs, and

13   plaintiff is just asking for a deadline.

14             Ms. Edwards, do you want to just give me a quick

15   update on where you are?  Have you had certain items

16   produced to you already, or are you still waiting for some?

17             MS. HOLLAND-EDWARDS:  I'm still waiting for

18   everything resulting from this conferral.

19             THE COURT:  And is it all from Wellpath, or is it

20   also from the El Paso defendants?

21             MS. HOLLAND-EDWARDS:  No.  This is just stuff from

22   Wellpath.

23             THE COURT:  Okay.  So Mr. McLeod, you want to give

24   me an update on where things are with that?  It's Footnote 1

25   of ECF 69.

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

15

1          MR. MCLEOD:  I'm pulling it up right now, Judge.

2          THE COURT:  It says the production of phone

3    numbers used by Wellpath --

4          MR. MCLEOD:  Yes.

5          THE COURT:  -- staff, schedules, documentation --

6          MR. MCLEOD:  Yes.

7          THE COURT:  -- identifying communications --

8          MR. MCLEOD:  I --

9          THE COURT:  -- regarding critical positions.

10         MR. MCLEOD:  Yes.  So I -- I've asked for that

11   information from my client, Judge, and I think at this

12   point, the best process is -- and I'm sure my -- my client

13   would agree too it, is if we could just have a date by which

14   I can flash that in front of them to kind of get things

15   moving, I think that would be in everyone's interest for

16   that information.

17         THE COURT:  Okay.  But I'm looking at --

18         MR. MCLEOD:  And for everything

19         (indiscernible).

20         THE COURT:  I'm trying to figure out -- I'm trying

21   to figure out the -- the volume, right, and what date is

22   reasonable.  I mean, if I give you a date of tomorrow, I

23   assume you're going to tell me that's too soon.  So give me

24   a reasonable --

25         MR. MCLEOD:  I would.

1          THE COURT:  -- estimate.

2          MR. MCLEOD:  I -- I -- I think two to three weeks.

3    You know, I would aim for three from today, but I -- if --

4    you know, there's a pressing issue in terms of -- I know we

5    have expert deadlines coming up for some of this stuff, but

6    -- but I don't see why we couldn't get it done within two to

7    three weeks.  I don't know if my colleague has thoughts on

8    that on timing.

9          THE COURT:  No.  That's good.  Thanks.  I'm going

10   to give you until March 19th to produce that.

11         MR. MCLEOD:  Okay.

12         THE COURT:  Okay.  So now let's go onto the next

13   categories.  The first category is the mortality reviews.

14   One of them is essentially what looks like a report or a

15   portion of the report, and then the rest is with respect to

16   mortality reviews of other patients.

17         So let's start first with the report in this part

18   three issue related to what Wellpath claims as PSWP.  I

19   think I've got the acronym right.  Mr. McLeod, can you help

20   me just understand what this report is and who went to?  Who

21   was the PSO that it was intended for and that it went to?

22         MR. MCLEOD:  Yes, Judge.  It -- it -- it went to

23   the Center for Patient Safety, and I included the date in

24   our discovery disposition statement as to when it was sent.

25   I mean, it's -- it's -- it's privileged patient safety work

1   records in a sense that it contain conclusions and

2   recommendations based on what occurred, and -- and it falls

3   within the statutory definition, and it was created for that

4   purpose.  You know, I -- I -- let me see if I can pull up

5   our position.

6            THE COURT:  No.  I've got your position here.  I

7   mostly just wanted to understand, so this -- tell me about

8   the Center for Patient -- what is it, the Center for Patient

9   Safety?

10           MR. MCLEOD:  The Center -- the Center for Patient

11  Safety.

12           THE COURT:  Tell me about them, just help me

13  understand that relationship, what to they do this report.

14  Just give me some context.

15           MR. MCLEOD:  Sure.  So it's -- it's -- it's a

16  certified PSO that Wellpath's been a part since May of 2016,

17  and it's essentially a division that they work with to

18  produce the sort of documentation to review and provide

19  various recommendations and evaluations on the care that

20  occurs throughout the facilities that Wellpath provides

21  services across the country.

22           It's a collaboration, from what I understand, and

23  it's sort of insulated in a sense that the -- the

24  documentations that they provide in those communications are

25  covered by patient safety work product privilege.  I -- I'm

1   happy to provide more information, but that's really the

2   extent of our knowledge as to their relationship.

3           THE COURT:  Okay.  Why is it that only part three

4   is privileged?

5           MR. MCLEOD:  My understanding that part three is

6   privileged because that's really the only part that is

7   actually provided to the PSO.  I've been told that parts one

8   and two are not actually given to the Center for Patient

9   Safety.  It's only part three.  So that's why Wellpath

10  claims privilege only over part three.

11          THE COURT:  Okay.  All right.  Ms. Edwards, I took

12  a look at the various cases that were cited.  The one that

13  jumped out at me was the Nelms case because it looks pretty

14  directly on point.  You've got Wellpath in that case, and

15  they have this three-part report, and part three is the R&R,

16  whether -- the report and recommendation that gets turned

17  over to the PSO, and the Court goes through the analysis and

18  finds that it meets the criteria under the -- there's two

19  many acronyms in this case, PSQIA.  So how is this case

20  different?

21          MS. HOLLAND-EDWARDS:  Well, it's a couple ways,

22  Your Honor.  I mean, first there's an affidavit in that

23  purports things.  So I've been asking since December for

24  proof that this was submitted to a PSO and haven't been able

25  to get it.  The first time I've seen a date or even like

1   representation by counsel was in the joint statement last

2   week.  And there have been several cases or instances where

3   it's been alleged that it was submitted, and then they

4   couldn't give me any proof that it was submitted.  So and

5   that's one major distinguishing factor.

6          I also -- you know, in the initial discovery

7   requests where we asked for this, were told the whole thing

8   was privileged.  I conferred and asked for proof that was it

9   submitted.  Then they said they withdrew PSQIA parts one and

10  two, and I was told that Mr. McLeod -- and I don't -- this

11  is not -- this is on Wellpath, not him, but didn't know

12  whether there was a part three.

13         And I said, "Well, I know there's a part three,

14  and so I'd like to have that."  And then I find out

15  (indiscernible) one submitted and they do refer to part of

16  it, but it's still not on the privilege log, and so I have

17  no proof of it being submitted.

18         So then also here, there are three -- at least

19  three -- three documents that require a review with

20  conclusions about what happened, a full review, an

21  administrative review, and conclusions about what happened

22  for recommendations for the future that's conveyed to staff

23  and that's conveyed to the County.

24         This is an accredited jail by the NCCHC and ACA,

25  in case you want more acronyms.  That -- those accrediting

1   organizations require a mortality review.  It's the County's

2   policy on MHS for requiring a mortality review with

3   conclusions conveyed to staff, and Wellpath's policy, which

4   really just is a restatement of the NCCHC's accreditation

5   requirement, also requires this be done.

6        So to some degree, their -- either they -- they're

7   doing something else that's not this and this is only for

8   the PSO, in which case I'd like to see some proof of that,

9   and whatever else they did to satisfy these other three

10   requirements, which hasn't been produced or have an

11   admission that they're not maybe policy requirements of

12   Wellpath or the County and NCCHC didn't to a review.

13        But you know, I think this more about

14        (indiscernible), which talks about places where

15   they're trying to use these -- these part one, two, and

16   three documents to satisfy multiple, you know, requirements

17   across the board.

18        THE COURT:  Okay.  All right.  Well, Mr. McLeod, I

19   100 percent agree with Ms. Edwards about the first point she

20   made, which is that one thing that distinguishes this case

21   from the Nelms case is that there was an affidavit in that

22   case, and that is something that stood out to me and I

23   couldn't find anywhere in the submissions here.

24        I do think that at -- at a minimum, you need

25   somebody who's going to attest to under oath that this

1    information was submitted to this PSO for the purpose that

2    is outlined in the applicable statute.

3              I think if you satisfy those requirements, Ms.

4    Edwards, this does fall into that -- into that at analysis

5    was that was conducted in Ms. Nelms case.  Obviously it's

6    not a case that I'm bound by, but I found it persuasive, and

7    I don't see any reason to deviate from that.

8              That said, Mr. McLeod, I do think there's an open

9    question as to whether you -- your client has been fully

10   responsive because if there are other documents that were

11   prepared, other mortality review documents that were

12   prepared to satisfy these other regulations that are not

13   this document that's subject to privilege, then you've got

14   some additional production to do.

15             So where does that leave us, Mr. McLeod, in terms

16   of, you know, getting an affidavit and making sure that

17   you've been complete in your responses?

18        MR. MCLEOD:  Well, in -- so from our perspective,

19   Judge, we have been complete.  The only document I've been

20   told that exists is part three.  I am more than happy to go

21   and get this affidavit, and if, presuming it can be produced

22   within the two weeks that -- that we've been discussing as a

23   deadline, I think that would be -- would satisfy essentially

24   the criteria we've been discussing in the Nelms case.

25             I don't know right now if other documentation

22

1    exists.  I've been told it doesn't, that it's only just part

2    three that we haven't produced, which I haven't even been

3    given.

4          THE COURT:  All right.

5          MR. MCLEOD:  Which is why it hasn't been logged.

6          THE COURT:  Okay.  Well, why don't you go back and

7    talk to your client about preparing an affidavit on this

8    particular document, this part three that you've been

9    talking about because that's certainly going to be

10   necessary.  Second, make sure the production --

11         MR. MCLEOD:  Okay.

12         THE COURT:  -- has been complete, and then after

13   that, confer with Ms. Edwards.  I will tell you that in

14   other cases where I have concerns about whether there's been

15   a complete production, I have brought in a witness or

16   custodian essentially to come in and testify live in court.

17         MR. MCLEOD:  Okay.

18         THE COURT:  And then I can be satisfied that

19   everything has been done and reviewed thoroughly because I

20   -- I do have concerns about -- you know, I mean, Ms. Edwards

21   has made a good point.  If there's a regulation that

22   requires a mortality review and the only thing you have is

23   this part three that privileged, well, thou -- how is this

24   other regulation being satisfied?

25         There -- it sounds like there must be there's some

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

23

1    other documents or maybe this is a dual-purpose document, in

2    which case it loses its privilege.  So I -- I've got to

3    concern there.

4            MR. MCLEOD:  Wellpath (indiscernible).  Okay.  I

5    -- I understand, Yes, Judge.

6            THE COURT:  Okay.

7            MR. MCLEOD:  Where -- and -- and I will let it be

8    known to my client that if somebody has to come in and

9    testify, they'll have to come and -- and do that.

10           THE COURT:  Yeah, okay.  All right.  Great.  Next

11   piece is the continuous quality improvement records, and I'm

12   at one that looks like you're looking, Ms. Edwards, for

13   meetings where they're discussing improvements, and you take

14   issue with the time limitation because you're trying to show

15   pattern and practice for Monell claims.

16           So I guess my question, Ms. Edwards, is what --

17   what pattern and practice are you trying to show exactly?  I

18   mean, I understand the next -- the -- the argument that you

19   make with respect to budget and staffing, I get it.

20           You're trying to show sort of continuous,

21   consistent understaffing, underbudgeting.  But I wasn't

22   quite sure what you were trying to get at in terms of this

23   pattern and practice for these quality improvement records.

24           MS. HOLLAND-EDWARDS:  So I can tell you, Your

25   Honor, that the CQI and -- and mass meeting process is

1    necessarily (indiscernible).  So (indiscernible) quarterly

2    report and will choose different issues to evaluate.  And so

3    I -- I've read mass meetings of CQIs are that are totally

4    irrelevant to my claim and others that relevant because it

5    some degree depends what they decide to send me.

6           But they -- staffing is a frequent and really

7    every single CQI would be involved in discussing staffing,

8    what positions are unfilled, what positions have been

9    working on, whether there's recruitment efforts.  So all --

10   most CQIs have a review of that.  It usually also have a

11   review of open kites, right, and open grievance -- open

12   grievances.  And Mr. Canett told deputies in this case that

13   he submitted a kite asking to see a doctor.

14          We don't have that kite, but we do have some

15   documents from the County talking about the extreme number

16   of open kites, and we have testimony from healthcare workers

17   that staffing contributed directly to kites taking a long

18   time to answer and not being -- you know, the medical

19   requests --

20          THE COURT:  I know, but that --

21          MS. HOLLAND-EDWARDS:  -- to be seen

22   (indiscernible).

23          THE COURT:  That goes directly to burden.  I mean,

24   there's -- there's tons of kites, right, that get opened up,

25   and there's tons of grievances, and there's a lot of

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

1   information, I'm sure, that they can sift through that, you

2   know, could maybe give you a glimpse of some issues, but

3   that -- that amounts to a fishing expedition.

4          I mean, I'm not hearing something specific that

5   you're looking, some specific piece of testimony, for

6   example, like you gave me on the next category that -- that

7   says, "There's relevant information here that we still have

8   not been able to access."

9          I also am not hearing a good argument as to where

10  the time limitation should be, because I understand your

11  point that Q2 2022 is too narrow.  I agree with you.  But

12  you know, you get all -- all CQI records for all times.

13  There's got to be some reasonable time limit on this.

14         MS. HOLLAND-EDWARDS:  Well, I -- I hear what

15  you're saying, Your Honor, but the -- the (indiscernible)

16  you're talking about has been done for the CQI meeting.  So

17  the -- the HSA, the health service administrator, collects

18  that data.  It is in the CQI minutes already.  So all

19  Wellpath has to do is give me the minutes that they

20  maintain.

21         I'm asking for -- they meet once a quarter for --

22  and I think we have they were there about two years, and

23  we're saying that this pattern gets worse over the year and

24  a half before our client died and it continued thereafter

25  without getting cleaned up.  So I don't -- you know, there

1    is the CQI meetings I already have from the County, but I

2    don't have them all, and Wellpath is supposed to maintain

3    them also, and also Wellpath usually has the attachments,

4    which the County might not always have.

5            So I'm not asking Mr. McLeod to go back through

6    the kites, but that -- they did that in -- in preparing the

7    many meeting minutes, and I'm asking to have those minutes,

8    not just for -- I mean, he died, right -- I'm trying to

9    think, January, February, March.  So you know, probably the

10   whole -- the whole rest of that year could have review of

11   his quarter, but it's looking at overarching patterns in

12   provision of care.  And they have done that legwork already.

13   They just won't give it to me.

14           THE COURT:  Okay.  I -- I'm sorry.  I'm having a

15   little bit of a hard time hearing just because there's an

16   echo, and so I'm trying to catch things in between, but I --

17   I think what you're asking for --

18           MS. HOLLAND-EDWARDS:  Sorry.

19           THE COURT:  -- a year -- a year behind his

20   confinement period.  So if he was confined in April of 2022,

21   you're asking for April 2021 to 2022, and you're saying they

22   already have it, they just haven't turned it over?

23           MS. HOLLAND-EDWARDS:  Right.  I would ask for the

24   -- the Wellpath contract period, which I think was January

25   2020 until they went out in beginning of this year.  But

27

1   certainly I think year -- the year leading up and a year

2   after, so that's like eight total meetings evaluating these

3   trends, both before showing they knew about the trends and

4   after showing they didn't correct them.

5           THE COURT:  Okay.  Mr. McLeod, go ahead and

6   respond and talk to me about burden.  I mean, what I'm

7   hearing Ms. Edwards say is that this information is already

8   collected.  So the think I was concerned about was the --

9   the burden here, but it doesn't sound like a very big

10  burden.

11          MR. MCLEOD:  Well, the information's already

12  collected in a sense that these document already exist.  You

13  know, I think as we discussed, some of the documentation has

14  been produced by the County.

15          I -- I don't know specifically what -- I -- I

16  believe Q2 of 2022, and someone please correct -- correct me

17  if I'm wrong on that, has been produced and --

18          THE COURT:  Mr. Whitney, can you --

19          MR. MCLEOD:  -- you know, I --

20          THE COURT:  -- tell us what's been produced

21  already by the County?

22          MR. WHITNEY:  Your Honor, I -- I don't have it off

23  the top of my head, but my understanding is some of our

24  individuals employed by UPSO who have some responsibility

25  for management of the contracts and its provisions did have

1    some of that information.  So I requested what they have,

2    and that has been produced.

3        I don't know that they have a continuous set of

4    documents that I believe will be produced, but we have -- I

5    don't have the exact time frame that.  I think Ms. Edwards

6    is asking to go back and -- and Ms. Edwards, I apologize if

7    I'm not recalling off the top of my head, but we did produce

8    one additional set if I recall correctly in addition to our

9    initial production of documents relating to these meetings.

10        So I think at this time, that's the best synopsis

11    I can give the Court.  I apologize for not giving greater,

12    better detail as to exactly what -- what hasn't been

13    produced in that respect.

14        THE COURT:  All right.  Okay.  Mr. McLeod, your

15    client should produce these quality -- continuous quality

16    improvement records, which I, Ms. Edwards, take to mean the

17    meeting minutes and attachments to those meeting minutes for

18    a year, which would be six months before his confinement and

19    six months after his confinement.  So it should span that

20    full year around that date, if that makes sense.  I see

21    heads nodded, so I assume --

22        MR. MCLEOD:  It does.

23        THE COURT:  -- that makes sense.  Okay.  Contract,

24    budget, and staff info.  Similar issue around timing.

25    Anything unique I need to take into account here, Ms.

1    Edwards?

2              MS. HOLLAND-EDWARDS:  Let me think about that for

3    a minute.  I mean, the staffing is (indiscernible) limited

4    to six months before and six months after.  I mean, I -- the

5    pattern of deaths that we have alleged are -- is shown from

6    the pattern are combined for that year.  The staffing is so

7    -- such a rampant and well-testified to problem that I -- I

8    don't think I would be that hamstrung by that restriction if

9    that's what the Court thinks is appropriate.

10             THE COURT:  Okay.  All right.  Then same -- same

11   order with respect to contract, budget, and staff info, as

12   outlined in the joint dispute report, Wellpath should

13   produce information spanning six months before and six

14   months after the confinement.

15             Okay.  The next category is complaints regarding

16   care.  Plaintiff wants all documents.  I -- this was a

17   really broad request, Ms. Edwards.  Any complaint or

18   expression of dissatisfaction with your work as a healthcare

19   provider.  I -- that is very broad.  So you're going to have

20   to figure out how to narrow that before I issue any kind of

21   order compelling production of that.

22             MS. HOLLAND-EDWARDS:  And I have through conferral

23   been working on that, Your Honor.  Part of the problem is

24   not knowing what the magic words are for how they keep

25   things, but in conferral, what I've said I would want is any

1    -- the -- the -- the grievances about the individual

2    defendants specifically, board of nursing -- any board of

3    nursing documents either produced or put on a privilege log

4    so we can assess what the privilege is that they're claiming

5    about individuals, because we learned in the last deposition

6    that there has been a board of nursing review at least one

7    of the nurses based on the complaint being filed.

8           I think we have one other -- let me -- oh, I know.

9    I wanted any -- any write-ups.  So I think we have resolved

10   that, right, Mr. McLeod?  We have all the write-ups on file

11   now.

12          MR. MCLEOD:  We do, yeah.  We --

13          MS. HOLLAND-EDWARDS:  The grievances are -- I

14   mean, I have been given grievances in many cases where you

15   can see grievances about specific individuals.  I don't

16   think that that is very cumbersome to bring up.  They have

17   an electronic medical system at -- you know, for kites and

18   grievances at El Paso.  They can search by the individual

19   defendants to get those pieces of information.

20          I also asked for (indiscernible) meaning that I

21   think the -- the individual defendants --

22          THE COURT:  So -- so what is it --

23          MS. HOLLAND-EDWARDS:  -- (indiscernible).

24          THE COURT:  What -- what would you want in order

25   for me to say in compelling them to provide more?

1          MS. HOLLAND-EDWARDS:  Any grievances naming any of

2    the individual defendants, any lawsuits or board of nursing

3    documents about individual defendants, and lastly -- I say

4    lastly.  I think that was it.

5          THE COURT:  Okay.  Mr. McLeod, go ahead and

6    respond to that specific request.

7          MR. MCLEOD:  My only response, Judge, I have no

8    objection to lawsuits naming individual.  The grievances, I

9    -- I -- I believe Wellpath has produced personnel files for

10   each individual defendant.  I -- to my understanding that

11   would have been (indiscernible).

12         I don't know at this point, because Wellpath no

13   longer has a medical service contract, whether Wellpath

14   would be able to access any electronic database as El Paso

15   County to further produce on-site documentation.  So that

16   would be my only note for the record on -- on that.

17         The board of nursing documents -- and just to

18   provide a little background, the -- the compliant for Nurse

19   Silva, I can't speak to -- to any of the other individual

20   defendants, was especially a screenshot of a newspaper

21   article printed off the Internet.  We're happy to produce

22   that if -- if need be.  I don't think it contains

23   necessarily relevant information, but it -- it can be

24   produced.  The -- the board of nursing documentation can be

25   produced.

1      THE COURT:  Okay.  Ms. Edwards, I saw you shaking

2  your head at the notion that they've produced personnel

3  files.  Do you have their personnel files?

4      MS. HOLLAND-EDWARDS:  I mean, I do.  I just don't

5  think any of them contain grievances.  And I get frustrated

6  because I, you know, have been trying to confer for a long

7  time.  So hearing they don't even know if there's access to

8  nurse grievances so -- or if that's something I should be

9  conferring with the County on just -- it -- it's shifting

10  targets to get information from Wellpath.

11      And I -- I don't -- I've never -- I can't remember

12  times where I've seen grievances really in the personnel

13  file.  So I think that would be in a separate maintained

14  location.  I have received the personnel files, and I

15  appreciate those.

16      THE COURT:  Okay.  And then how far back are you

17  intending to go, Ms. Edwards, for these grievances?  Because

18  I assume --

19      MS. HOLLAND-EDWARDS:  I think --

20      THE COURT:  -- if you go too far back, then we're

21  looking at paper files, and so I -- that's -- that sounds

22  very cumbersome, but -- and I don't know how long these

23  people have been employed.  So maybe it's not an issue, but

24  how far back are you intending to go?

25      MS. HOLLAND-EDWARDS:  I would like to go back to

1    the Wellpath period.  Some of these people were there before

2    Wellpath, but I don't want to -- I'm not trying to go into

3    the archives or, you know, previous Wellpath

4    (indiscernible).

5             THE COURT:  Okay.  Well, I'm going to order the

6    defendants or Wellpath, but to the extent that the County

7    needs to be involved in some respect, I'm not sure, but

8    Wellpath to produce grievances dating back to, what was the

9    period of time?  Was it April 2020?

10            MS. HOLLAND-EDWARDS:  I think it was January 2020

11   to, what, December 2023.  Is that right, Mr. McLeod?

12            MR. MCLEOD:  What -- well, I -- I'm -- what time

13   frame are we looking at?

14            THE COURT:  I -- I want --

15            MS. HOLLAND-EDWARDS:  (Indiscernible).

16            MR. MCLEOD:  (Indiscernible).

17            THE COURT:  I want to do it from the date of the

18   Wellpath contract, which I thought was sometime in 2020.

19            MR. MCLEOD:  Right.  January -- yeah.  January

20   2020 to December '23, correct, Anna?  Correct.

21            MR. WHITNEY:  That sounds correct, Your Honor.

22            THE COURT:  Okay.

23            MR. WHITNEY:  If Your Honor, if I can interject

24   (indiscernible).  You know, this discovery request that was

25   not directed at the County, and I would like, to the extent

1    the burden of production gets pushed on us -- because I

2    don't know sitting here today what Wellpath's access is to

3    the -- to grievances filed through our kite system.

4           To that extent that burden gets pushed upon the

5    County because these were not produced during a time which

6    Wellpath was the contractor and still had access to the

7    system, that we be able to raise any objections to undue

8    burden as far as the time, the amount of labor, et cetera,

9    certainly being imposed upon the County, which then has

10   additional important obligations in terms of running a

11   facility.  So if it could take 100 man hours

12   (indiscernible), a lot of our employees and so forth to

13   this, I would like to be able to readdress it to the extent

14   that burden gets pushed on us.

15          THE COURT:  Yes, you can.  If you're looking at

16   the system and you find that there's a heavy burden

17   associated with pulling the date range that I'm ordering you

18   to pull, then yes, you can re-raise that with the Court.

19          But first obviously confer with plaintiff's

20   counsel, who I assume will be reasonable in narrowing the

21   request to reduce the burden, and then if you can't agree,

22   you can raise it with the Court.

23          Also, Ms. Edwards with, I don't see why you would

24   need it through -- when did you file this lawsuit?

25          MS. HOLLAND-EDWARDS:  I filed it in May of 20 --

1    THE COURT:  Oh.

2    MS. HOLLAND-EDWARDS:  -- 23.

3    THE COURT:  Oh, okay.  Okay.  So -- and then the

4  time frame was to January of 2023.  I just wanted to make

5  sure that the time frame, the cutoff was before you actually

6  filed the lawsuit.

7    MS. HOLLAND-EDWARDS:  Well, that was -- so I was

8  just trying to go through December of 2023, which is after

9  the lawsuit, but to me, if Wellpath -- you know, just even

10  after the notice of Wellpath, they continue to get

11  grievances about these same individuals, the problem

12  continues, that goes to (indiscernible) whether the pattern

13  of mismanagement of staff.  So I don't think the lawsuit

14  date is really the cutoff, but whatever.  You know,

15  obviously, I'd defer.

16    THE COURT:  I do think the lawsuit date is the

17  cutoff.  So that will be the cutoff date.  So it will start

18  when the contract started, it will end when the lawsuit was

19  filed.

20    Mr. Whitney, that will be subject to whatever

21  burden objections you might need to raise down the road.

22  Okay.

23    MR. WHITNEY:  And so, Your Honor, if I could just

24  for my clarification, the Court's ordered that Wellpath is

25  trying to obtain that information, to the extent that it

1    can't because it no longer has access to the system, then we

2    would try to pull that information, the County, subject to

3    additional objects due to burden, time, et cetera?

4            THE COURT:  Yes.  Thank you for that

5    clarification.  And so that it's clear in the minutes, this

6    order is an order with respect to Wellpath.  What we're

7    trying to do here is short-circuit additional disputes, and

8    I'm making clear that I would order the County, subject to

9    any burden objections, to assist with this prosecution to

10   the extent Wellpath hits certain limitations.  But the order

11   today --

12           MR. WHITNEY:  Thank you.

13           THE COURT:  -- is with respect to Wellpath.

14           Okay.  I also did not -- I don't think I made

15   clear when we were talking about the mortality review

16   records, the other issue there was whether you should have

17   access, Ms. Edwards, to patients other than Mr. Canett, and

18   I don't think you should.

19           So my order is with respect to the mortality

20   review related to Mr. Canett, and obviously that order is

21   subject to the other comments I made around Mr. McLeod, you

22   know, getting an affidavit and conferring with his client,

23   but I am denying any request as it relates to other

24   patients.

25           MS. HOLLAND-EDWARDS:  May I be heard on this, Your

1    Honor?

2          THE COURT:  Sure, sure.

3          MS. HOLLAND-EDWARDS:  So I'm a little -- so to the

4    extent that they are compiling evaluations of deaths in El

5    Paso County, which I've limited it to for the purposes of

6    this, is to satisfy the County requirements and the nation

7    requirements.

8          I don't -- those -- and I've alleged that this --

9    these deaths -- this is one in a series of a pattern of

10   deaths.  I mean, I think this was the 22nd death or

11   something, that it's a pattern that have certainly alleged

12   in the complaint, you know, and the names of all the people

13   are public because of the public document to expose those

14   deaths.  We have possibly all of the County (indiscernible)

15   investigations of those.

16         And so I don't -- in the sense that they are

17   making conclusions pursuant to an agreement with the

18   government about these deaths, and then not implementing

19   them, I don't -- you know, there's not a privilege log.

20   There's no -- (indiscernible) back to what the documents are

21   that they're using now to meet this obligation of

22   accreditation in a public facility, but their conclusions

23   about deaths there (indiscernible) public duty seems

24   directly relevant to me to the claim of the pattern that's

25   alleged that they don't respond to changes.

1    THE COURT: But you're asking for folks that are

2 not part of this lawsuit. Have you identified the specific

3 individuals, and have you identified sort of the -- the

4 links between those deaths and these deaths in terms of the

5 substantial similarity of them? Is that -- is that

6 something you've presented to them?

7    MS. HOLLAND-EDWARDS: Yes. I mean, that's in the

8 complaint (indiscernible) pages of descriptions of the other

9 deaths in El Paso that we(indiscernible). We spent like six

10 to eight months preparing this complaint, getting all of

11 these reviews of the death s in El Paso from the County and

12 looking for similarities and pointing out the deaths so we

13 can follow this pattern of not responding timely to medical

14 complaints, of noting the staffing necessary to review

15 people's medical complaints, you know, that we think is part

16 of this -- this pattern.

17    And so I understand that they're not our client,

18 but given the extremely high burden on plaintiff to

19 establish these patterns in a government functioning place,

20 I don't understand why documents where they can prove what

21 the problems were that aren't privileged wouldn't be, you

22 know, relevant when they're even alleged in the complaint.

23    THE COURT: So I mean, look, I can see the -- the

24 relevance to your Monell claims and your pattern and

25 practice claims, but we're talking about mortality review

1    records that are going to include highly sensitive

2    information, I suspect, about these deceased individuals.

3            And so I don't see this as a, you know, are they

4    relevant and should be get everything?  I think there needs

5    to be a higher standard here.  So to the extent that you

6    want individual -- documents related to individuals, I'm

7    going to need to see more about them.

8            I want to understand how they're related, if there

9    really are, you know, clear ties between those particular

10   patients and the deceased that's at issue in this lawsuit

11   before we just sort of open it up to you get everything

12   that, you know, involves what I suspect, again, is very,

13   very private and sensitive information.  So what's the right

14   way --

15           MS. HOLLAND-EDWARDS:  How -- how can I get that?

16   Yeah.  Like, is there briefing on that?  You know, I mean, I

17   think we can go through with a finer --

18           THE COURT:  How many people --

19           MS. HOLLAND-EDWARDS:  -- toothed comb the death

20   certificates.

21           THE COURT:  How many people are we talking about?

22           MS. HOLLAND-EDWARDS:  I mean, I have a spreadsheet

23   of the deaths of Well -- at El Paso (indiscernible).  It's

24   like 25 deaths, I think that were part of the pattern.  But

25   you know, there are some that (indiscernible) than others.

1    If the Court wants me to cite for them, like, these are the

2    ones I think are directly in this pattern, I mean, honestly

3    I think the pattern is not having a staff (indiscernible)

4    people dying from medical deaths as a result.

5            So really, it's not about the conditions as it is

6    about the lack of attention to medical needs, but I can go

7    through and, you know, make a showing and -- and make a

8    grievance about a protective order, but a lot of these

9    (indiscernible) you're talking about, not the conclusions of

10   Wellpath, but the sensitive information about these

11   individuals is public because of a government function.

12           So we have all of the incidents reports, we've

13   alleged them, in ten other lawsuits alleged them, and so

14   they're -- that information is in the public eye already

15   because of the public nature of the obligation.

16           THE COURT:  Mr. McLeod, what's your position on

17   it?

18           MR. MCLEOD:  Yeah.  Well, so I -- I will just say,

19   Judge, to -- to the last part, I mean, counsel's already

20   indicated she has this information.  So I'm not sure quite

21   sure really what is being sought from Wellpath except for

22   the specific mortality document that you highlighted has

23   some aspect of confidentiality and privilege as we discussed

24   from part three.

25           But I would be -- if you want me to confer with --

1    with my colleague if we can identify and limit and discuss

2    which of these former -- former patients are potentially

3    relatable to -- to Mr. Canett's case and care beyond, you

4    know, this broad notion that a lack of staffing or lack of

5    attention caused these deaths, because I think that opens up

6    sort of far more discovery than we have now in regards to

7    the intimate detail of each of these -- these events and the

8    circumstances that underlie their confinement.  So I think,

9    at a minimum, further conferral is required.

10         THE COURT:  Yeah.  Well, I have two -- I have two

11   concerns, and they're competing concerns.  One is, I

12   certainly don't want to open this up so that, you know, Ms.

13   Edwards, you get all of this information, and then it leads

14   to more information, it snowballs into something that is

15   just very, very disproportionate.

16         And that's not to say that this case is not an

17   important and that you don't need this, you know,

18   information, but obviously my job is to keep this discovery

19   process reasonable.

20         My second concern though, Mr. McLeod, is that you

21   really shouldn't be in the position or your client shouldn't

22   be in the position of self-selecting which ones are

23   relevant, right, and cherry-picking which ones to produce

24   and which ones not to produce.

25         MR. MCLEOD:  Sure.

42

1          THE COURT:  So it's a little bit tough for me, and
2     I will tell you part of it -- part of what makes this tough
3     is I feel like I'm doing this in a little bit of a -- of a
4     vacuum.  I don't know what you have, and that's obviously
5     the problem --
6          MR. MCLEOD:  I --
7          THE COURT:  -- that Ms. Edwards has, right?  She
8     doesn't know what information you have.  She doesn't know if
9     you prepared just certain reports, for example, for PSOs or
10    if you have some additional documentation, which goes back
11    to the issue that we discussed earlier that you need to
12    confer with your client on.
13         So at a minimum, there does need to be more
14    conferral, I think for you, Mr. McLeod, to talk it your
15    client about what information you have, about what
16    information might be relevant.
17         And then frankly, I think it might be helpful for
18    someone to just testify here and just explain what you have,
19    explain what you don't have, and then I can better
20    understand what is relevant and what is minimally burdensome
21    under the circumstances, or I suppose reasonably burdensome
22    under the circumstances.
23         So why don't you all confer a little bit.  Let's
24    put a pin in this mortality review issue as to both issues,
25    the mortality review as it relates to Mr. Canett and

43

1   potentially the mortality reviews as it relates to other

2   individuals.

3           Once you confer, I'm going to give you a deadline

4   for a joint status report, and then I'll decide whether to

5   set a hearing on where I can hear from a Wellpath

6   individual.  Does that make sense?

7           MS. HOLLAND-EDWARDS:  Yes, Your Honor.

8           MR. MCLEOD:  It does, Your Honor.

9           THE COURT:  Okay.  Let's see.  Let me just figure

10  out where we were.

11          MS. HOLLAND-EDWARDS:  I think we're at insurance.

12          MR. MCLEOD:  I believe all we have left is

13  insurance, (indiscernible) --

14          THE COURT:  Okay.  Yeah.  I mean, insurance --

15          MR. MCLEOD:  -- my colleagues.

16          THE COURT:  -- agreements are usually produced.

17  What's going on with that, Mr. McLeod?

18          MR. MCLEOD:  You know, Your Honor, I -- I can

19  provide the -- the declaration page.  We can produce the

20  declaration page.  And I've been given instructions that the

21  -- the agreement will only produced with a Court order.

22          THE COURT:  Okay.  Well, there's a --

23          MR. MCLEOD:  So --

24          THE COURT:  -- Court order.  You've -- you've got

25  to produce those.  I don't see any reason why those wouldn't

1    be --

2            MR. MCLEOD:  (Indiscernible).

3            THE COURT:  -- produced, yeah.  Okay.

4            MR. MCLEOD:  I agree.

5            THE COURT:  I --

6            MS. HOLLAND-EDWARDS:  Your Honor, can I just

7    (indiscernible), Your Honor?  I -- I -- (indiscernible).

8    Wellpath  (indiscernible) taking this position that there's

9    -- they don't need a Court order to produce documents that

10   are ordered by rule, and the answer always is -- you know,

11   Mr. McLeod and I have very reasonable conferrals, we come up

12   with proposals, but they get shot down by the client, and

13   then the answer always is, "You have to get an order for

14   it."

15           And it's -- I don't know what the right -- I'm not

16   even asking for specific -- maybe just an admonition to the

17   client because I don't want -- I'm not trying to make this

18   unduly contentious, but the need to get a Court order for

19   basic things is really slowing down the litigation and kind

20   of taking away my attention from where I like to be spending

21   it.

22           THE COURT:  Sure, I understand.  And frankly,

23   that's part of the reason why I think the best approach here

24   is going to be to have somebody from Wellpath coming into

25   Court and testifying.  I think sometimes it's important for

1    the client to feel the weight of litigation for themselves.

2            You know, they often just sort of put it on the

3    attorneys to go in and have the fights for them, and

4    sometimes they need to get involves in well as understand

5    that this is a serious proceeding and they have

6    responsibilities.

7            So all the more reason why Mr. McLeod, I'm likely

8    going to have somebody from your client, just a

9    representative to come in, sit under oath, and answer some

10   questions from the Court.  And to the extent it's helpful to

11   have them questioned by the parties, I might do that as

12   well.  Okay.

13           MR. MCLEOD:  And is that -- is that an order -- is

14   that going to be an order specifically (indiscernible) --

15           THE COURT:  No.

16           MR. MCLEOD:  -- mortality reviews?  Is that kind

17   of a future issue?  I'm just trying to.

18           THE COURT:  It's going to the mortality review

19   issue, but hearing what I'm hearing from Ms. Edwards, this

20   may also be something I address there in terms of not

21   waiting Court orders to be helpful participants in

22   litigation because it just slows things down unnecessarily.

23           In any event, the joint status report --

24           MR. MCLEOD:  I understand.

25           THE COURT:  -- is going to be due on March 20th.

46

 1   I think that gives you all plenty of time, Mr. McLeod, to

 2   confer with your client, and then to confer with Ms.

 3   Edwards.  That joint status report will give the Court an

 4   update on what discussions you've had with respect to the

 5   mortality reviews and tell me whether you've reached

 6   agreement on certain documents to provide in connection with

 7   that request.

 8          If you haven't reached agreement, the Court will

 9   set a date for an evidentiary hearing essentially to get

10   testimony from a custodian about what information is kept in

11   connection with these mortality reviews, the purpose of that

12   information, so how are they prepared and why are they

13   repaired and who do they go to, and then the related nature,

14   I guess, of these individuals that Ms. Edwards has

15   identified as being substantially similar and warranting

16   disclosure of mortality reviews for them as well.

17          So essentially it's two buckets, right?  Anything

18   related to Mr. Canett, and then anything related to these

19   other individuals who passed away under similar

20   circumstances according to plaintiff.

21          MR. MCLEOD:  And -- and the potential testimony

22   being about the mortality documents related to those?

23   Because I don't know that there's a person who would know

24   any specific, you know, intimate details that would testify

25   as to the relatedness if -- if that makes --

1          THE COURT:  Well, so --

2          MR. MCLEOD:  -- sense.  I -- I don't --

3          THE COURT:  So you might -- I mean, you might need

4    to have two people.  I'm not sure.  I -- I want somebody

5    who's --

6          MR. MCLEOD:  Okay.

7          THE COURT:  -- going to be able to help me

8    understand what these mortality review records are.  Are

9    they just this report that's produced to this PSO that you

10   just described to me and part three is the only one that

11   gets turned over to this PSO, or are there other documents

12   that can fairly be considered mortality review records that

13   -- that don't get produced to these PSOs, that are prepared

14   for purposes of satisfying the regulations that Ms. Edwards

15   pointed out?

16          And if there aren't these other documents, right,

17   that is not going to PSOs, that are not privileged, then --

18   then does that mean that this part three document is

19   essentially a dual-purpose document that serves both for the

20   purpose of satisfying the PSO's -- you know, the PSO

21   relationship that they have, but also for the purpose of

22   satisfying these regulators?  And if that's the case, I

23   don't know that they have this privileged nature, right,

24   that your client is claiming.  So that's -- that's kind of

25   the first --

48

```
 1            MR. MCLEOD:  I -- I understand.

 2            THE COURT:  That's the first piece of it, and

 3    maybe that's just one custodian who helps me understand,

 4    like, how these records are prepared and what records exist.

 5            But the second piece is all of these other people

 6    that Ms. Edwards has identified, I -- I don't know how I'm

 7    going to be able to discern, you know, which ones are

 8    substantially related, and I don't necessarily want to leave

 9    it to your client to cherry-pick which ones are similarly

10    related.

11            But it also seems like, you know, I think Ms.

12    Edwards said 25.  Getting records and documents for 25

13    individuals seems so broad that I want to find some way to

14    narrow it.  So I'm hoping you've got somebody who can help

15    me understand maybe how these folks are categorized, what

16    information is out there that can help me categorize and

17    draw the lines.

18            MR. MCLEOD:  I hope so too, Judge.

19            THE COURT:  Okay.  And maybe --

20            MR. MCLEOD:  That's the goal.

21            THE COURT:  And maybe --

22            MR. MCLEOD:  That's the goal.

23            THE COURT:  -- you can resolve one of those,

24    right?  Like maybe you all come to some agreement where you

25    say, "Here's ten that I know relate," and you don't even
```

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

1    need to bring this dispute to me.  But if you can't resolve

2    these issues, then we're going to have an evidentiary

3    hearing where you have a custodian testifying.

4         MR. MCLEOD:  Understood.

5         THE COURT:  Okay.  All right.  Did I -- did I

6    address everything in the joint discovery dispute report?

7         MR. WHITNEY:  Your Honor, can I raise one issue?

8    And I apologize.  Since we didn't get involved in production

9    in part of this once the wheels got turning with respect to

10   grievances as related to two nurses, Silva, now Pablo (ph)

11   and Lupo, there are a lot of the kites and grievances sent

12   through electronic system.  There are hundreds of thousands

13   likely for a year or two years.

14        Some of those medical-related grievances may be

15   the nurse didn't do this, the nurse didn't --

16        THE COURT:  Yeah.

17        MR. WHITNEY:  -- didn't do that.

18        THE COURT:  Yeah.

19        MR. WHITNEY:  Without specifically

20   (indiscernible), so I just want to make sure that the

21   Court's order to this is not --

22        THE COURT:  Can those be searched electronically?

23   Like, can you do like 16 words --

24        MR. WHITNEY:  I would -- we can --

25        MR. MCLEOD:  Judge --

1       MR. WHITNEY:  We should be able to do that.  My --

2  my concern is if we just (indiscernible) nurse, and then

3  trying to ascertain whether an inmate was making a complaint

4  this nurse or that nurse, but I think the keyword can

5  hopefully narrow it down.

6       THE COURT:  So and that -- that's where I was

7  going because I do -- I mean, it -- I -- I'm foreseeing your

8  burden objection here if -- you know, if the Wellpath

9  defendants can't -- or Wellpath can't access this

10  information in a way that is targeted.

11       I mean, Ms. Edwards, is there a way to develop --

12  can you think of keywords that you can develop that would be

13  a more targeted way of having these defendants pull truly

14  relevant information?  Because I mean, folks file grievances

15  on a lot of things, right?  Like I didn't get my bar of soap

16  or what -- whatever it is, and that's not -- that's not

17  something you need to see, and that's not something they

18  need to take the time to review and potentially have to

19  redact.  So is there an easier way to do this?

20       MS. HOLLAND-EDWARDS:  Yeah.  I mean, I think those

21  -- importantly, I think (indiscernible) conferral on this is

22  how are they kept, and the one thing, I'm -- I'm usually

23  pretty good at working with opposing counsel once I

24  understand the -- the system available to me that it's

25  proposing.

**PATTERSON TRANSCRIPTION COMPANY**

scheduling@pattersontranscription.com

51

1          But I can tell you what I can see from the outside

2    is that kites and grievances are classified and sent in a

3    specific way.  So there's medical versus, you know, like

4    soap or (indiscernible), what those (indiscernible).

5    They're already divided kind by the nature of the

6    submission.

7          I think what Mr. Whitney's talking about is people

8    might say, "The nurse was mean to me," and what's his

9    obligation to figure out which nurse they're talking about.

10   I'm a realist, and like I understand he's not going to be

11   able to do that, right?

12        THE COURT:  Yeah.

13        MS. HOLLAND-EDWARDS:  I believe that there are a

14   lot of frequent flyers and sophisticated people in -- in the

15   jail that know the person that's not giving them what they

16   want, and I -- one of the main issues in this case is there

17   was an LPN, a charge nurse almost every night.  So while I

18   don't think they have to look up every nurse, the same

19   charge nurse was the charge nurse all the time and -- and

20   that's -- and she's a defendant here.

21        But I feel confident that if it becomes Mr.

22   Whitney's and he explains what he has available to him, then

23   we can come up with a reasonable limitation that won't land

24   us back here.

25        THE COURT:  Okay.  I do understand the issue Mr.

52

1    Whitney was raising, and I agree with him, and I don't

2    think, Mr. Whitney, that you are responsible for trying to

3    track down which nurse is being referenced when it's not a

4    specific nurse, but that -- I was sort of tying that to

5    another issue, which is just the general burden associated

6    with combing through every grievance and wondering if there

7    -- if there was a way to cull that down through keywords.

8            Ms. Edwards, what I'm hearing you say is it's

9    already culled down in a sense because it is sectioned off

10   by medical needs versus other needs.  Maybe that's the case,

11   but I'm -- I'm still going to allow Mr. Whitney to come back

12   and -- and assert any objections he might have on burden.

13           And to the extent there is a way to reduce that

14   burden preemptively, Ms. Edwards, by coming up with some

15   keywords that they could plug into the system, think about

16   that as a solution during your conferrals because keywords

17   may be --

18           MS. HOLLAND-EDWARDS:  Okay.

19           THE COURT:  -- a good way to really target

20   information.  Okay.  Anything else the parties want to

21   raise?

22           MS. HOLLAND-EDWARDS:  The one related issue on the

23   board of nursing complaint, you know, in conferring, we did

24   not -- haven't finished conferring, but with Defendant

25   Lupo's counsel about what they found out about the Silva

1    board of nursing, and they've -- I understand the

2    (indiscernible) been updated (indiscernible) about whether

3    there was a similar investigation into Nurse Lupo.

4         And so I would just ask that that be done with a

5    privilege log (indiscernible) being maintained by the same

6    two-week date that you gave for Wellpath so we can see if

7    there's any issues there.

8         THE COURT:  I had a hard time hearing the last

9    part of that, but what is it that you're asking for?

10        MS. HOLLAND-EDWARDS:  I just said it conferring on

11   whether there are board of nursing documents about Defendant

12   Lupo, and there -- I think counsel has said they will submit

13   them as disclosure updates soon, and I'm just asking for the

14   same deadline of two weeks, I think you gave Wellpath --

15        THE COURT:  I see.

16        MS. HOLLAND-EDWARDS:  -- to get that to me.

17        THE COURT:  Okay.  Mr. Wood, is that your client?

18        MR. WOOD:  Yes.  That's -- that sounds good.

19   Yeah.  In fact, I -- we put together an updated disclosure

20   and privilege log, and I thought it was sent over to

21   plaintiff's counsel, but it seems like they never received

22   it.  So that deadline is fine with us, and I'll make sure

23   that we get the updated discovery response and privilege log

24   over to Ms. Holland-Edwards.

25        MS. HOLLAND-EDWARDS:  I'm (indiscernible).  So I

54

1    didn't -- I haven't -- I couldn't find it.

2              THE COURT:  Okay.  All right.  Anything else?

3              MS. HOLLAND-EDWARDS:  Nothing from plaintiff.

4              THE COURT:  All right.  Thank you, all.  I

5    appreciate your time.  Court is in recess.

6              (Whereupon, the within proceedings concluded at

7    2:02 p.m.)

8

9                  TRANSCRIBER'S CERTIFICATE

10             I certify that the forgoing is a correct

11   transcript, to the best of my knowledge and belief (pursuant

12   to the quality of the recording) from the record of

13   proceeding in the above-entitled matter.

14

15   /s/Brittany Payne                    May 7, 2024

16   Signature of Transcriber             Date

17

18

19

20

21

22

23

24

25