Exhibit 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-1211-DDD-MDB

THE ESTATE OF CRISTO JESUS CANETT,
by and through its personal representative
Elizabeth Naranjo;

Plaintiff,

vs.

WELLPATH, LLC;
SHERIFF JOSEPH ROYBAL, in his official capacity;
ANTHONY LUPO, individually;
MICHELLE SILVA, individually;
MAKAYLA PATTERSON, individually;
JENNENE SCOTT, individually;
Defendants.

---

VIDEOTAPED DEPOSITION OF MICHELLE SILVA JACKSON

(NonConfidential Only Transcript)

February 9, 2024

---

Exhibit 15

Exhibit 25, page 23.
Can we agree that if I ask questions about this job description, this is not in the confidentially designated section?
MR. McLEOD: Yes.
MS. HOLLAND EDWARDS: Okay. And then if I flag -- if I move toward something that is more personal and sensitive --
MR. McLEOD: I'll let you know.
MS. HOLLAND EDWARDS: -- you let me know, and I'll try to also flag it. Okay?
MR. McLEOD: Yes.
Q. (BY MS. HOLLAND EDWARDS) Can you go back to Exhibit 25. And it should on the first -- it should at the top corner have a stamp that says what exhibit number they are.
A. Okay.
Q. And in that exhibit, if you can go to page 23, which is also in the top right.
So Exhibit 25, page 23, is the job description I've been given as your job description at Wellpath. You saw this when you came on at Wellpath, right?
A. Correct.
Q. And it says that your job

responsibilities -- well, first it says the purpose is that you were "responsible for assisting in the delivery of patient care through the nursing process of assessment, planning, implementation, and evaluation."
Do you see that?
A. Yes.
Q. And then it says, "Under the supervision of the RN(s)" -- that your job -- that you'll "direct and guide patient teaching and activities that commensurate with his or her education and demonstrated competencies."
Do you see that?
A. Correct.
Q. What does it mean to "work under the supervision of an RN"?
A. Usually, that would mean there would be an RN on staff and they would be able to delegate what the LPN and the rest of the staff on shift would do.
Q. And not just on staff but on shift, right?
A. On shift, yes.
Q. Like, physically present.
A. Right in the building, yes.

Q. And what is your scope of practice, as you understand it, as an LPN?
A. As an LPN, I've always understood that the LPN is limited to things. So I've always been taught that the LPN is not allowed to do initial assessments. They can assist in assessments after the RN has done the initial assessment, but never the initial assessment. And that's basically the only thing.
And then we can't push meds, like, narcotics and stuff in the hospital. But other than that, their scopes are kind of the same, with just a little bit of limitations.
Q. Is it within your scope, as you understand it, to do a physical nursing assessment on a patient without an RN in the building?
MR. McLEOD: Object to form.
A. Not an initial, no.
Q. (BY MS. HOLLAND EDWARDS) What about -- okay. You know, Mr. Canett came in and there was no RN on while he came in, right?
A. Uh-huh, correct.
Q. And so was there any physical assessment that you could do with him within your scope of practice?

MR. McLEOD: Object to form.
A. Usually not.
Q. (BY MS. HOLLAND EDWARDS) "Usually" meaning, like, within what you were supposed to do, no. Right?
A. Correct.
Q. But at Wellpath, there was not a night RN for a lot of the time that you were working with Wellpath, right?
MR. McLEOD: Object to form.
A. Right.
Q. (BY MS. HOLLAND EDWARDS) Just give him a second to object.
And so you were put in a position frequently where you did have to do that anyway, right?
A. Correct.
Q. Did you ever complain to Wellpath that they were putting you in a bad situation with your licensure by having you do assessments without an RN present?
A. Many times.
Q. Who did you make those complaints to?
A. Usually, it would just be the chain of command, so I would start with our director of

Exhibit 15

nursing.
Q. And who was that in 2022?
A. 2022. I don't remember.
Q. Was it Jacqueline Barnes?
A. That sounds about right.
Q. Let me look at -- and when you went to your director of nursing with concerns that Wellpath was putting you in a dangerous position with respect to your licensure by having you do assessments without the supervision of an RN, what did they say?
MR. WHITNEY: Objection, form. You know, while she's answering, my understanding is one objection is good for all counsel.
MS. HOLLAND EDWARDS: Yes.
A. I don't -- do I respond after?
MR. WHITNEY: That was lawyer speak. Sorry.
Q. (BY MS. HOLLAND EDWARDS) Yes. You respond unless someone tells you not to.
A. Okay.
MR. WHITNEY: Just ignore us.
A. When I made the complaints multiple times, she -- the Wellpath director, I think, was Kesha at the time, would tell her that it was okay for an LPN to work as charge and do the assessments.

Page 34

Q. (BY MS. HOLLAND EDWARDS) Did you agree with that?
A. I did not.
Q. And who is Kesha?
A. Kesha is the regional director for Wellpath for El Paso County.
Q. Do you know what licensure Kesha holds?
A. I do not.
Q. Is it a man or a woman?
A. Female.
Q. Do you know Kesha's last name?
A. Poland, I think.
Q. Poland?
A. I think that's what it was.
Q. And did you ever refuse to work as a charge nurse?
A. Many times.
Q. Tell me about that.
A. Whenever I would complain and not want to take the charge keys from the day shift nurse, they would usually just say, Well, there's no one else coming in and we don't have staff, so . . .
Q. So you basically were in a position to choose no care for the people that were there that night or have to practice outside of your scope?

Page 35

A. Correct.
MR. McLEOD: Objection, form.
MR. WHITNEY: Form.
A. (Deponent nodded head up and down.)
Q. (BY MS. HOLLAND EDWARDS) How often would that happen?
A. Almost the whole time I've been at the jail.
Q. What is the point, as you understand it, to the different scopes of practice for different nurses or different licensures?
A. More education and more, I guess, just more knowledge in in-depth nursing.
Q. It's fundamentally a safety concern for patients, right?
A. Correct.
Q. And so you were aware at the time that Wellpath was requiring you to basically jeopardize patient safety because of their staffing issues; is that fair?
MR. McLEOD: Object to form.
A. Correct.
Q. (BY MS. HOLLAND EDWARDS) And that was persistent day in, day out during your time at Wellpath?

Page 36

MR. WHITNEY: Objection, form.
A. Yes.
Q. (BY MS. HOLLAND EDWARDS) So other than Kesha and your -- I'm trying to find the actual DON to make sure I'm talking about the right DON.
A. I think it was Jacque that was there at the time.
Q. I know I have it, but I -- Nicole Blatnick at some point was the DON also, right?
A. Yes.
Q. Do you have any way to kind of say in time when was one and when was the other?
A. So Nicole -- I want to say she was the one who hired me, and then she left the jail and she came back. So I can't really give a specific time.
Q. Well, given that this was a persistent problem, do you think it's fair to say you had these conversations with each of your DONs?
A. Yes.
Q. And so that would include Ms. Barnes and Ms. Blatnick?
A. Yes.
Q. Were there any other DONs you worked with?
A. After -- after those people, it would

Page 37

Exhibit 15

be Jennifer Armstrong, who is there now, and I've made multiple complaints.
Q. To her as well?
A. Uh-huh.
Q. And what about -- was Alicia Reavis ever the DON?
A. No. That doesn't sound familiar.
Q. And other than Kesha Poland, are you aware of anyone from Wellpath pushing -- being involved in your concerns?
MR. WHITNEY: Objection, form.
A. No.
Q. (BY MS. HOLLAND EDWARDS) Other than your DON, did you talk to your HSA?
A. I did.
Q. And what HSAs do you remember?
A. I want to say Nicole Blatnick stepped down to be an HSA at one point. There was Christine Mohr. And I can't remember anyone else.
Q. Christine Mohr was an HSA at some point?
A. Yes, I believe so.
Q. And did you complain to Christine?
A. I did.
Q. And what about the medical director?

Was there a medical director at Wellpath while you were there?
A. I don't remember.
Q. Often -- so I've had cases against -- well, this jail, under different medical providers. I know that under Armor there was an on-call doctor who was considered -- there were several on-call providers, but there was one that was considered the medical director.
At Wellpath, did you ever have that?
A. I think it would be Dr. Santini who was the medical provider.
Q. George Santini, right?
A. Yes.
Q. Did you ever complain to him about this concern?
A. No.
Q. Was it stressful to work outside of your -- what you understood to be your scope of practice?
A. It was very stressful.
Q. What were you worried about?
A. All of the safety concerns with my license being on the line and just being the charge or the head person, so to say, in that position

during my shift and being responsible for the inmates and the staff and all of the things. All of the responsibilities it came with. It was just a lot.
Q. As I understand it, the charge nurse on a given shift would be who was -- who decided whether the doctor got called?
A. Yes.
Q. And whether someone went to the hospital?
A. Correct.
Q. And whether someone needed a medical clearance?
MR. McLEOD: Form.
A. Usually, the medical clearance would be determined by the intake person. But if there was -- if the inmate was already back and booked into the facility and they had -- they were out in the wards, then yes.
Q. (BY MS. HOLLAND EDWARDS) Did -- it seems like you were always the charge nurse at night; is that right?
A. Yes. For some time, yes.
Q. And in 2022, right?
A. Yes.
Q. Or at least in April 2022, when

Mr. Canett was there?
A. Correct.
Q. Did other LPNs refuse to do it?
MR. WHITNEY: Objection, form.
A. During my shift, the only LPN -- so during my shift it was Anthony Lupo, me, and Christa Valdez, who were the only LPNs in the building. And Christa refused and Anthony was never asked because he was in intake.
Q. (BY MS. HOLLAND EDWARDS) And why did Christa refuse, as you understand it?
MR. WHITNEY: Objection to form and foundation.
Q. (BY MS. HOLLAND EDWARDS) Go ahead.
A. Because of her license.
Q. And did you hear conversations of her refusing to do it with DON or HSAs?
MR. WHITNEY: Objection. Form and foundation.
A. I don't remember.
Q. (BY MS. HOLLAND EDWARDS) How did you know she refused?
MR. WHITNEY: Objection. Form and foundation.
A. She would tell me.

Exhibit 15

Q. (BY MS. HOLLAND EDWARDS) Did you consider doing that too?
MR. WHITNEY: Objection, form.
A. I did many times. She -- she and I would have a conversation -- she had just gotten her LPN when she started working at the jail. And they would ask her, they would ask me, but we would both agree that I was a little bit more experienced. I had a few more years under my belt. And she was not ready.
Q. (BY MS. HOLLAND EDWARDS) So you took one for the team?
MR. WHITNEY: Objection, form.
A. Yes. You could say.
Q. (BY MS. HOLLAND EDWARDS) Were there, at any point while you worked at Wellpath, situations where you felt like not having an RN on at night caused a bad outcome?
MR. WHITNEY: Objection. Form and foundation.
MR. McLEOD: Form.
A. Yes.
Q. (BY MS. HOLLAND EDWARDS) Tell me about that.
MR. WHITNEY: Objection, form.

A. Whenever there was an emergency happening and I just would have rather had the RN to deal with that rather than an LPN.
Q. (BY MS. HOLLAND EDWARDS) So it's fair to say it was a persistent concern of yours that it was creating a safety problem within the jail at night?
MR. WHITNEY: Objection. Form and foundation.
MR. McLEOD: Object to form.
A. Yes.
Q. (BY MS. HOLLAND EDWARDS) Let me show you another part of your personnel file.
MS. HOLLAND EDWARDS: And tell me what you think about this, Rob.
Q. (BY MS. HOLLAND EDWARDS) So I'm going to have so you turn to Exhibit 25, page 5.
MR. McLEOD: Yeah. We're going to designate this as confidential.
MS. HOLLAND EDWARDS: Let me un- -- stop it when we get off of confidential so we don't --
MR. McLEOD: Sure.
MS. HOLLAND EDWARDS: So I'll reserve my objection to that, but I won't make a big speech

about that right now.
(Proceedings continued on page 47, confidential excerpt.)

Exhibit 15

(Proceedings continued from page 47, line 16.)

Q. Did you get paid more for charge nurse?
A. They offered, I believe, it was $5 extra a shift.
Q. A shift?
A. Yes.
Q. And so we could tell from your payroll records any shift you worked charge on because it would be at an increased rate?
A. Correct.

Q. But fair to say, you know, up to and including the time when Mr. Canett was there, you were charge at night almost every shift you were there?
A. Correct.
Q. How many days a week did you work in 2022?
A. 2022, I only did the three.
Q. So who was charge nurse when you weren't there at night?
A. I don't remember.
Q. Also an LPN?
MR. WHITNEY: Objection, form.
A. I don't remember.
Q. (BY MS. HOLLAND EDWARDS) Were you under the impression there was a charge -- there was an RN that was in the building at nights -- on nights when you weren't there?
MR. WHITNEY: Objection. Form and foundation, speculation.
A. I -- I don't know how to answer that. I would assume there would be an RN, but usually, no. When I first started there was an RN. And then they dwindled down, so then I -- I don't know at the time, because on the opposite side of my shift we did hire

RNs. But I don't know if they were working at that time.
Q. (BY MS. HOLLAND EDWARDS) Did you attend staff meetings at Wellpath?
A. I did.
Q. And it was fair to say that it was a frequent, constant source of conversation about trying to hire RNs?
A. Yes.
Q. And so you're aware from your staff meetings that it was -- they didn't have as many RNs as they were supposed to have?
MR. McLEOD: Form.
A. Correct.
MS. HOLLAND EDWARDS: Can we end the confidential part of the transcript? Thank you. And are you okay going back to the end of the discussion about Moreno.
MR. McLEOD: Correct. Yes.
Q. (BY MS. HOLLAND EDWARDS) So while you weren't there on the other nights to know exactly who was there, you knew from your participation at staff meetings that they didn't have the RNs that they needed to cover the night shift?
MR. WHITNEY: Objection. Form and

Exhibit 15

A. Yes.
Q. It says, "The registered nurse is responsible and accountable for direct supervision of the total health care delivery system in his or her assigned unit of facility, in conjunction with the delivery of patient care through the process of collecting health status data, nursing diagnosis goal setting, planning, implementation, and evaluation."
Do you see that?
A. Yes.
Q. And it says at the end of that paragraph "Under the direction" -- well, let me go back.
"Wellpath has taken into consideration the need for RN coverage, dedicated charge, infirmary, intake, history and physical, sick call, and the courthouse."
Do you see where it says that?
A. Yes.
Q. And then it says, "Under the direction of the director of nursing, the Wellpath plan includes RN coverage - 902 hours per week," right?
A. Yes.
Q. A "Minimum of four RNs - onsite 24/7."
Do you see that?

A. Yes.
Q. And that is -- I mean, you're -- it makes you giggle because it's so not what happened, right?
MR. McLEOD: Form.
MR. WHITNEY: Objection, form and foundation.
A. Correct.
Q. (BY MS. HOLLAND EDWARDS) And a "Minimum of one ACLS Certified RN onsite 24/7," right?
A. Correct.
Q. Did you ever work under Wellpath where there were four RNs on site?
A. On my shift, no.
Q. And it was actually the exception to work on a shift where there was even one RN, right?
MR. WHITNEY: Objection, form.
A. Correct.
Q. (BY MS. HOLLAND EDWARDS) And most of the time there were none?
A. Correct.
MR. WHITNEY: Objection, form.
Q. (BY MS. HOLLAND EDWARDS) And then in intake it says, "To ensure timely processing, the staffing plan for El Paso County ensures 24/7

staffing by two registered nurses in intake at all times."
Do you see that?
A. I do.
Q. Did you ever have a shift where there was an RN in intake?
A. Not that I remember.
Q. Under "Sick Calls, Transfers, and Clinic Services," do you see, "The Wellpath staffing plan ensures sufficient staff to manage sick call, transfers, and all clinical services. Sick call is staffed with RNs ten hours a day, seven days per week to ensure compliance with NCCHC standards. LPNs will further support the medical clinic, intake and medical observation areas."
Do you see that?
A. I do.
Q. But on your shifts, the LPN wasn't supporting the medical clinic, it was the medical clinic, right?
MR. McLEOD: Objection, form.
MR. WHITNEY: Objection, form.
A. Correct.
Q. (BY MS. HOLLAND EDWARDS) And if you can turn to page 9 of this exhibit, 9 and 10. So this

was the staffing plan that was proposed by Wellpath for CJC.
Do you see on the night shift what positions -- that they have an RN in charge, an RN in infirmary, an RN in intake, an LPN to do med pass, right?
A. Correct.
Q. A CMA or other QMAP for -- I assume also for med pass, right?
A. Yes.
Q. And a site registered nurse.
Do you see that?
A. Yes.
Q. Does that look anything like what your staffing plan actually was at night?
MR. WHITNEY: Objection, form.
A. No.
Q. (BY MS. HOLLAND EDWARDS) Instead, this -- all three of those registered nurses were replaced by LPNs, right?
A. Correct.
Q. And then the med pass wasn't done by LPNs because LPNs were doing the nursing work, right?
MR. WHITNEY: Objection, form.
A. Correct.

Exhibit 15

A. I do not.
Q. Are there any of the deaths that have happened at Wellpath that you remember any specifics of?
A. No. Just -- there was a lady who had -- I got -- I think she was -- I don't remember. But she was already deceased upon arrival when I got there.
Q. Was it a suicide?
A. No. It was -- I think it was an OD.
Q. Was there a lot of blood there?
A. No.
Q. Were you involved in Savannah Poppell's response?
A. No. I don't know who that is.
Q. Have you had conversations with other medical staff about the number of deaths that were happening at Wellpath?
A. We talked about -- yeah. In the beginning of the year how it was starting to be frequent.
Q. Were staff upset about it?
A. Yes.
Q. Who was upset about it?
A. I can't remember who was all involved.

Page 126

Q. Were you upset about it?
A. I was, yes.
Q. Did you feel like -- that some of the deaths that were happening at the jail were preventable?
MR. WHITNEY: Objection, form, foundation. Speculation.
A. I mean, they all were all different. So some of them were natural causes. I think -- I honestly don't know.
Q. (BY MS. HOLLAND EDWARDS) Were there any that you thought, This shouldn't have happened?
MR. McLEOD: Object to form.
A. I don't -- I don't think so. I don't know.
Q. (BY MS. HOLLAND EDWARDS) How common is it to die of withdrawal in the jail?
MR. WHITNEY: Objection, form and foundation. Speculation.
A. I don't know how common it is, but I know how common it is for withdrawal -- or for overdoses, yeah. I've responded to a few overdoses.
Q. (BY MS. HOLLAND EDWARDS) What type of drug?
A. Fentanyl is the main one.

Page 127

Q. Fentanyl is a hard one.
Well, here, we'll just -- I'll get out the complaints and we can go through and talk about specific deaths in a minute.
Also in this Exhibit 28, I wanted to show you. If you can go to page 10 of Exhibit 28. This is a Position Control Summary we've been given. I don't have the one that covers April so far. But this one goes through the first quarter. So the three months right before Mr. Canett died.
Do you see where it says "Charge RN"?
A. Yes.
Q. And you can see on the day they have 2.1 and that evening there's zero, right?
A. Correct.
Q. And at night -- I guess you can't see this. This is in red in the original, but I should have printed it in color.
So this first one is what's authorized, right? So 2.1 for day, zero for evening, 2.1 for night, right?
A. Correct.
Q. And then when you go to "Assigned," there's 2.675 for day and zero for night, right?
A. Yes.

Page 128

Q. And that's consistent with your experience of having no charge RN, right?
A. Yes.
Q. And while we don't have the paper for it, that continued at least through April of 2022, right?
MR. WHITNEY: Objection to form.
A. Yes.
Q. (BY MS. HOLLAND EDWARDS) And, really, it continued until Wellpath left, right?
MR. WHITNEY: Objection, form.
MR. McLEOD: Form.
A. Yes.
Q. (BY MS. HOLLAND EDWARDS) And you said you got paid $5 more a shift to be charge nurse?
A. Correct.
Q. Was the rest of your pay hourly or per shift?
A. Hourly.
Q. And so how much did you get paid hourly before the $5?
A. It's gone up over the years, so I don't know.
Q. By the end of Wellpath?
A. 33.66.

Page 129

Exhibit 15

MR. WHITNEY: Objection, form.
A. Yes.
Q. (BY MS. HOLLAND EDWARDS) I'm going to read you a couple of paragraphs from our complaint that I wrote down.
Do you know, as an LPN, that if left untreated, ulcers can cause severe internal bleeding?
MR. WHITNEY: Objection. Form and foundation.
A. I think I've read that, yes.
Q. (BY MS. HOLLAND EDWARDS) Do you understand as an LPN -- or did you understand as an LPN in 2022 that symptoms of an ulcer can include burning stomach, abdominal or back pain, and it can spread to the shoulder?
MR. WHITNEY: Objection, form and foundation.
A. Yes.
Q. (BY MS. HOLLAND EDWARDS) Do you understand that nausea and vomiting can be symptoms of an ulcer?
MR. WHITNEY: Objection, form and foundation.
A. Yes.
Q. (BY MS. HOLLAND EDWARDS) Did you

Page 218

understand that sudden and severe abdominal pain that spreads to the back or shoulder can be a very serious medical sign?
A. Yes.
MR. WHITNEY: Objection, form and foundation.
Q. (BY MS. HOLLAND EDWARDS) Do understand that a perforated ulcer is unquestionably a medical emergency?
MR. WHITNEY: Objection, form and foundation.
A. Yes.
Q. (BY MS. HOLLAND EDWARDS) Do you agree that all reasonably trained health care workers understand that the signs and symptoms of an ulcer must be worked up and evaluated by a doctor?
MR. WHITNEY: Objection to form and foundation.
A. I can't tell you what their knowledge is, but I know from what I know.
Q. (BY MS. HOLLAND EDWARDS) You agree with that?
A. Yes.
Q. One of the things that we've done in the lawsuit is alleged patterns of Wellpath that we

Page 219

think are unconstitutional.
Do you agree that Wellpath has consistently understaffed the jail while it -- this jail while it was here?
MR. McLEOD: Form.
MR. WHITNEY: Objection, form and foundation.
A. Yes.
Q. (BY MS. HOLLAND EDWARDS) Do you agree that Wellpath did not have in place proper mechanisms to respond timely to kites?
MR. WHITNEY: Objection, form and foundation.
A. Yes.
Q. (BY MS. HOLLAND EDWARDS) Do you agree that during 2022 Wellpath did not have in place adequate staffing or systems to allow for prompt medical evaluations of complaints?
MR. WHITNEY: Objection, form and foundation.
A. Yes.
Q. (BY MS. HOLLAND EDWARDS) Do you agree that Wellpath had in place a system in El Paso County in 2022 that had people -- required its staff to practice outside of their scope?

Page 220

MR. WHITNEY: Objection, form and foundation.
MR. McLEOD: Form.
A. Can you repeat the question?
Q. (BY MS. HOLLAND EDWARDS) Sure. Do you believe -- do you agree that Wellpath in 2022 had a staffing system in place that routinely required staff to practice outside of their licensure scope?
A. Yes.
MR. WHITNEY: My objection was to both questions. I just didn't reraise it.
MS. HOLLAND EDWARDS: I think that's all I have for you. As I told you before, the other lawyers may ask questions and that may prompt some, but it gets shorter from here.
THE DEPONENT: Okay.

EXAMINATION

BY MR. McLEOD:
Q. Hey, Michelle. I just have a couple of questions for you.
The first question would be: In terms of practicing within your scope, do you defer to the Nursing Practice Act and other Colorado statutes to make those determinations?
A. Yes.

Page 221