```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO


  - - - - - - - - - - - - - - -x
  THE ESTATE OF CRISTO           :
  JESUS CANETT, by and
  through its personal           :
  representative Elizabeth
  Naranjo;                       :
         Plaintiff,              :
     v.                          :
                                     Civil Action No.
  WELLPATH, LLC; SHERIFF         :
  JOSEPH ROYBAL, in his              23-cv-1211-DDD-MDB
  official capacity;             :
  ANTHONY LUPO,
  individually; MICHELLE         :
  SILVA, individually;
  MAKAYLA PATTERSON,             :
  individually; JENNENE
  SCOTT, individually;           :
         Defendants.             :
  - - - - - - - - - - - - - - -x


       Videotaped Deposition of MAKAYLA PATTERSON
                 BETHESDA, MARYLAND
               Tuesday, March 19, 2024
                    10:11 a.m.
  Job No.: 44107
  Pages: 1 - 206
  Reported By: Okeemah S. Henderson, RPR
```

**Makayla Patterson**

Estate of Cristo Jesus Canett v. Wellpath, et al                                              3/19/2024

### Page 22

1  there that there were -- that there was more
2  deaths happening than normal or than expected at
3  the El Paso County Jail.
4      A. Yes.
5      Q. And how did you become aware of that?
6      A. I had heard about the protests and that
7  was probably the main way.
8      Q. What did you think about Wellpath?
9          MR. MCLEOD:  Form.
10     A. I thought it was -- I think they had the
11 right values, and I think the real issue was just
12 the short-staffed.  I think we could have done a
13 lot of really great things for the inmates and the
14 lack of staff made it very difficult.
15 BY MS. HOLLAND EDWARDS:
16     Q. And you don't see that as part of
17 Wellpath's problem?
18         MR. MCLEOD:  Form.
19     A. I do know that they were working to get
20 more staff.  I know I had heard multiple times
21 about interviews and things like that and the
22 people they were interviewing fell through, so I

### Page 23

1  do know they were attempting to fix the issue.
2  BY MS. HOLLAND EDWARDS:
3      Q. But did it get -- it didn't get fixed at
4  any point while you were there?
5      A. There were periods of time that we had the
6  correct amount of staff but people turned over
7  pretty quickly.
8      Q. And what do you use to determine the
9  correct amount of staff?
10     A. There was -- we had a schedule that was
11 typically posted but as far as med pass goes there
12 were suppose to be three med passers.  We had
13 three different carts that were kind of assigned
14 to different wards of the jail.
15        So we had -- again for the majority of the
16 time I was there we had what were called blister
17 packs, so they had the medications in them with
18 the inmate's name on them that was assigned to
19 that inmate.
20        So each of those inmates blister packs and
21 cards of medication were in the specific carts for
22 them.  So there were three carts and supposed to

### Page 24

1  be three med passers that each took a cart to
2  distribute those medications.
3      Q. So when you talk about there were times
4  when had an adequate number of staff, you're
5  talking mainly about at med passers?
6      A. Mainly about med pass.  Typically there
7  were -- I believe there was typically only one
8  intake nurse as well and I think technically there
9  were supposed to be two as well.
10     Q. Did you ever work a night shift where
11 there were four registered nurses on shift?
12     A. Not that I remember.
13     Q. Did you ever work when there was more than
14 one registered nurse?
15     A. Not that I remember.
16     Q. And most of the time there wasn't even
17 one?
18     A. Correct.
19     Q. We'll come -- I have a lot of staffing
20 questions.  But let's -- to finish what you
21 reviewed to get ready for today, did you see any
22 video of Mr. Canett?

### Page 25

1      A. No, ma'am.
2      Q. Did you read any other depositions?
3      A. No, ma'am.
4      Q. Did you read -- the document that we use
5  to file a lawsuit is called the complaint.  Have
6  you ever seen the complaint in this case?
7      A. I don't believe so.
8      Q. Do you remember Mr. Canett?
9      A. A little bit came back to me after reading
10 my notes and things like that and speaking with my
11 attorney.
12     Q. What do you remember about him?
13     A. Really just what I put in my note.  I
14 remember taking the Tylenol Ibuprofen to him, then
15 responding to that code.
16     Q. Can you remember -- without looking at
17 documents, do you have any memory of him in the
18 cell that night when you brought the medicine to
19 him?
20     A. Yes.
21     Q. What -- tell me what you remember about
22 how he seemed?

Olender Reporting                                              (866) 420-4020
A Boutique Litigation Support Firm                   Schedule@OlenderReporting.com

Makayla Patterson
Estate of Cristo Jesus Canett v. Wellpath, et al
3/19/2024

Page 38

1    A. Typically, yes.
2    BY MS. HOLLAND EDWARDS:
3    Q. Did you ever see kites just go completely
4    unanswered?
5    A. I'm unaware of that, not that I know of.
6    Q. Would an inmate say I put in a kite three
7    weeks ago and haven't heard anything?
8    MR. MCLEOD: Form.
9    A. There were times that they were out that
10   long.  I do think they eventually got responded to
11   from what I know, but I don't -- I do know that
12   there were severe delays.
13   BY MS. HOLLAND EDWARDS:
14   Q. Fair to say almost every med pass somebody
15   would say, I've been waiting to be seen.  I
16   haven't been seen?
17   A. I don't remember specifically but I do
18   know that it was an issue.
19   Q. Persistent?
20   A. Yes, ma'am.
21   Q. And the delay in responding to kites was
22   both the paper kites and to electronic kites,

Page 39

1    right?
2    A. We typically use the electric kite system.
3    We were trying to move away from the paper kite.
4    The only time that we were allowed to give paper
5    kites for the inmates to fill out was if they were
6    deaf or weren't able to read or write and in that
7    case we would be able to fill it out for them, so
8    as an accessibility thing or if the kite system
9    was down.
10       So the vast majority of the time we used
11   the electronic kite system.
12   Q. And the kite system would go down from
13   time to time?
14   MR. MCLEOD: Form.
15   A. From what I understood from the inmates.
16   BY MS. HOLLAND EDWARDS:
17   Q. So then they would -- if that happened,
18   they would have to ask for a paper kite?
19   A. Yes, ma'am.
20   Q. And if someone was having trouble walking
21   as an accessibility issue that also could be a
22   time where they could use a paper kite?

Page 40

1    MR. MCLEOD: Object to form.
2    THE COURT REPORTER: That also could be a
3    time --
4    MS. HOLLAND EDWARDS: They would allow them
5    to use a paper kite?
6    MR. MCLEOD: Object to form.
7    A. Typically yes.
8    BY MS. HOLLAND EDWARDS:
9    Q. And the deputies had access to paper kites
10   too, right?
11   MR. MCLEOD: Foundation.
12   A. I don't --
13   MS. JAY: Form and foundation.
14   BY MS. HOLLAND EDWARDS:
15   Q. Okay.  So you would defer to deputy
16   testimony on their access to paper kites?
17   A. Yes.
18   Q. When you talk about vendor staffing, how
19   many -- so on a typical night shift, what do you
20   think the staffing plan called for?
21   A. How many we were supposed to have?
22   Q. Yes.

Page 41

1    A. I don't remember the exact specifics.  I
2    know there was supposed to be one charge nurse,
3    one Chem Dep, which was our chemical dependency
4    program nurse, three med passers and then two
5    people at intake.
6    Q. What was more typical?
7    MR. MCLEOD: Form.
8    A. Typically we had one person in charge
9    nurse, one person Chem Dep, one person at intake
10   and then two med passers.
11   BY MS. HOLLAND EDWARDS:
12   Q. So on a typical shift you were at least
13   two people down?
14   A. Yes, ma'am.
15   Q. From your understanding of the staffing
16   plan which was 1, 2, 4, 7 people?
17   A. Yes.  And like I said, I don't remember
18   the exact specifics, but that was the basics of
19   what I remember.
20   Q. What percentage of the time would you say
21   it was down to the five people?
22   A. I would say probably 75 percent of the

**Makayla Patterson**
Estate of Cristo Jesus Canett v. Wellpath, et al
3/19/2024

## Page 42

1  time.
2  Q. And of those five people the highest
3  licensure would be an LPN?
4  A. Typically, yes.
5  Q. And you think 75 percent is also a fair
6  estimate on that or higher?
7  MR. MCLEOD: Form.
8  A. I don't remember exactly. I would say 75
9  is probably around the right time.
10  BY MS. HOLLAND EDWARDS:
11  Q. What -- can you name the RNs that you
12  worked with on night shift?
13  A. I remember there was Anthony Lupo who was
14  there for a brief period of time that I worked
15  there and then there was Jackie, and I don't
16  remember her last name. She started towards the
17  end of the time that I worked there.
18  Q. Was it Barnes?
19  A. No. She was the, like, the
20  administrative -- there was another Jackie that I
21  don't remember her last name.
22  Q. Okay.

## Page 43

1  A. Those are the only two that I remember
2  right now.
3  Q. Anthony Lupo do you know if he's an LPN?
4  A. I did not know that.
5  Q. You thought he was an RN?
6  A. I did think he was an RN.
7  Q. Okay. And so when you were counting the
8  shifts that you had RNs on, were you thinking Mr.
9  Lupo?
10  A. I believe so, yes.
11  Q. So can you name any RN that was ever on
12  the night shift with you?
13  A. Jackie was. She worked certain days, so
14  typically Michelle, Krista, and I worked -- I
15  don't remember the days of the week, but typically
16  they worked three days a week and I typically
17  worked four and on that fourth day was when Jackie
18  would typically be there because she worked the
19  other half of the week, but I do know that there
20  were nights that she was there with Michelle and
21  Krista and I and the other people as well.
22  Q. Where did you get the impression that

## Page 44

1  Anthony was a RN?
2  A. That must have just been my mistake. I
3  don't -- I don't remember.
4  Q. So before you'd given an estimate of
5  75 percent of the time there wasn't an RN on shift
6  but you also were counting times in that
7  25 percent that had Anthony?
8  A. Yeah.
9  Q. So if you take Anthony out of it, what
10  percentage of the time do you think you had an RN
11  on shift?
12  MR. MCLEOD: Object to form.
13  A. Probably slightly less. I do believe
14  Jackie started working there and was there for a
15  decent amount of shifts once -- I don't remember
16  when she started working there but she also picked
17  up shifts as well.
18  BY MS. HOLLAND EDWARDS:
19  Q. And when she was on shift, she would be
20  the charge nurse, right?
21  A. Yes, ma'am.
22  Q. So did she -- generally was she on

## Page 45

1  different -- it sounded like generally she was on
2  different shifts than the Silva shifts?
3  A. If I'm remembering right, yes. I think
4  there was some overlap but...
5  Q. So we just recently were given time
6  details for people who were on shift and I don't
7  -- I haven't mastered them because I just got
8  them --
9  A. No worries.
10  Q. But the only -- there was a Jacqueline
11  Barnes --
12  A. Okay.
13  Q. -- I see who was on shift sometimes. Do
14  you know if Jackie was a Jacqueline?
15  A. I'm not sure.
16  Q. (Inaudible) J-A. Okay. Well, I'll look
17  at that at a break?
18  A. Okay. No worries.
19  MS. HOLLAND EDWARDS: Let me show you --
20  I'm going to give you an exhibit marked 22. So if
21  you can put that one aside.
22  It's not new. This is previously marked.

12 (Pages 42 to 45)

Makayla Patterson
Estate of Cristo Jesus Canett v. Wellpath, et al
3/19/2024

Page 174

1  [As Read] so you were aware at the time
2  that Wellpath was requiring you to basically
3  jeopardize patient safety because of their
4  staffing issues; is that fair?"  And she answered
5  "Correct."  [As Read] "And that was persistent day
6  in and day out during your time at Wellpath?"  She
7  said, "Yes."  Do you see that?
8      A. Yes.
9      Q. Do you agree with this testimony that
10 Wellpath's staffing put staff in the position to
11 routinely jeopardize patient care?
12     MR. MCLEOD:  Object to form.
13     A. Yes.
14 BY MS. HOLLAND EDWARDS:
15     Q. And they did that -- and that was --
16 happened through delay and response in responding
17 to complaints, right?
18     MR. MCLEOD:  Object to form.
19     A. Yes.
20 BY MS. HOLLAND EDWARDS:
21     Q. Not having time to communicate with each
22 other about what was happening?

Page 175

1      MR. MCLEOD:  Same objection.
2      A. Yes.
3  BY MS. HOLLAND EDWARDS:
4      Q. And overall just being too frazzled to
5  really take the time to focus the way you would
6  want to?
7      MR. MCLEOD:  Object to form.
8      A. Yes.
9      THE COURT REPORTER:  Your answer?
10     A. Yes.
11     THE COURT REPORTER:  If you can just wait
12 for him to object first and then you can answer.
13     THE WITNESS:  Okay.  Sorry.
14 BY MS. HOLLAND EDWARDS:
15     Q. If you can go to page 220 of the
16 deposition.  One of our jobs in this lawsuit is we
17 have to show a pattern or practice by Wellpath in
18 order to have them in the lawsuit.
19     So I asked these questions of Nurse Silva
20 and I want to know if you agree with the answers.
21 I said, [As Read] "Do you agree that Wellpath has
22 consistently understaffed the jail while it was

Page 176

1  there?"  And she said, "Yes".  Do you see that?
2      A. Yes.
3      Q. And you agree with that, right?
4      MR. MCLEOD:  Form.
5      A. Yes.
6  BY MS. HOLLAND EDWARDS:
7      Q. I said, [As Read] "Do you agree that
8  Wellpath did not have in place proper mechanisms
9  to respond to Kites," and she said, "Yes."  Do you
10 see that?
11     A. Yes.
12     Q. And you agree with that?
13     MR. MCLEOD:  Object to form.
14     A. What do you mean by mechanisms?
15 BY MS. HOLLAND EDWARDS:
16     Q. Well, they didn't -- whatever their system
17 was it didn't cause timely response to Kites,
18 right?
19     MR. MCLEOD:  Form.
20     A. Correct.
21 BY MS. HOLLAND EDWARDS:
22     Q. [As Read] "Do you agree during 2022

Page 177

1  Wellpath did not have in place adequate staffing
2  or symptoms to allow for prompt medical
3  evaluations of complaints?  And she said, "Yes",
4  right?
5      A. Yes.
6      Q. And it's not just prompt it didn't -- it
7  didn't have enough staffing to allow timely or
8  like reasonably adequate response to medical
9  complaints, right?
10     MR. MCLEOD:  Form.
11     A. Yes.
12 BY MS. HOLLAND EDWARDS:
13     Q. I asked her, [As read] "Do you agree that
14 Wellpath in 2022 had staffing system in place that
15 routinely required staff to practice outside of
16 their license or scope?"  She said, "Yes."  Do you
17 agree with that?
18     A. Yes.
19     Q. And that means that basically they had a
20 system that routinely required staff to jeopardize
21 patient safety?
22     MR. MCLEOD:  Form.

45 (Pages 174 to 177)

## Page 178

1  A. Correct.
2  BY MS. HOLLAND EDWARDS:
3  Q. Do you agree from what you've seen that
4  that's what happened with Mr. Canett?
5  MR. MCLEOD: Object to form.
6  A. Yes.
7  BY MS. HOLLAND EDWARDS:
8  Q. How do you feel about seeing what happened
9  to Mr. Canett?
10  MR. MCLEOD: Form.
11  A. I think it's awful. I wish I would have
12  known more information on it, and had the
13  information going into it, and I wish that we
14  would have done more for him.
15  BY MS. HOLLAND EDWARDS:
16  Q. If you'd known more of this you would have
17  done what DeLuca did right and advocated until
18  someone paid attention?
19  A. Absolutely.
20  Q. That's because with things we're seeing
21  it's very obvious that this man needed to go to
22  the hospital?

## Page 179

1  A. Absolutely.
2  MR. MCLEOD: Object to form.
3  BY MS. HOLLAND EDWARDS:
4  Q. I'm going to ask about some of the other
5  deaths that happened at El Paso County at -- under
6  Wellpath's watch. And I understand you to have
7  been involved in some of them at least on the
8  response.
9  A. Okay.
10  Q. So do you remember patient Addison Reid?
11  A. I don't remember that name. No.
12  Q. When did you -- did you start in October
13  of 2021 or September?
14  A. I thought it was October. I could be
15  wrong.
16  Q. I think you might have been right before
17  you came. But he was a patient who -- he was a
18  diabetic patient who went into extreme diabetic
19  ketoacidosis and had to go to the hospital where
20  he died 19 days later.
21  And that's -- I mean, it was a known
22  problem at the time that patients weren't able to

## Page 180

1  get their -- even their critical medications
2  timely, right?
3  A. Yes.
4  Q. And lack of insulin -- you know dying from
5  lack of insulin in a jail shouldn't happen, right?
6  A. Correct.
7  Q. And it's part of this same pattern that
8  you've been describing of staffing affecting
9  medication administration and timely care?
10  A. Yes.
11  Q. In February, 2022 was when Shawn Williams
12  died.
13  A. Okay.
14  Q. He was naked and emaciated and not
15  responding to verbal commands.
16  A. Okay.
17  Q. And deputies called the charge nurse and
18  told them that he hadn't drank or eaten much for
19  days which the charge nurse said was a sort of
20  psychosis. Do you remember Mr. Williams?
21  MR. MCLEOD: Form.
22  A. Very vaguely.

## Page 181

1  BY MS. HOLLAND EDWARDS:
2  Q. In a deputy report a deputy noted, that
3  [As Read] "Multiple medical staff walked over and
4  met Williams. He made sound of distress while he
5  laid on the floor.
6  Deputies were returned him to his
7  wheelchair and when deputies asked about him they
8  said, just so you know he's psychotic."
9  Do you remember hearing complaints from
10  the deputies that the nurses were walking over a
11  person passed out on the floor?
12  A. Yes.
13  Q. Which deputies told you that?
14  A. I don't remember.
15  Q. That's a pretty upsetting report, right?
16  A. Yes.
17  Q. Were people in the staff upset at the time
18  about it?
19  A. Medical staff?
20  Q. Yes.
21  A. Like upset that he was not doing well or
22  upset that people were saying that.